BAKER, MANOCK & JENSEN
A Professional Corporation
Robert D. Wilkinson   #100478
Fig Garden Financial Center
5260 North Palm Avenue, Fourth Floor
Fresno, California 93704-2209
(559) 432-5400
(559) 432-5620 (facsimile)

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Randolph D. Moss     (admitted *pro hac vice*)
Brian M. Boynton     #222193
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
(202) 663-6363 (facsimile)

Attorneys for Plaintiff THE CALIFORNIA
TABLE GRAPE COMMISSION

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE CALIFORNIA TABLE GRAPE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RB SANDRINI, INC., RB SANDRINI FARMS, L.P. d/b/a/ RB SANDRINI FARMS, and RICHARD B. SANDRINI,<br><br>Defendants. | CASE NO. 1:06-cv-00842-OWW-TAG<br><br>**DECLARATION OF ROSS JONES IN SUPPORT OF THE CALIFORNIA TABLE GRAPE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, Ross Jones, declare as follows:

1.    I am currently employed by the California Table Grape Commission ("Commission") as the Vice President of Research.  I submit this declaration in support of the Commission's Motion for Partial Summary Judgment in the above-referenced matter.  I make this declaration on my own personal knowledge, and if called to testify, I would and could competently testify as set forth below.

2.      Before I started at the Commission, I worked at the University of California's largest off-campus agricultural research facility, the Kearney Agricultural Center, as a laboratory/field technician. I held this position approximately six years, working for a number of different research scientists, including Dr. Kent Daane, a specialist in biological control of insect pests. In April 1997, the Commission hired me as the Director of Research, and in 2004, my title was changed to Vice President of Research.

3.      As the Vice President of Research, I oversee the Commission's Viticulture, Technical Issues, and Patenting/Licensing programs. These programs involve, among other things, directing and funding viticulture research performed by scientists from a variety of research institutions, including the University of California, U.S. Department of Agriculture ("USDA"), and California State University. As part of my duties at the Commission, I regularly review and coordinate Commission production research, including research about cultural practices and post-harvest techniques related to growing, harvesting, short and long-term storage, volume yield, handling, and fruit quality. My duties also include directing and implementing the Commission's new-variety patenting and licensing program.

**The Commission's Patenting and Licensing Program**

4.      The Commission has worked with the USDA since 1981 to develop new varieties of table grapes. The purpose of the Commission's patenting and licensing program is to create new world-class grape varieties and then patent them in order to control their distribution and maintain their quality, thereby benefiting the California table grape industry as a whole. The Commission uses the revenue from the patenting and licensing program (in addition to grower assessments) to fund the costs of the program.

5.      One of the varieties developed and patented as part of these joint efforts is the Autumn King variety at issue in this case. The California table grape industry has sought for decades a late-harvest, large, green seedless grape that can be shipped from the fields (rather than from cold storage) from late September to early December. Autumn King is that variety and is the subject of U.S. Plant Patent No. PP16,284 ("the '284 patent").

6. The Commission has sublicensed its right to grow and propagate the Autumn King variety described in the '284 patent to three public nurseries. Each sublicensed nursery must be a participant in a state-approved grapevine registration and certification program and agree to propagate and distribute only state-certified plant material free of known viruses. The nurseries are then authorized to sell the Autumn King vines to growers who execute license agreements that require them to refrain from propagating the vines (*i.e.*, multiplying the vines by breeding or grafting) or distributing the vines to third parties. The Commission receives a royalty on each Autumn King vine sold by a licensed nursery, and a portion of this royalty is paid to the USDA. The Commission also has sought to control the unauthorized propagation of Autumn King vines internationally by filing for plant variety protection and/or plant breeders' rights in ten foreign countries.

**Obtaining a New Variety Before Competitors Is Advantageous**

7. In order to learn how to grow new varieties of grapes successfully and how to grow existing varieties more efficiently and effectively, table grape growers engage in ongoing experimentation and evaluation as a regular part of daily operations. For example, growers monitor the effect of changes in production and harvest practices on per-vine/per-acre yields, harvest timing, fruit quality, and storage and shipping quality. Most growers (or their employees) keep logs/records of weather, production techniques, and yields for year-to-year comparison purposes. It is standard practice in the table grape industry for growers to modify substantially their production and post-harvest practices for a newly acquired variety in order to learn how to grow and handle it so as to produce the best quality fruit.

8. Because Autumn King was only recently released to the industry, there is a substantial amount of information not yet known about how best to grow, handle, store and ship this variety. Before Autumn King's release as a USDA patent-pending variety, it was grown on only a small number of vines at the USDA research center, not under commercial conditions. As a result, there is very little known about how to grow it successfully at the commercial farm level.

9. Any grower who produced, harvested, long-term cold-stored, transported, and marketed Autumn King table grapes before other growers would obtain a significant advantage over

other growers who are not yet able to grow the variety. The learning process for producing, harvesting, long-term cold storing, transporting, and marketing grapes continues over several years, with each successive season providing a grower additional knowledge about the best techniques to utilize.

10. A grower who produces a new variety will, for example, learn over time how to grow that variety efficiently on that grower's particular farm. The quality of fruit of any given table grape variety varies from grower to grower and from field to field (depending on factors such as soil type, trellis type, rootstock, and production practices). A grower who has two or more years' advantage in producing and storing a variety and in tailoring his production techniques to the particular growing conditions in his vineyards will very likely be able to produce a superior product to competitors. That increase in quality will result in a price premium for the advantaged grower and could well create a negative quality perception for the other growers.

11. A grower utilizing a new variety also will gain important information about costs. Production costs, which are a critical competitive element for table grape growers, vary significantly from variety to variety based on the innate characteristics of the variety. Any grower with the opportunity to grow, harvest, long-term cold store, and transport Autumn King is learning about the costs of producing the new variety. This could provide a grower with knowledge about whether to continue growing other varieties that compete with Autumn King. This knowledge provides a competitive advantage.

12. The nurseries authorized to sell the Autumn King variety began selling the variety in 2005 but sold only immature potted plants, not mature "wood" that could be grafted onto existing rootstock. If a grower purchased such immature Autumn King vines from an authorized nursery in 2005 and grew them using standard industry practices, they likely will not begin producing marketable volumes of fruit until 2007 or 2008. Mr. Sandrini – who has admitted obtaining and grafting mature wood as early as 2004 – has at least a two-year jump on such authorized growers. Furthermore, if Mr. Sandrini were allowed to continue to produce Autumn King grapes, he would continue to maintain an advantage over authorized growers in terms of knowledge and experience with the variety.

**Sandrini's Vineyards Containing Autumn King**

13. On February 10, 2006, I went with Commission Vice President Jim Howard to meet with Richard Sandrini at his office in Delano. After meeting at his office, we all drove out to his vineyards. At this time of year, the vines were dormant and showed no green growth. Mr. Sandrini identified to us specifically where he had planted Autumn King. He identified four vineyards – two vineyards in which he said he had first planted Autumn King and that had produced fruit in 2005, and two vineyards in which he said he had planted Autumn King later and that were expected to produce fruit in 2006 and 2007. He also noted to us that he needed to do more replanting of Autumn King in the spring in order to replace dead vines. Based on my viewing of the vineyards, I estimated that Mr. Sandrini had approximately 53 acres of Autumn King vines.

14. After the visit, I called Mr. Sandrini on February 14, 2006 to ask whether he had grown his Autumn King from immature plants or had grafted the material onto existing rootstock. He told me all of the Autumn King material had been grafted onto rootstock.

15. With Mr. Sandrini's permission, I returned to Mr. Sandrini's vineyards on April 10, 2006 to take a sample of the vines he had showed us in order to verify with absolute certainty that they were Autumn King. I had previously collected plant material for DNA testing on numerous occasions, and prior to the meeting with Mr. Sandrini, I contacted Gerald Dangl at the University of California's Foundation Plant Services ("FPS") in Davis. Mr. Dangl provided me a DNA sample collection kit and instructions regarding how to collect samples for genetic identification of grape varieties. The kit contained sample envelopes, blotting paper, chemicals to preserve the samples, and "Ziplock" bags. On April 10, I went to the Sandrini vineyards with Mr. Sandrini and Jim Howard. At this time of year, the vines did bear small green leaves, and I collected four sets of leaf samples – one sample from a single vine in each of the four vineyards in which Mr. Sandrini had indicated that he had planted Autumn King. I placed each sample between two sheets of blotting paper, which I then placed in an envelope. I labeled the four envelopes "4/10/06 Vineyard 1 R12 V5," "4/10/06 Vineyard 2 R16 V17," "4/10/06 Vineyard 3 R3 V1," and "4/10/06 Vineyard 4 R15 V14." I placed silica gel packets in the envelopes and put the envelopes into a Ziplock bag along with Drierite crystals, according to the instructions provided by Mr. Dangl. I then returned to the

1 Commission's office, where I personally supervised the packaging of the Ziplock bags for delivery to FPS the next day via United Parcel Service.

16. On May 16, 2006, I received a written report from FPS stating that its DNA testing had confirmed that three of the four sets of leaf samples were the patented Autumn King variety. A copy of the FPS report is attached as Exhibit 6 to the Declaration of Gerald S. Dangl (CTGC 01913).

17. On September 12, 2006, I returned to Mr. Sandrini's vineyards to conduct a field audit to verify Mr. Sandrini's compliance with his stipulation (entered into on July 14, 2006) not to harvest or sell his Autumn King grapes. I took a series of photographs of the Autumn King vineyards and grapes. True and correct copies of those photographs are attached to this declaration as **Exhibit 1** (CTGC 05069-05167). As shown in the photographs, the vines were then full of fruit, which I could identify as Autumn King. I also noticed various indications that the vineyards had been managed and maintained to some degree during the growing season. Among other things, I noticed that there had been some thinning of shoots, thinning of grape clusters, leaf removal, and pruning of the canopy. I also noticed furrow irrigation (*i.e.*, the use of small, parallel channels to carry water to the vines) and tractor tire marks in the vineyards.

18. After the Commission received information in 2006 that Lawrence Ludy might also be growing Autumn King, on November 10, 2006, I drove along the public roads bordering Lawrence Ludy's vineyards near Wasco, California. When I looked at the rows of vines that were viewable from the public roads, I was unable to determine what specific grape varieties were being grown and could not see any indication that Ludy's vineyards contained Autumn King. Later, on December 7, 2006, I visited Ludy's farm with his permission. He showed me the sections of his vineyards where he said that he had planted a late-harvest green seedless grape that he called "Late White." These sections were on the interior of the farms and not visible from public vantage points surrounding the farms.

1  I declare under penalty of perjury that the foregoing is true and correct.

2

3  Executed on March **30**, 2007.                    _____
                                                      Ross Jones