BAKER, MANOCK & JENSEN
A Professional Corporation
Robert D. Wilkinson  #100478
Fig Garden Financial Center
5260 North Palm Avenue, Fourth Floor
Fresno, California 93704-2209
(559) 432-5400
(559) 432-5620 (facsimile)

WILMER CUTLER PICKERING
    HALE AND DORR LLP
Randolph D. Moss      (admitted *pro hac vice*)
Brian M. Boynton        #222193
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
(202) 663-6363 (facsimile)

Attorneys for Plaintiff THE CALIFORNIA
TABLE GRAPE COMMISSION

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA TABLE GRAPE COMMISSION, | CASE NO. 1:06-cv-00842-OWW-TAG |
| Plaintiff, | **DECLARATION OF KATHLEEN NAVE IN SUPPORT OF THE CALIFORNIA TABLE GRAPE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| RB SANDRINI, INC., RB SANDRINI FARMS, L.P. d/b/a/ RB SANDRINI FARMS, and RICHARD B. SANDRINI, | |
| Defendants. | |

I, Kathleen Nave, declare as follows:

1.      I am the President of the California Table Grape Commission ("Commission").  I submit this declaration in support of the Commission's Motion for Partial Summary Judgment in the above-referenced matter.  I make this declaration on my own personal knowledge, and if called to testify, I would and could competently testify as set forth below.

2.      I have served as the President of the Commission since January 1999.  From 1996 to 1999, I served as the Commission's Executive Vice President.  Prior to assuming that position, I

1    was, at various points in time, the Commission's Vice President of Communications, Director of

2    Communications, and Director of Consumer Affairs.  I have been employed with the Commission

3    continuously since 1987.

4          3.      The Commission is a government corporation of the State of California created by the

5    Ketchum Act, Cal. Food and Agric. Code §§ 65500 *et seq*.  The Commission's purposes include

6    maintaining and expanding demand for California table grapes worldwide and preventing economic

7    waste of the agricultural wealth of the State of California.  To advance these purposes, the

8    Legislature has granted the Commission authority to engage in a broad range of demand-generating

9    activities.

10        4.      The Commission enables California table grape growers to pool their resources

11    through a governmental entity that acts for the collective benefit of the industry.  The Commission

12    works to advance the interests of the California table grape industry as a whole.  It has a

13    responsibility to all growers to act in a fair and even-handed manner and takes that responsibility

14    very seriously.  The Commission would never favor one grower at the expense of other California

15    growers or take steps to offer one grower a benefit not made available to other California growers on

16    an equal basis.

### The Commission's Patenting and Licensing Program

18        5.      One way in which the Commission maintains and expands demand for California

19    table grapes is by promoting the development, patenting, and equitable distribution of new varieties

20    of grapes that improve on existing varieties.  The Commission works in close partnership with the

21    United States Department of Agriculture ("USDA") and funds approximately one-third of the

22    USDA's table grape breeding program.  Between 1990 and 2006, California table grape growers

23    contributed a total of more than $1.1 million to the program through their assessments paid to the

24    Commission.

25        6.      Since the Commission began funding the USDA's breeding program in 1981, the

26    program has developed 13 new varieties of grapes that are currently being marketed.  The top

27    variety by volume shipped out of California today is Crimson Seedless, which was developed by the

28    USDA with co-funding from the Commission.  In the past, the Commission also provided funding

DECL. OF KATHLEEN NAVE

1    for the University of California's breeding program.  Together, the varieties co-funded by growers

2    through the Commission account for approximately 45% of all California table grapes shipped.

3        7.    The development and protection of new varieties is important to the success of the

4    California table grape industry.  California table grape growers face a number of substantial

5    economic hurdles and intense competitive pressures from foreign growers.  The California table

6    grape industry has remained competitive in the face of these pressures through innovation,

7    particularly in the development of new varieties with improved characteristics (*e.g.*, seedlessness,

8    advantageous harvest timing, disease resistance, higher yield, post-harvest handling, etc.).  Such

9    efforts are critical to maintaining the long-term health of the industry.

10        8.    The California table grape industry invests a considerable amount of time, effort, and

11    resources in support of the USDA's breeding program.  In addition to the direct financial support

12    provided through the Commission, growers dedicate countless hours and lend their substantial

13    expertise to assisting the breeding program.  For example, the growers who serve on the

14    Commission's Research Committee routinely meet with representatives from the USDA to provide

15    input on the direction of the USDA's breeding program.  Along with other growers who attend the

16    meetings, the Research Committee members help to identify the characteristics of new varieties that

17    would be most helpful to the industry, to select among competing priorities, and to provide feedback

18    to the USDA on experimental selections.  The willingness of growers to give so freely of their time

19    and expertise is important to the success of the breeding program

20        9.    The patenting and licensing of new varieties helps to combat a substantial free-rider

21    problem faced by the USDA's breeding program.  California growers contribute to the development

22    of new varieties through the assessments they pay to the Commission and their federal tax dollars.

23    Without patent protection, however, once those varieties are released, they can make their way

24    overseas, and foreign growers (who did not contribute to their development) are free to use them.

25    As a result, California growers can find themselves subsidizing the operations of their foreign

26    competitors who free-ride on the California industry's effort and investment.  The patenting and

27    licensing of new varieties will allow the collection of royalties from foreign growers.  The collection

28

DECL. OF KATHLEEN NAVE

1  of these royalties, along with royalties collected from domestic nurseries, will, among other things,

2  offset the program's costs.

3      10.    The problem of foreign grape growers exploiting U.S. grape-breeding innovations is

4  hardly hypothetical.  The California table grape industry has learned from experience about the

5  problems resulting from the uncontrolled release of new varieties.  In the 1970s, for example, the

6  USDA developed the Flame Seedless grape and publicly released it to both domestic and foreign

7  growers.  Flame Seedless grapes were soon planted in Chile, and the early harvest of those grapes in

8  Chile put them on the market in time to compete with California's late-season varieties.  The effect

9  on the California table grape industry was devastating, particularly on California growers of the late-

10  season Emperor grape.  In 1982, California grew more than 10.9 million boxes of Emperor grapes

11  and exported nearly 3 million of those boxes.  By 1985, under pressure from Southern Hemisphere

12  exports of Flame Seedless grapes, Emperor production in California was down to 5 million boxes.

13  By 2004, California production had declined to slightly more than 40,000 boxes.  The South

14  American production of Flame Seedless grapes had knocked California out of the late-season

15  marketing window.  It was only with the arrival of other USDA-bred late-harvest grape varieties that

16  California growers began to recover some of the late-season market.  The climb back has been long

17  and difficult and is still a work in progress.

18      11.    The history of the uncontrolled release of the Crimson Seedless variety in 1989

19  shows a similar pattern.  The Crimson Seedless is a large, crisp red seedless grape that harvests late

20  in California.  It was specifically bred by the USDA to help California growers regain the late

21  market they lost to Chile.  Today the California industry produces more Crimson Seedless grapes

22  than any other variety of table grape.  As with Flame Seedless, however, Crimson Seedless quickly

23  made its way to Chile, where growers who did not contribute to its development began to use it to

24  compete against U.S. growers.  Late-season Crimson Seedless grapes from Chile are still in the

25  market as late as May and weaken demand for early-season grapes grown in California.

26      12.    The latest example of foreign free-riding on U.S. breeding efforts is China.  The Red

27  Globe is a large, seeded red grape that was developed and patented by the University of California.

28  By 2004, production of Red Globe in California had risen to over 14 million boxes, and Red Globes

DECL. OF KATHLEEN NAVE

1    are the dominant grape variety exported to China, which is one of California's largest export

2    markets.  The patent on the Red Globe, however, has not been effectively enforced, and in recent

3    years, China has begun planting enormous acreage of Red Globes.  By the end of 2004, China

4    produced a volume of 36 million boxes.  By 2005, China had planted over 104,000 acres of Red

5    Globe alone.  By way of comparison, in that same year, California had only approximately 110,000

6    acres for all of the more than sixty varieties produced in the state.  China has also begun to export

7    Red Globe grapes to other Asian countries and is beginning to take market share away from

8    California growers.

9        13.    In addition to preventing such free-riding by foreign growers, the Commission's

10   patenting and licensing program protects the quality and integrity of new varieties.  For example,

11   growers who sign the domestic grower license agreement for the Autumn King variety commit

12   themselves to maintaining a certain standard of quality for the fruit they sell.  The program also

13   allows the Commission to ensure that patented varieties sold in the United States are free of known

14   viruses and sold by nurseries that participate in the California Grapevine Registration &

15   Certification Program.  Protecting a variety's quality and reputation is crucial to maintaining demand

16   for the variety by retailers.

17       14.    The USDA did not patent new table grape varieties until relatively recently.  In the

18   late 1990s, California table grape growers increasingly began to recognize that they were investing

19   substantial amounts of money, time, and effort in the development of new varieties only to have

20   their prices undercut by competitors who did not contribute to the creation of those varieties.  In

21   1999, the Commission contacted the Office of Technology Transfer within the Agricultural

22   Research Service at the USDA to encourage the USDA to patent grape varieties developed with

23   Commission funding.  In 2000, the USDA orally agreed to consider patenting future new varieties.

24   The USDA, however, indicated that it wanted to work with just one licensee—either the

25   Commission or another industry umbrella organization.

26       15.    On August 6, 2001, the Commission signed a Memorandum of Understanding with

27   the USDA, establishing a framework for cooperation between the USDA and the Commission to

28   develop and patent new table grape varieties.  A true and correct copy of the Memorandum of

DECL. OF KATHLEEN NAVE

1   Understanding is attached as **Exhibit 1** (CTGC 01331-01334).  The USDA and Commission agreed

2   that obtaining intellectual property protection for the USDA's new table grape varieties would often

3   be in the best interest of American table grape producers.  Exhibit 1 at 2.  The parties also agreed

4   that as the USDA developed and decided to patent new varieties, the Commission would apply to

5   become the licensee, and if it became the licensee, would then administer the rights to the new

6   varieties and make them available to growers in an equitable and even-handed manner.

7        16.    In my experience, it generally takes the USDA at least ten years of careful study to

8   advance from the creation of a new experimental selection to the decision to release that selection as

9   a new variety.  Along the way, the USDA must eliminate thousands of false starts and experimental

10  selections that do not improve on existing varieties.  Typically, after an experimental selection has

11  been under development for a number of years, the USDA enlists the help of the Commission and

12  other growers to sample and provide feedback on the selection.  It then typically takes at least

13  several more growing seasons of careful study to determine the characteristics of an experimental

14  selection and whether the selection has sufficient promise to be patented and released.  Because

15  experimental selections are living things subject to disease, weather conditions, and a host of other

16  unpredictable variables, it is important to study them carefully before patenting and release.

17  Premature release of a variety could be economically disastrous for the California industry if it turns

18  out that the variety is susceptible to an unforeseen problem—for instance, if it does not hold up well

19  under standard fumigation and cold storage practices.

20       **The Development and Patenting of the Autumn King Variety**

21       17.    The California table grape industry has long sought a green seedless grape that could

22  be harvested late in the season and therefore extend the California growing season for green seedless

23  grapes into October and November.  The California-grown variety of green seedless grapes most

24  widely available to consumers in October and November is currently Thompson Seedless.  In the

25  San Joaquin Valley, however, Thompson Seedless grapes are harvested in mid-summer through

26  early fall.  To extend their supply of green seedless grapes into the "late market," growers delay

27  harvesting their highest quality Thompson Seedless as long as possible and then place them in cold

28  storage for sale in the fall.

DECL. OF KATHLEEN NAVE

18.    The USDA developed the Autumn King variety (with financial assistance and guidance from the Commission and other growers) in order to fill this long-recognized need of the California industry for a late, green seedless grape.  Autumn King grapes ripen later than other varieties of green seedless grapes grown in California—on average, eight weeks after Thompson Seedless.  Autumn King grapes thus give California growers a new product to sell fresh out of the field from late September through early December and allow growers to extend their cold storage supplies of green seedless ever further into the late market.  In addition to their late maturity, Autumn King grapes are characterized by their pale green fruit color, cylindrical to ovoid fruit shape, large berry size, firm flesh texture, medium thick skin, neutral sweet flavor, and medium to tight clusters.

19.    On September 28, 2004, Dr. David Ramming, director of the USDA's grape breeding program, and his assistant, Ronald Tarailo, filed an application for a plant patent on the Autumn King variety.  On February 21, 2006, Ramming and Tarailo were issued U.S. Patent No. PP16,284, entitled "Grapevine Denominated Autumn King" ("the '284 patent").  A true and correct copy of the '284 patent is attached as **Exhibit 2** (CTGC 01876-01881).  The United States of America, as represented by the Secretary of Agriculture, owns the '284 patent by assignment.  A true and correct copy of the assignment agreement is attached as **Exhibit 3** (CTGC 00477)

20.    The Commission is the exclusive licensee of the '284 patent pursuant to a License Agreement fully executed on June 27, 2005.  A true and correct copy of the License Agreement is attached as **Exhibit 4** (CTGC 00732-00741).  Under the License Agreement, the Commission is obligated to offer Autumn King plant material for sale to growers either directly or through sublicensees, and the Commission must pay 40% of collected royalties back to the USDA.  The program allows USDA to retain control of its intellectual property and ensures that the USDA and the California table grape industry will receive some return on their investment of money, time, and effort in the breeding of the new varieties.  As the exclusive licensee for the new varieties, the Commission is also charged with applying for intellectual property protection abroad, setting the terms on which the new varieties are made available abroad, and enforcing foreign intellectual

DECL. OF KATHLEEN NAVE

1  property rights obtained.  The Commission has filed for plant variety protection and/or plant

2  breeders' rights in a number of key international markets.

3                          **The Autumn King Licensing Program**

4          21.     The Commission has chosen to make Autumn King plant material available to

5  domestic growers through sublicensed nurseries.  This is the only way that growers are authorized to

6  obtain the Autumn King variety.  The Commission has built its relationships with nurseries over a

7  number of years.  In 2004, the Commission licensed three nurseries to distribute Sweet Scarlet, the

8  first variety to be released under the Commission's patenting and licensing program.  In December

9  2004, it solicited sublicense applications from nurseries for the Autumn King and Scarlet Royal

10  varieties.  A true and correct copy of the memo and criteria sheet sent to nurseries in December 2004

11  is attached as **Exhibit 5** (CTGC 00486-00490).

12         22.     Three nurseries signed sublicense agreements and started receiving Autumn King

13  plant material in 2005 in order to increase the supply in advance of the variety's later official release

14  to growers.  True and correct copies of the Domestic Nursery License Agreements for the three

15  nurseries (Sunridge Nurseries, Vintage Nurseries, and Casa Cristal Nursery) are attached as **Exhibit**

16  **6** (CTGC 00496-00519, 00522-00533), and true and correct copies of the Material Transfer

17  Agreements are attached as **Exhibit 7** (CTGC 00548-00556).

18         23.     Each sublicensed nursery is required to participate in a state-approved grapevine

19  registration and certification program and to agree to propagate and distribute only state-certified

20  plant material free of known viruses.  This requirement ensures that the newly developed vines are

21  propagated free of known viruses and that the resulting fruit is of top quality.  The nurseries are not

22  limited in the amount of the plant material that they produce.  The nurseries must, however, pay the

23  Commission a $5000 annual license fee plus a royalty of $1 per vine.

24         24.     Before a grower may purchase Autumn King plant material from a nursery, it must

25  execute a license agreement requiring the grower not to self-propagate the vines (*i.e.*, breed or

26  otherwise multiply the vines) or distribute the vines to third parties.  A true and correct copy of the

27  Domestic Grower License Agreement is attached as **Exhibit 8** (CTCG 00570-00572).

28

DECL. OF KATHLEEN NAVE

25.     In the fiscal year ending on April 30, 2006, the three sublicensed nurseries sold 158,087 units of Autumn King.  Between April 30, 2006 and February 2007, an additional 330,000 units of Autumn King were ordered.

26.     Sublicensed nurseries incur substantial upfront expenses to plant a new variety and prepare it for release.  The willingness of nurseries to continue to participate in the Commission's patenting and licensing program depends on their ability to recoup this investment through authorized sales of the variety, including repeat sales to growers who are forbidden from self-propagating and must obtain additional plant material through licensed nurseries.  The Commission lacks the resources, facilities, and expertise necessary to prepare new varieties for widespread release to growers.  Without the cooperation and participation of nurseries, the Commission would not be able to distribute new varieties to growers in the broad and equitable manner that it does under the patenting and licensing program.

27.     Like nurseries, growers are willing to incur the expense of purchasing plant material and cultivating that material only when they expect to recoup their investment.  If growers believe that other growers are obtaining plant material through improper channels, it will reduce their willingness to buy patented plant material from licensed nurseries.  Growers do not want to pay to get a new variety through authorized nurseries only to find themselves undercut in the marketplace by growers who did not incur the same costs.

**Communications to Growers about the Patenting and Licensing Program**

28.     The Commission repeatedly communicated to California growers and shippers that the USDA intended to begin patenting new table grape varieties and that the distribution of those varieties was going to be controlled via the patenting and licensing program.

29.     The potential for patenting new varieties was discussed at open Commission meetings as early as 1998 and continuing through the 2000-2001 time period when the Commission and the USDA ultimately agreed to cooperate on a patenting and licensing program.

30.     On August 22, 2001, I again explained the patenting program at a meeting of grape growers.  The purpose of the meeting was to ask growers to view and provide feedback on experimental varieties in a controlled setting.  At the meeting, I discussed the patenting and licensing

DECL. OF KATHLEEN NAVE

1   program because, earlier in the month, the Commission had signed the Memorandum of

2   Understanding with the USDA and the evaluation meeting was the first to be held indoors.  A

3   number of growers asked me why the meeting was being held indoors.  I explained to them and

4   made an announcement to the entire group in attendance that the new varieties on display were

5   subject to patenting and licensing under the Commission's agreement with the USDA.  I explained

6   that the meeting was being held indoors to increase security because the varieties were part of the

7   patenting and licensing program.  Autumn King, which was then known as C67-120, was one of the

8   varieties on display.  A true and correct copy of the notice for meeting that went to all growers and

9   shippers on August 13, 2001 is attached as **Exhibit 9** (CTGC 01849).  A true and correct copy of the

10  minutes from the meeting is attached as **Exhibit 10** (CTGC 01850-01852).

11      31.     Jim Ludy and Lawrence Ludy attended the August 22, 2001 meeting.  A true and

12  correct copy of a sign-in sheet for the meeting is attached as **Exhibit 11** (CTGC 05022-05023).  Not

13  all attendees are listed, but the sheet shows the signatures of Jim and Larry Ludy.  True and correct

14  copies of photos from the meeting are attached as **Exhibit 12** (CTGC 01854-01858).  CTGC 01857

15  shows Jim Ludy in the center with the sunglasses in his pocket and Larry Ludy to his right in the

16  checkered shirt.  CTGC 01858 shows Larry Ludy on the far left of the picture wearing a baseball

17  cap.

18      32.     I remember speaking with Jim Ludy at the end of the meeting.  He apparently had

19  asked one of the USDA employees whether he could see the grapes in the vineyard and had been

20  told that the Commission would not allow it.  He asked me whether the growers were really going to

21  be prevented from seeing the new varieties in the vineyard.  I explained that the USDA employee

22  was correct and that the security precautions were being taken as part of the plan to patent

23  experimental varieties.  It was at this time that the USDA and Commission took a number of steps to

24  further enhance security.  Growers were prohibited from taking pictures of plant material, and the

25  USDA's Dr. Ramming limited the information he made public regarding the new varieties.  The

26  name of the Autumn King variety was also changed from C67-120 to C10 so that the name no

27  longer referred to its location at the USDA facility.  The minutes from a September 2002

28

DECL. OF KATHLEEN NAVE

1    Commission Executive Committee meeting, a true and correct copy of which is attached as **Exhibit**

2    **13** (CTGC 00056-00060), summarize some of the increased security measures that were taken.

3           33.     The patenting program was again discussed with growers at a new variety evaluation

4    meeting on August 28, 2002.  I specifically discussed, at the beginning of the meeting, the necessity

5    of maintaining security for the experimental varieties, which at this meeting again included Autumn

6    King (now identified as C10).  A true and correct copy of the agenda from the meeting is attached as

7    **Exhibit 14** (CTGC 03005).  The sign-in sheet from the meeting does not list all of the attendees, but

8    does show that Jim Ludy was present.  A true and correct copy of the sign-in sheet is attached as

9    **Exhibit 15** (CTGC 03688-03689).  A true and correct copy of the evaluation sheet that Jim Ludy has

10   said he turned in at the meeting is attached as **Exhibit 16** (CTGC 03695).

11          34.     The patenting and licensing program was also discussed at industry meetings, such as

12   the San Joaquin Valley Table Grape Seminar on February 26, 2003, at which I made a presentation

13   regarding the program.  The program also was described in the Grape Research Report (Volume 15),

14   which the Commission sent to all California growers in the summer of 2003.  A true and copy of that

15   report is attached as **Exhibit 17** (CTGC 01030).  I again described the program (including the

16   Commission's intent to strictly enforce any patents) in a memorandum sent to all California growers

17   and shippers on November 24, 2003.  A true and correct copy of the memorandum is attached as

18   **Exhibit 18** (CTGC 01806)

19          35.     In 2004, before the release of any varieties under the patenting and licensing

20   program, the Commission decided to offer growers a one-time amnesty if they were cultivating

21   unreleased USDA varieties.  To qualify for amnesty, growers had to come forward and either

22   remove the vines or pay a penalty per vine grafted and a penalty per box of the variety shipped in the

23   three years that followed.  The amnesty was implemented with the express understanding that after

24   the amnesty, the Commission would seek strict penalties against growers who cultivated patented

25   varieties without authorization.

26          36.     On May 7, 2004, the Commission sent a memorandum to all California growers and

27   shippers to announce the amnesty.  A true and correct copy of the memorandum is attached as

28   **Exhibit 19** (CTGC 01820-01822).  The memorandum warned that "[g]rowers who do not come

DECL. OF KATHLEEN NAVE

1    forward under the amnesty program and are later found to be in possession of unauthorized plant

2    material face the possibility of required grafting or removal of grapevines, enjoinment from shipping

3    and paying compensation for financial and other damages." The original deadline for growers to

4    come forward under the amnesty program was July 15, 2004.

5         37.    On July 12, 2004, the Commission extended the amnesty deadline by one month to

6    August 15, 2004. In a letter to all growers, the Commission again warned that any growers "found

7    to be growing . . . *any* unreleased USDA varieties who have not registered under this program"

8    (emphasis added) would face financial penalties and potentially "court-ordered injunctions

9    preventing the sale of the variety and/or court-ordered destruction of the vines." A true and correct

10   copy of the letter is attached as **Exhibit 20** (CTGC 01824). On August 4, 2004, the Commission

11   sent a final reminder to all growers, noting that only 10 days remained under the amnesty for

12   growers who possessed USDA varieties without authorization. A true and correct copy of that letter

13   is attached as **Exhibit 21** (CTGC 01825).

14        38.    After the amnesty, growers continued to receive information about the patenting and

15   licensing program, including information specifically about the Autumn King variety. On December

16   10, 2004, the Commission announced in a Grower Report sent to all growers that it was seeking

17   nurseries to propagate two "patent-pending table grape varieties"—Scarlet Royal and Autumn King.

18   The report described Autumn King as "a late-season (October in Fresno), white seedless, neutral-

19   flavored variety." A true and correct copy of the report is attached as **Exhibit 22** (CTGC 01830).

20        39.    In July 2005, the USDA issued an official release notice "to fruit growers and

21   nurserymen" announcing the release of the Autumn King grape. In my experience, the USDA never

22   releases a new variety to the public before issuing such a notice and has followed this practice

23   consistently for all the years I have been involved in the industry. A true and correct copy of the

24   release notice for Autumn King is attached as **Exhibit 23** (SAND 00069). I understand that Mr.

25   Sandrini produced a copy of the release from his records. The release describes the Autumn King

26   grape in detail and states that a patent application is pending for the variety and that the Commission

27   is the exclusive licensee.

28

DECL. OF KATHLEEN NAVE

40.     In October 2005, the Commission sent another Grower Report to all growers announcing that the Autumn King variety had been sublicensed to three nurseries and telling growers to contact the Commission with inquiries about the new variety.  A true and correct copy of the report is attached as **Exhibit 24** (CTGC 01826).

**Mr. Sandrini's Unauthorized Possession of the Autumn King Variety**

41.     In October 2005, based on a tip from a confidential informant, the Commission came to suspect that California grower and shipper Richard Sandrini possessed and was cultivating the Autumn King variety without authorization.  After learning of this, I talked to Mr. Sandrini over the telephone on more than one occasion in or around November 2005.  I asked Mr. Sandrini if he possessed Autumn King, and he responded that he did.  He stated that he was aware of the Commission's patenting and licensing program, that he knew that Autumn King was one of the varieties that was going to be patented, and that he had chosen not to participate in the Commission's amnesty program.  Mr. Sandrini also stated that Autumn King was a great variety for which customers were paying him a premium price.

42.     On November 18, 2005, the Commission sent Mr. Sandrini a letter, a true and correct copy of which is attached as **Exhibit 25** (CTGC 04802-04806).  The letter asked Mr. Sandrini to confirm, in a signed affidavit, that he possessed Autumn King vines.  The letter also warned him about the potential legal consequences of unauthorized possession.

43.     The Commission received back from Mr. Sandrini an "Affidavit Confirming Possession or Control (Autumn King)," which he signed and had witnessed on November 22, 2005.  A true and correct copy of the signed affidavit is attached as **Exhibit 26** (CTGC 04801).  In the document, Sandrini admitted that he had 18,629 "unauthorized/unreleased grapevines" and had shipped 5,500 boxes of Autumn King during the 2005-06 season.

44.     After receiving the affidavit from Mr. Sandrini, the Commission conducted, on February 10, 2006, an audit of Mr. Sandrini's vineyards to confirm his possession of the Autumn King vines and to assess their location, quantity, and maturity.

45.     On February 28, 2006, the Commission's counsel sent Sandrini a letter attaching a copy of the '284 patent and demanding that he remove the infringing Autumn King plant material in

DECL. OF KATHLEEN NAVE

1    his possession.  A true and correct copy of that letter is attached as **Exhibit 27** (SAND 00031-

2    00038).

3        46.    In April 2006, the Commission agreed to conduct DNA testing of the vines in

4    Sandrini's possession to confirm that they were Autumn King vines.  Ross Jones, the Commission's

5    Vice President for Research, collected four leaf samples and submitted them for DNA testing to

6    Foundation Plant Services ("FPS") of the University of California, Davis.  On May 16, 2006, the

7    Commission received a written report from FPS confirming that three of the four leaf samples were

8    the patented Autumn King variety.  The fourth set of leaf samples was a wine grape variety name

9    Ruby Red.  I called Richard Sandrini and requested the ability to retest the fourth vineyard.  He said

10   that it was not necessary.  He said he knew that there were some Ruby Red vines inadvertently in the

11   fourth vineyard, and he admitted the vineyard was planted predominantly with Autumn King vines.

12       47.    On July 1, 2006, the USDA authorized the Commission to enforce the '284 patent to,

13   and on July 3, 2006, the Commission initiated this lawsuit against Mr. Sandrini and his business

14   entities.

15       48.    In October 2006, Sandrini harvested 7,309 boxes of Autumn King grapes.  In

16   November 2006, those boxes were re-packed into consumer clamshells, which were then placed in

17   16 pound boxes.  Those boxes were then offered for sale under conditions set by the Court.  A total

18   of 2,400 boxes were ordered by Costco, but 600 of those boxes were then cancelled based on the low

19   quality of the fruit, resulting in a net sale of 1,800 boxes.  An additional 4,192 boxes were sold to a

20   customer in Mexico.  The proceeds from both sales were placed in an escrow account, although a

21   portion of those proceeds was eventually repaid to the customer in Mexico, who complained about

22   the quality of the grapes.

23                              **False Labeling and False Reports**

24       49.    The California Department of Food and Agriculture ("CDFA") has issued mandatory

25   regulations for the labeling of table grapes, which require nonconsumer containers of table grapes

26   accurately to identify the variety of grape being sold.  The regulations provide that "every

27   nonconsumer container of grapes shall be clearly and conspicuously marked with" among other

28   things "[t]he name of the variety of grapes, if known, or the words 'Unknown Variety.'"  Cal. Code

DECL. OF KATHLEEN NAVE

1   Regs. tit. 3, § 1436.30(a).  The regulations also state that "[g]rapes shall not be mislabeled as to

2   variety."  *Id.* § 1436.31(a).  The CDFA periodically sends memos to members of the California table

3   grape industry informing them of the varietal labeling requirements.  A true and correct copy of the

4   CDFA memo dated August 12, 2004 is attached as **Exhibit 28**.  A true and correct copy of the

5   CDFA memo dated May 24, 2005 is attached as **Exhibit 29**.  A true and correct copy of the CDFA

6   memo dated April 17, 2006 is attached as **Exhibit 30** (CTGC 02004-02006).

7       50.     Shippers are also required by California law to report their sales of table grapes to the

8   Commission in order to allow the Commission to keep accurate statistics for the industry and to

9   facilitate collection of grower assessments.  The Commission requires weekly reports from shippers

10  during the harvest and shipping season, and reports must identify each shipment by variety name.

11  Examples of the packets of information and shipping reports sent to shippers at the start of each

12  season are attached as **Exhibit 31** (CTGC 05029-05037) and **Exhibit 32** (CTGC 05038-05043).  As

13  explained in Exhibit 32, "The commission's rules for reporting grapes shipped are based upon the

14  CDFA regulations that require grape variety names to be stamped on each box.  When completing

15  the weekly shipment reports to the commission, use the true name of the grape varieties shipped, as

16  stamped on the boxes." Exhibit 32 (CTGC 05039).  California law provides, "It shall be a

17  misdemeanor for . . . [a]ny person to willfully render or furnish a false or fraudulent report,

18  statement or record required by the commission pursuant to the provisions of this chapter or any

19  rules or regulations of the commission."  Cal. Food & Agric. Code § 65653(b).

20      51.     **Exhibit 33** is filed separately under seal as an exhibit to the Confidential Declaration

21  of Kathleen Nave in Support of the California Table Grape Commission's Motion for Partial

22  Summary Judgment.

23          **The Need To Protect Against Unauthorized Domestic Use of USDA Varieties**

24      52.     It is imperative that the Commission be able to protect against domestic growers who

25  make unauthorized use of USDA varieties.  The unauthorized use of such varieties threatens the

26  existence of the patenting and licensing program and the ability of the Commission to fund USDA

27  research altogether.  Growers will not support such research unless the program operates for the

28  collective benefit of the industry and in an even-handed and fair manner.  If the program operates

1  unfairly—so that some growers can avoid paying any royalty or can obtain the USDA varieties

2  before others—support for the program will collapse.  No grower wants his assessment dollars spent

3  on a project that gives an unfair advantage to other growers.

4       53.    The unauthorized use of a USDA variety such as Autumn King also harms the

5  Commission by placing control in the hands of disparate growers who may harm its integrity.  As

6  the exclusive licensee for the Autumn King, and on behalf of all California table grape growers, the

7  Commission wants to ensure that the variety produces quality fruit, is well-received by retailers, and

8  maintains a good reputation.  A quality problem that harmed the reputation of the variety would

9  reduce interest in the variety, harm the marketability of the variety, harm growers, and deprive the

10  Commission of revenue from royalties.

11       54.    To minimize the production of substandard Autumn King fruit, the Commission has

12  required the distributing nurseries to participate in the CDFA's California Grapevine Registration &

13  Certification Program and has prohibited authorized growers from self-propagating Autumn King

14  vines.  These measures ensure that Autumn King vines will remain free of diseases that spread from

15  vine to vine by grafting and/or vegetative propagation, and these measures thereby keep the quality

16  of the Autumn King fruit high.  Permitting the use of Autumn King plant material outside of these

17  requirements would give a cheating grower a short-term economic gain at the expense of the

18  Commission's long-term interest in protecting both the variety and the patenting and licensing

19  program more generally.

20       55.    It is widely recognized in the industry that a grower who obtains a variety ahead of

21  other growers gains an incalculable advantage.  Learning how to cultivate a particular variety of

22  grape requires much trial and error.  A grower who obtains a variety even one season ahead of other

23  growers will have a significant head start over other growers in terms of maximizing the quantity

24  and quality of the fruit grown.  Such a grower also will have a significant head start in building

25  relationships with buyers for the sale of the variety.  These advantages come at the expense of other

26  growers who have waited for Autumn King to become available through legitimate means and are

27  now years behind Sandrini in the cultivation of the variety and in building relationships with buyers

28  for the sale of this variety.

56.    The Commission would never grant an exclusive license to a single grower or otherwise authorize a single grower to obtain a head start in growing, marketing, or developing knowledge and expertise regarding a new variety of grape.  Granting such a head start is antithetical to the very purpose of the Commission's program and its mission to promote the California table grape industry as a whole.  That is why the Commission has insisted on distributing the USDA varieties as equally and fairly as possible across the industry and has used three different nurseries to ensure such broad, equal distribution.

57.    Unequal distribution of USDA varieties threatens support for the entire patenting and licensing program.  In my experience, growers understand that in order for the patenting and licensing program to achieve its purposes, the propagation of new varieties must be controlled both within the United States and abroad.  This requires the creation of rules that apply to all growers and are enforced in a fair and even-handed manner.  The growers who supported the creation of the program understood that this process, although necessary, would not be easy and might lead to legal action against their friends and neighbors.  An important element in their support for the program was, and continues to be, the expectation that the Commission will administer the program fairly and for the benefit of the entire California industry.  Growers must be able to trust that if they follow the rules and wait for new varieties to be officially released, other growers will do the same.  If a grower is allowed to abuse that trust, other growers will not be willing to continue to support a program that restricts their own ability to self-propagate.  Without effective limits on self-propagation, the Commission will not be able to prevent unauthorized use and dissemination of the variety and will be deprived of royalties on both Autumn King and other USDA-developed varieties (and any additional assessments from increased sales) that it can use to fund further research for the benefit of the California industry.

58.    Without an effective patenting program that prevents a single grower from gaining an unfair advantage over other growers, grower support for the USDA's breeding program will also be seriously undermined.  Growers are unlikely to continue supporting a program to produce new varieties if the unauthorized use of those varieties allows foreign competitors to free-ride on the money, time, and effort invested by California growers through the Commission and if unscrupulous

17                                    DECL. OF KATHLEEN NAVE

1 | domestic growers can use those varieties to obtain an unfair advantage at the expense of those who
2 | follow the rules.

4 | I declare under penalty of perjury that the foregoing is true and correct.

8 | Executed on March 30, 2007.

Kathleen Nave