1  HENNIGAN, BENNETT & DORMAN LLP
   LAWRENCE M. HADLEY (SBN 157728)
2  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
3  Phone: (213) 694-1200
   Fax: (213) 694-1234
4
   THE LAW OFFICES OF RALPH B. WEGIS
5  RALPH B. WEGIS (SBN 67966)
   MICHAEL J. STUMP (SBN 193542)
6  1930 Truxtum Avenue
   Bakersfield, CA 93301
7  Telephone: (661) 635-2100
   Facsimile: (661 635-2107
8
   Attorney for Defendants
9  RB SANDRINIG, INC., RB SANDRINI FARMS, L.P.
   and RICHARD B. SANDRINI
10

11              UNITED STATES DISTRICT COURT

12            EASTERN DISTRICT OF CALIFORNIA

13

14
   THE CALIFORNIA TABLE GRAPE        )  CASE NO. 1:06-cv-00842-OWW-TAG
15 COMMISSION                        )
                                     )
16          Plaintiff,               )  **DEFENDANTS' MEMORANDUM OF**
                                     )  **POINTS AND AUTHORITIES IN**
17 vs.                               )  **SUPPORT OF MOTION FOR SUMMARY**
                                     )  **JUDGMENT**
18 RB SANDRINI, INC., RB SANDRINI FARMS,)
   L.P. d/b/a/ RB SANDRINI FARMS and  )  DATE:      April 30, 2007
19 RICHARD B. SANDRINI               )  TIME:      10:00
                                     )  JUDGE:   Hon. Oliver W. Wagner
20          Defendants.              )
   _____  )
21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**(Page)**

I.   INTRODUCTION ............................................................................................ 1

II.  STATEMENT OF FACTS .............................................................................. 3

A.   Based on the CTGC's Recommendation, the USDA Delayed Filing
     The Patent Application on "Autumn King" For Years. ................................. 3

B.   During the Period of Delay in Seeking Patent Protection for Autumn
     King, Jim and Lawrence Ludy Obtained, Grafted, Asexually
     Reproduced, and Harvested Autumn King Fruit ............................................. 5

C.   The CTGC's Patent Licensing Program ...................................................... 9

III. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT ...................... 10

IV.  THE PATENT-IN-SUIT IS INVALID AS A MATTER OF LAW UNDER
     35 U.S.C. §102(B) ..................................................................................... 11

A.   Legal Standards Governing Invalidity Challenges to Plant Patents ............. 11

     1.   The Statutory Bar of 35 U.S.C. §102(b) Precludes any Patent
          on Inventions in Public Use More than One Year Prior to the
          Application Date in the United States ............................................. 11

     2.   Third Party Public Use Qualifies as an Invalidating Use ................. 12

     3.   Consent Of The Inventor Is Not Required For A Public Use
          To Apply Under 35 U.S.C. §102(b). .............................................. 13

     4.   The Experimental Use Exception Does Not Apply to
          Unclaimed Features or Uses Beyond the Inventor's Control. ........... 15

B.   The Invention Claimed in the '284 Patent Was In Public Use More
     Than One Year Before the USDA Submitted the Patent Application .......... 16

V.   PLAINTIFF DOES NOT HAVE THE STATUTORY AUTHORITY TO
     LICENSE AND ENFORCE PATENTS. .......................................................... 18

A.   The California Table Grape Commission's Statutory Powers. .................... 19

VI.  THE CTGC OFFERED, AND MR. SANDRINI ACCEPTED, A LICENSE
     TO THE AUTUMN KING VARIETY. ............................................................ 21

VII. CTGC'S STATE LAW CLAIMS ARE PREEMPTED BY FEDERAL
     PATENT LAW. ............................................................................................ 22

VIII. CONCLUSION ............................................................................................ 24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

<u>(Page)</u>

## FEDERAL CASES

<u>Alan Engineering Corp. v. Bartell Industrial</u>,
299 F.3d 1336 (Fed. Cir. 2002) ........................................................................ 15

<u>Andrews v. Hovey</u>,
124 U.S. 694 (1888) ............................................................................... 13, 17

<u>Association for Retarded Citizens v. Department of Development Services</u>,
38 Cal. 3d 384 (Cal. 1985) ................................................................................ 19

<u>Barmag Barmer Mischinenfabrik AG v. Murata Machine, Ltd.</u>,
731 F.2d 831 (Fed. Cir. 1984) ........................................................................... 10

<u>Baxter International, Inc. v. Cobe Laboratory, Inc.</u>,
88 F.3d 1054 (Fed. Cir. 1996) ............................................................. 12, 15, 17

<u>In re Blaisdell</u>,
242 F.2d 779 (CCPA 1957) ........................................................................ 13, 17

<u>Bonito Boats</u>,
489 U.S. 141 (1989) ......................................................................................... 23

<u>Bourne v. Jones</u>,
114 F. Supp. 413 (S.D. Fla. 1951), aff'd 207 F.2d 173 (5th Cir. 1953), <u>cert.</u>
<u>denied</u> 346 U.S. 897 (1953) ..................................................... 11, 12, 16, 18

<u>Ex Parte C</u>,
27 U.S.P.Q. 2d (BNA) 1492 (Bd. of Pat. App. 1992) ...................................... 12

<u>Celotex Corp. v. Catrett</u>,
477 U.S. 317 (1986) ......................................................................................... 10

<u>Chemitron Corp. v. Procter & Gamble Co.</u>,
287 F. Supp. 291 (D. Md. 1968), aff'd, 427 F.2d 893 (4th Cir.), <u>cert</u> <u>denied</u>,
400 U.S. 925 (1970) ......................................................................................... 13

<u>Electromotive Division of General Motors Corp. v. Transportation Systems Division</u>
<u>of General Electric Co.</u>,
417 F.3d 1203 (Fed. Cir. 2005) ........................................................................ 15

<u>In re Elsner</u>,
381 F.3d 1125 (Fed. Cir. 2004) .................................................................. 12, 16

<u>Eolas Technologies Inc. v. Microsoft Corp.</u>,
399 F.3d 1325 (Fed. Cir. 2005) .................................................................. 12, 17

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**TABLE OF AUTHORITIES (cont'd)**

(Page)

Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,
    149 F.3d 1309 (Fed. Cir. 1998) ................................................................ 10

Evans Cooling System, Inc. v. General Motors Corp.,
    939 F. Supp. 154 (D. Conn. 1996) ............................................................ 17

Evans Cooling Systems, Inc., v. General Motors Corp.,
    125 F.3d 1448 (Fed. Cir. 1997), cert. denied, 522 U.S. 1115 (1998)...................... 15, 17

Ferdig v. State Personnel Bd.,
    71 Cal. 2d 96 (1969) ............................................................................ 20

Hobbs v. U.S. Atomic Energy Com.,
    451 F.2d 849 (5th Cir. 1971) .................................................................. 14

J.A. LaPorte, Inc. v. Norfolk Dredging Co.,
    787 F.2d 1577 (Fed. Cir. 1986) .............................................................. 17

Jacobs v. Nintendo of America,
    370 F.3d 1097 (Fed. Cir. 2004) .............................................................. 22

Lorenz v. Colgate-Palmolive-Peet Co.,
    167 F.2d 423 (3rd Cir. 1948) .................................................................. 15

Lough v. Brunswick Corp.,
    86 F.3d 1113 (Fed. Cir. 1996), cert. denied, 522 U.S. 806 (1997).......................... 15, 17

Manning v. Cape Ann Insinglass & Glue Co.,
    108 U.S. 462 (1883) ........................................................................ 13, 14

In re Martin,
    74 F.2d 951 (CCPA 1935) ...................................................................... 15

New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.,
    298 F.3d 1290 (Fed. Cir. 2002) ........................................................... 13, 17

Scripps Clinic & Resource Foundation V. Genentech, Inc.,
    927 F.2d 1565 (Fed. Cir. 1991) .............................................................. 10

In re Smith,
    714 F.2d 1127 (Fed. Cir. 1983) ........................................................... 13, 15

Special Devices, Inc. v. OEA Inc.,
    270 F.3d 1353 (Fed. Cir. 2001) .............................................................. 15

Ultra-Precision Manufacturing, Ltd. v. Ford Motor Co.,
    411 F.3d 1369 (Fed. Cir. 2005) .............................................................. 23

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1:06-cv-00842-OWW-TAG            Motion for Summary Judgment

## TABLE OF AUTHORITIES (cont'd)

**(Page)**

United Farm Workers of America, AFL-CIO v. Agricultural Labor Relations Bd.,
        41 Cal. App. 4th 303 (1995) .............................................................. 19, 20, 21

United Mine Workers of America v. Gibbs,
        383 U.S. 715 (1966) ....................................................................... 24

W.L. Gore & Associates, Inc. v. Garlock, Inc.,
        721 F.2d 1540 (Fed. Cir. 1983) ....................................................... 12

Waner v. Ford Motor Co.,
        331 F.3d 851 (Fed. Cir. 2003) ......................................................... 23

Watson v. Allen,
        254 F.2d 342 (D.C. Cir. 1958)........................................................ 14

Woodland Trust v. Flowertree Nursery, Inc.,
        148 F.3d 1368 (Fed. Cir. 1998) ....................................................... 13

### STATE CASES

American Federation of Labor v. Unemployment Insurance Appeals Board,
        13 Cal. 4th 1017, 920 P.2d 1314 (Cal. 1996) ................................ 20

B.C. Cotton, Inc. v. Voss,
        33 Cal. App. 4th 929 (1995) .......................................................... 20, 21

Merced County v. Helm,
        102 Cal. 159 (1894) ....................................................................... 20

United Farm Workers of America, AFL-CIO v. Agricultural Labor Relations Board,
        41 Cal. App. 4th 303 (1995) ........................................................... 19, 20

### FEDERAL STATUTES

35 U.S.C. § 102(B) ..................................................................... passim

35 U.S.C. § 103 ................................................................................ 23

35 U.S.C. § 161 (2000)..................................................................... 11

35 U.S.C. § 1338(b).......................................................................... 24

Fed. R. Civ. P. § 56(c) ...................................................................... 10

-iv-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## TABLE OF AUTHORITIES (cont'd)

<u>(Page)</u>

### STATE STATUTES

California Business and Professions Code § 17200 ................................................................. 3, 22

Ketchum Act, Cal. Food & Agr. Code,
     § 65500 ................................................................................................... 1, 2, 19
     § 65572(h) ...................................................................................................... 19
     § 65600 ......................................................................................................... 2, 19
     § 65601 ............................................................................................................ 19
     § 65605 ............................................................................................................ 19

### OTHER

1 Chisum on Patents,
     § 1.05[1][b][v] (2006) ..................................................................................... 11

2 Chisum on Patents
     § 6.02[5][c] (2006) ......................................................................................... 13

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1:06-cv-00842-OWW-TAG                                    Motion for Summary Judgment

1  **I.    INTRODUCTION**

2        Plaintiff California Table Grape Commission ("Plaintiff" or "CTGC") filed this action

3  against Defendants RB Sandrini, Inc., RB Sandrini Farms, L.P. d/b/a/ RB Sandrini Farms and

4  Richard B. Sandrini (collectively "Defendants" or "Sandrini") for infringement of U.S. Patent No.

5  PP16,284 ("the '284) entitled "Grapevine Denominated 'Autumn King.'"  The CTGC's Complaint

6  also contains related claims under California state law.

7        In this motion, Sandrini seeks summary judgment on four dispositive grounds: (1) the '284

8  patent is invalid under 35 U.S.C. §102(b) because the patented grapevines were in public use more

9  than a year prior to the filing of the application for the '284 patent; (2) the CTGC lacks statutory

10  authority to license, enforce, and collect royalties on patents; (3) the CTGC granted Sandrini an

11  express license to the Autumn King variety for the grapevines at issue, and (4) the state law claims

12  are preempted by the Patent Act, and this Court should decline supplemental jurisdiction once the

13  federal patent law claims are dismissed.

14        Sandrini's motion as to invalidity raises purely legal issues on undisputed facts:  Lawrence

15  Ludy, from whom Sandrini received the grapevines at issue, asexually reproduced the infringing

16  plant material on his farm in 2002, and obtained harvestable grapes prior to September 2003.  So did

17  Jim and Jack Ludy on their farm.  Both reproductions occurred more than one year *before* the

18  USDA filed its patent application on September 29, 2004.  Neither Jim/Jack nor Lawrence Ludy

19  were under any confidentiality agreement to the patentee relating to their use of the Autumn King

20  grapevines.  Likewise, neither Jim/Jack nor Lawrence Ludy undertook security measures to keep

21  secret their reproduction and use of Autumn King plant material.  Indeed, both Jim/Jack and

22  Lawrence Ludy disclosed the reproduction of Autumn King plant material to third parties well

23  before the USDA filed its patent application for the Autumn King variety.  Finally, DNA testing

24  confirms that the plant material Mr. Ludy reproduced prior to September 2003 is the same "Autumn

25  King" plant material that Sandrini possesses.  Under these facts, the law is settled:  the public use by

26  Jim/Jack and Lawrence Ludy more than one year before the filing of the patent application on

27  Autumn King renders the patent invalid under 35 U.S.C. §102(b).

28        Sandrini's motion as to standing is based solely on the language of Ketchum Act, Cal. Food

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-1-

and Agric. Code §§ 65500 *et seq*.  Under the Ketchum Act, the CTGC lacks express authority to engage in its patent licensing program.  Specifically, nothing in the Ketchum Act authorizes the CTGC to license patents, sue parties for patent infringement, or collect patent royalties.  Indeed, the Ketchum Act only authorizes the CTGC to collect revenue through the levying of assessments under Cal. Food and Agric. Code §§ 65600 *et seq.*  Until recently, the USDA never patented new table grape varieties.  Instead, the USDA made new varieties freely available to growers like Mr. Sandrini (whose assessment fees to the CTGC paid for much of the research and development of new table grape varieties).  At the CTGC's urging, the USDA has begun patenting grower-funded, new varieties, with the CTGC acting as the exclusive licensee.  As exclusive licensee, the CTGC charges California growers for access to the new varieties on top of the assessment fees already paid.   These license fees, which the CTGC splits with the USDA, provide the CTCG with revenue beyond the sources authorized under the Ketchum Act.  Because the CTGC lacks the statutory authority to license and collect royalties on the USDA table grape patents, the CTGC also lacks statutory standing to bring the present action.

Sandrini's motion as to an express license is based on just that – an undisputed offer of a license by the CTCG to Sandrini for the grapevines at issue, which Sandrini accepted in writing. Prior to initiating this lawsuit, the CTGC had publicized an "amnesty" program for table grape growers in possession of plant material for which the USDA filed patent applications.  Under the amnesty program, growers in unauthorized possession of patented varieties could continue production, so long as they acknowledged possession and paid the license fee.  Upon learning of Mr. Sandrini's possession of Autumn King grape vines, the CTGC contacted Mr. Sandrini.  In a follow-up letter, the CTGC asked Mr. Sandrini to sign an affidavit confirming his possession of Autumn King plant material.  In exchange, the CTGC offered Mr. Sandrini a license to the Autumn King plant material in his possession.  Based on the CTGC's offer, Mr. Sandrini signed the affidavit confirming his possession of Autumn King plant material.  After receiving the signed affidavit, the CTGC sent Mr. Sandrini a "Domestic Grower License Agreement – Autumn King."  Mr. Sandrini then executed the license agreement and returned it to the CTGC.  This license exhausts the patent monopoly as to Sandrini, thus precluding the current infringement claims as a matter of law.

-2-

Motion for Summary Judgment

1    Sandrini's motion as to preemption and supplemental jurisdiction is based solely on a matter

2    of law as well.  In its Complaint, the CTGC includes counts for violation of the California Business

3    and Professions Code section 17200, intentional interference with prospective economic

4    relationships, and unjust enrichment.  Each count expressly arises from Sandrini's alleged

5    possession of unlicensed Autumn King grapevines.  Because the allegations underlying the CGTC's

6    state law claims are predicated on the identical facts as those giving rise to its federal patent

7    infringement claim, the CGTC's state law claims are preempted by federal patent law.  Moreover, if

8    the Court grants Defendants' motion for summary judgment with respect to either the invalidity,

9    standing or express license issues, the Court should decline jurisdiction over Defendants' state law

10   claims, as no federal claims would remain in this case.

11   **II.    STATEMENT OF FACTS**

12       **A.    Based on the CTGC's Recommendation, the USDA Delayed Filing The Patent**

13              **Application on "Autumn King" For Years.**

14       Although the USDA filed its patent application on the Autumn King grapevine on September

15   28, 2004 (Hadley Dec., Ex. 1), development of the Autumn King plant variety was completed years

16   earlier – by 2002 – and began over a decade earlier – in about 1993.  (Ramming Dep. [Hadley Dec.,

17   Ex. 2] at 26:5-9.)  The USDA ultimately sought patent protection for Autumn King on September

18   28, 2004.  Much of the delay in seeking timely patent protection falls on the CTGC.

19       Dr. Ramming runs the heads the Agricultural Research Service of the USDA, where he has

20   developed numerous new table grape varieties over a 30 year period.  (Id. at 8:15-23, 13:12-16.)

21   One such variety is Autumn King.  After years of initial development, the Autumn King vines began

22   bearing fruit in about November, 2000.  (Id. at 116:22-24; 123:14-18.)  Since the CTCG funded a

23   significant part of Dr. Ramming's breading program, the Research Committee of the CTGC has

24   provided input to Dr. Ramming, including whether new varieties should be released.  (Id. at 134:1-

25   135:7.)  Dr. Ramming almost always followed the Committee's recommendations.  (Id.)  After the

26   CTGC convinced the USDA to seek patent protection on Dr. Ramming's new varieties, the

27   Research Committee recommendations included whether patent protection should be sought.  Again,

28   Dr. Ramming followed the CTGC's advice.  (Id. at 117:25-118:22, 137:13-15.)

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Beginning in 2001, the Research Committee of the CTGC held public meetings at which Dr.

2    Ramming publicly displayed Autumn King fruit and discussed the characteristics of the Autumn

3    King grapevine.  (Id. at 123:12-23; 124:15-127:6; J. Ludy Dep. [Hadley Dec., Ex. 6] at 25:18-23;

4    28:3-9; 31:24-32:14; 46:3-9.)  Attendees were allowed to take samples of the Autumn King fruit.  (J.

5    Ludy Dep. [Hadley Dec., Ex. 6] at 33:8-13.)  In September, 2001, Dr. Ramming began collecting

6    data for a patent on the Autumn King variety.  (Ramming Dep. [Hadley Dec., Ex. 2] at 101:1-19.)

7    By 2002, the Autumn King variety was ready for patenting.  In January, 2002, Dr. Ramming

8    stated to the CTGC in a report that the Autumn King will likely be released and that virus testing

9    would be completed by December of that year.  (Ramming Dep., 109:23-110:10; Hadley Dec., Ex.

10   3.)  In March, 2002, the Research Committee of the CTGC decided that Dr. Ramming should

11   continue collecting data needed to seek patent protection, but that the decision on releasing and

12   patenting Autumn King, should be deferred another year.  (Hadley Dec., Ex. 15.; Ramming Dep.

13   [Hadley Dec., Ex. 2] at 162:19-163:20.)  The next year, in January, 2003, Dr. Ramming

14   recommended that Autumn King be released that month.  (Ramming Dep. [Hadley Dec., Ex. 2] at

15   114:3-21; Hadley Dec., Ex. 5, p. 51).  But the CTGC again decided that the release and patenting of

16   Autumn King should be deferred for at least another year.  (Ramming Dep. [Hadley Dec., Ex. 2] at

17   164:20-166:17; Hadley Dec., Ex. 16.)  Dr. Ramming did not question the CTGC's recommendation:

18       Q.   [A]s of January of 2003 you had recommended to the commission
         that Autumn King be released?
19

20       A.   Yes.

21       Q.   Do you recall having any discussions with the commission about
         the fact that you were recommending that Autumn King be released
22       and the commission was recommending evaluation for one more year
         so that it could be compared to C11 and some of these other concerns
23       could be evaluated?

24       A.   No.

25   (Ramming Dep. [Hadley Dec., Ex. 2] at 165:23 – 166:8.)

26       In February, 2003, all data needed for a patent application on Autumn King was available.

27   (Id., 166:23 – 167:24)  In the Summer of 2003, Dr. Ramming completed the collection of all data

28   needed for the patent application on Autumn King.  (Id., 168:16-19; 177:24-178:3.)  Although the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    CTGC was aware that it could file its patent application earlier to secure patent protection, CTGC

2    chose not too.  (Nave Dep. [Hadley Dec., Ex. 12] at 206:18 – 208:4, 213:4-24, 216:25-219:5)

3    Instead, Dr. Ramming did not begin drafting the patent application on Autumn King until January,

4    2004.  (Ramming Dep. [Hadley Dec., Ex. 2] at 117:21 – 118:7)  On September 28, 2004, the USDA

5    finally filed the application.  (Hadley Dec., Ex. 1.)

  Despite the delay in seeking patent protection, neither the USDA nor CTGC undertook even

6    basic precautions to ensure that Autumn King plant material remained secure and outside the public

7    domain.  For example, the USDA and CTGC made no efforts to conceal or secure the plant material.

8    (Ramming Dep. [Hadley Dec., Ex. 2] at 41:20 – 42:13); (J. Ludy Dep. [Hadley Dec., Ex. 6] at

9    135:20-136:20.)  Likewise, the USDA failed to put in place reasonable precautions to prohibit

10   persons from entering the USDA test facility or to ensure that plant material cuttings were not taken

11   by employees.  (Ramming Dep. [Hadley Dec., Ex. 2] at 61:19-65:14.)  Nor did the USDA follow-up

12   on whether plant material that was distributed to other facilities was returned or destroyed.  (Id. at

13   66:4-9.)  Although both the USDA and CTGC were aware of the lackadaisical security for some

14   time (Nave Dep. [Hadley Dec., Ex. 12] at 184:2-185:4), and even knew that the lack of proper

15   security could jeopardize its right to seek patent protection (Id. at 203:16-205:12.), neither the

16   USDA nor CTGC implemented measures to preserve the confidentiality or privacy of its acreage

17   devoted to new table grape varieties.  (Ramming Dep. [Hadley Dec., Ex. 2] at 53:13 – 54:3; 56:15 –

18   58:8); (Nave Dep. [Hadley Dec., Ex. 12] at 188:16-189:1.)

19   

20     **B.**  **During the Period of Delay in Seeking Patent Protection for Autumn King, Jim**

21       **and Lawrence Ludy Obtained, Grafted, Asexually Reproduced, and Harvested**

22       **Autumn King Fruit**

23     Not surprisingly, some of the Autumn King plant material made its way into the public

24   domain well before the USDA sough patent protection.  In early 2002, more than two years before

25   filing the patent application, someone at the USDA provided "sticks" of Autumn King plant material

26   to another grower, Jim and Jack Ludy.  (J. Ludy Dep. [Hadely Dec., Ex. 6] at 68:5-17.)  Shortly

27   after, Jim/Jack Ludy grafted 46-47 vines with the Autumn King plant material.  (J. Ludy Dep.

28   [Hadely Dec., Ex. 6] at 76:11-15; L. Ludy Dep. [Hadley Dec., Ex. 7] at 102:11-104:3.)  At about the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    same time, Jim/Jack Ludy gave some of the sticks to their cousin, Larry Ludy, who owned another

2    farm in the same area. With these sticks, Larry Ludy began reproducing Autumn King vines on his

3    harm by grafting 25 vines on March 21, 2002. (L. Ludy Dep. [Hadely Dec., Ex. 7] at 22:8-24:21,

4    95:7-20) Mr. Ludy's written notes and a cancelled check to the grafter corroborate the reproduction

5    on that date. (L. Ludy Dep. [Hadley Dec., Ex. 7] at 34:7-36:12, 127:2-21, 133:15-18) Over the next

6    three months, Mr. Ludy continued to cultivate the reproduced Autumn King vines at his farm – well

7    over a year before the USDA sought patent protection.

8         The CTGC cannot dispute that Jim/Jack Ludy initially received the Autumn King material

9    from a USDA employee. Of course, neither the USDA nor the CTGC had any actual or pending

10   patent rights at the time of receipt and propagation by the Ludy cousins. Indeed, the CTGC had no

11   rights whatsoever in Autumn King at the time Jim/Jack Ludy received the plant material. Nor can

12   the CTGC point to any law prohibiting the providing or receipt of the Autumn King plant material.

13   At the time, the USDA freely distributed plant material from Dr. Ramming's experimental facility to

14   growers following release. (Ramming Dep. [Hadley Dec., Ex. 2] at 135:17-137:9.) Even for

15   unreleased experimental varieties, Dr. Ramming allowed certain growers access to the plant material

16   so they could evaluate the likely commercial success of his new varieties. (Id. at 140:15-142:12.)

17   Not surprisingly, when such unreleased varieties showed promise, other growers frequently planted

18   material for their own propagation and use – again without recourse or consequence against either

19   the provider of the plant material or the recipient. (Id. at 145:9-20.) In fact, Mr. Ludy testified that

20   he viewed his receipt of plant material later identified as Autumn King no different than the many

21   other growers who often received unreleased plant material – a cooperator authorized to evaluate

22   commercial potential.[1] (J. Ludy Dep., 139:21-140:9.)

23        Moreover, Jim/Jack Ludy received the plant material at issue without any restrictions on its

24

25   [1] At the time Jim/Jack Ludy received the plant material, the name "Autumn King" did not exist.
     Instead, Dr. Ramming referred to the variety as C67-120 and later C10. (Ramming Dep. [Hadley
26   Dec., Ex. 2] at 84:8-9, 161:11-13.) While Jim/Jack Ludy suspected that the plant material came
     from an unreleased variety, they were not told the name and referred to the Autumn King variety as
27   "Late White" or "Big White." (J. Ludy Dep. [Hadly Dec., Ex. 6] at 27:19-28:4; L. Ludy Dep.
     [Hadley Dec., Ex. 7] at 35:15-20, 54:17-55:18; Declaration of Richard B. Sandrini in Support of
28   Defendants' Motion for Summary Judgment, Ex. B.)

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

disclosure.  Specifically, Jim Ludy was not asked to sign any kind of confidentiality agreement, or take any kind of oath of secrecy.  (J. Ludy Dep. [Hadley Dec., Ex. 6] at 146:8-23.)  Nor were any other restrictions on J. Ludy's ability to disclose or publicly display Autumn King imposed.  (Id. at 147:3-7.)  Likewise, when Jim Ludy gave Larry Ludy some of the plant material later identified as Autumn King, Jim Ludy knew that Larry Ludy would be using that plant material to graft the Autumn King to grow Autumn King vines and fruit.  (Id. at 150:3-13.)  Despite this knowledge, Jim Ludy imposed no restrictions on Larry Ludy's use or ability to publicly display the Autumn King vine.  (Id. at 154:7-23.)  Finally, public access to the Ludys' Autumn King vines was not limited in any way.  To the contrary, the vines were viewable from publicly used roads.  (L. Ludy Dep. [Hadely Dec., Ex. 7] at 177:8-180:11; 190:4-192:25.)

The grafted Autumn King vines on both Ludy farms bore fruit in late 2002.  Specifically, in the Fall of 2002, Jim Ludy successfully grafted and grew Autumn King vines and produced Autumn King fruit.  (J. Ludy Dep. [Hadley Dec., Ex. 6] at 150:15-151:17.)  These same vines produced fruit again the following year, and Jim Ludy gave that fruit to other people.  (Id. at 155:4-156:24.)  In fact, many people other than the Ludys saw fruit and vines.  (L. Ludy Dep. [Hadley Dec., Ex. 7] at 38:5-39:12; 169:9-20; 175:22-176:16.)  One such person was Sandrini.  In October/November, 2002, Richard Sandrini observed Autumn King vines with fruit growing on both Ludy farms.  (Sandrini Dep. [Hadely Dec., Ex. 11] at 61:20-63:13; 66:23-67:5; 73:1-74:11; 79:5-13.)

It is undisputed that when people saw the Autumn King vines growing on the Ludy's land, no confidentiality agreement or understanding of secrecy was imposed.  (J. Ludy Dep. [Hadely Dec., Ex. 6] at 84:21-88:12; 149:1-150:1; 157:12-159:23; 161:4-16.)  Nor did Jim Ludy did not take any precautions to prevent the public disclosure of viewing of the Autumn King vines.  (Id. at 147:17-25; 148:16-25; 163:9-167:20.)

Larry Ludy's Autumn King vines began producing fruit for a second year in July 2003, and in September, 2003 this fruit was again publicly viewed.  (L. Ludy Dep. [Hadley Dec., Ex. 7] at 39:13-44:14; Declaration of Gerry Chua, ¶¶2-3; Declaration of Courtney Goldman, ¶2; Declaration of Gerry Chua, ¶¶ 2-3; Declaration of Rodrigo Cantorina, ¶2.)  Larry Ludy harvested this fruit and publicly distributed it.  (L. Ludy Dep. [Hadley Dec., Ex. 7] at 39:13-44:14.)  In November, 2003,

Larry Ludy sold these Autumn King grapes. (Sandrini Dep. [Hadley Dec., Ex. 11] at 80:19-81:4.) During that same timeframe, Larry Ludy grafted additional Autumn King vines, which later bore fruit. (L. Ludy Dep. [Hadley Dec., Ex. 7] at 176:18-177:7.) A picture of Larry Ludy's Autumn King fruit was taken at this time. (Declaration of Courtney Goldman, ¶2, Ex. A; Hadley Dec., Ex. 14; L. Ludy Dep. [Hadley Dec., Ex. 7] at 128:12-21; 129:2-23.) In addition, Larry Ludy's written records corroborate the growth and production of Autumn King grapevines in 2003. (L. Ludy Dep. [Hadely Dec., Ex. 7] at 134:2-7; 136:2-14; 137:15-21; 138:2-6; 138:20-25.) During the 2003/2004 Winter, Larry Ludy gave Richard Sandrini some of his Autumn King plant material. (Sandrini Dep. [Hadley Dec., Ex. 11] at 107:6-111:23.) This same plant material, which was later grown by Mr. Sandrini, is accused of infringement by CTGC. DNA testing confirms that the plant variety, grafted, asexually reproduced and harvested by Larry Ludy in 2002 and 2003 is the same as the Autumn King variety claimed in the '284 patent. (Sandrini Decl., Ex. B.)

The following timeline summarizes the most pertinent facts:

| Date | Event | Time prior to application for '284 patent |
|------|-------|-------------------------------------------|
| November, 2000 | Autumn King vines grown by CTGC bear fruit. (Ramming Dep. [Hadley Decl., Ex. 2] at 116:22-24; 123:14-18.) | About 4 years. |
| August, 2001 | CTGC begins displaying Autumn King fruit publicly. (Ramming Dep. [Hadley Dec., Ex. 2] at 123:12-23; 124:15-127:6; J. Ludy Dep. [Hadley Dec., Ex. 6] at 25:18-23; 28:3-9; 31:24-32:14; 46:3-9.) | Over 3 years. |
| September, 2001 | Dr. Ramming begins collecting data for Autumn King patent. (Ramming Dep. [Hadley Dec., Ex. 2] at 101:1-19.) | About 3 years. |
| January, 2002 | Dr. Ramming predicts release of Autumn King and completion of virus testing by end of year. (Ramming Dep. [Hadley Decl., Ex. 2] at 109:23-110:10; Hadley Decl., Ex. 3.) | Over 31 months. |
| March, 2002 | CTGC decides to begin process for patenting Autumn King. (Hadley Decl., Ex. 4; Ramming Dep. [Hadley Decl., Ex. 3] at 162:24-163:6.) | About 29 months. |
| Spring, 2002 | Jim and Lawrence Ludy obtain Autumn King plant material and graft that material on their farms. (J. | About 29 months. |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| | | |
|---|---|---|
| | Ludy Dep. [Hadley Dec., Ex. 6] at 68:5-17; L. Ludy Dep. [Hadley Decl., Ex. 7] at 22:8-24:21, 95:7-20.) | |
| September, 2002 | Jim and Lawrence Ludy grafted and asexually reproduced Autumn King successfully that bore fruit. Vines and fruit publicly viewed. (J. Ludy Dep. [Hadley Dec., Ex. 6] at 76:11-15, 84:21-88:12, 149:1-150:1, 157:12-159:23, 161:4-16; L. Ludy Dep. [Hadley Dec., Ex. 7] at 34:7-36:12, 38:5-39:12, 102:11-104:3, 127:2-21, 133:15-18, 169:9-10, 175:22-176:16, 177:8-180:11, 190:4-192:25; Hadley Dec., Exs 8, 9; Declaration of Gerry Chua, ¶¶ 2-3; Declaration of Courtney Goldman, ¶2, Ex. A; Sandrini Dec., Ex. B.) | About 2 years. |
| January, 2003 | Dr. Ramming recommends that Autumn King variety be released, but the CTGC rejects his recommendation. (Ramming Dep. [Hadley Dec., Ex. 2] at 114:3-21; Hadley Dec., Ex. 5 at p. 51.) | About 20 months. |
| February, 2003 | All data needed for patent application is available to Dr. Ramming. (Ramming Dep. [Hadley Dec., Ex. 2] at 166:23-167:24.) | About 19 months. |
| September, 2003 | Ludys' Autumn King vines bear fruit for a second year; fruit is publicly viewed, harvested and later sold. (J. Ludy Dep. [Hadley Dec., Ex. 6] at 76:11-15, 84:21-88:12, 149:1-150:1, 157:12-159:23, 161:4-16; L. Ludy Dep. [Hadley Dec., Ex. 7] at 34:7-36:12, 38:5-39:12, 102:11-104:3, 127:2-21, 133:15-18, 169:9-10, 175:22-176:16, 177:8-180:11, 190:4-192:25; Hadley Dec., Exs 8, 9; Declaration of Gerry Chua, ¶¶ 2-3; Declaration of Courtney Goldman, ¶2, Ex. A; Sandrini Dec., Ex. B.) | 14 months. |
| September 28, 2004 | Application for '284 patent filed. (Hadley Dec., Ex. 1.) | - |

## C.     The CTGC's Patent Licensing Program

CTGC law requires that California grape growers pay an assessment of approximately $0.13 per box of table grapes. (Nave Dep. [Hadley Dec., Ex. 12] at 57:6-12.) CTGC operates at an annual surplus from these assessments, but does not return any of the assessment money back to the California growers. (Id. at 51:3-16.) Since the early 1980s, research and development by the CTGC and USDA of new varieties of grapes has been funded by these assessments imposed on California's grape growers. (Id. at 56:11-57:5, 58:13-59:19, 63:21-64:20.) Included in this funding is the breeding program which led to the development of the Autumn King variety. (Id. at 59:20-60:8.)

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Prior to 2000, the CTGC and USDA did not have a patenting program.  Rather, for nearly

2    two decades, the grape varieties that were developed by the CTGC and USDA with California grape

3    growers' assessment revenues were distributed freely to California growers.  Then, in the late 1990s,

4    the CTGC contacted the USDA to initiate a patent licensing program to generate additional revenue

5    for the CTGC and USDA.  (Id. at 135:13-137:1)  The USDA eventually agreed to seek patent

6    protection based on the CTGC's request, but only if the CTGC would act as the exclusive licensee

7    to administer sublicensing to growers and collecting of royalties.  (Id. at 108:25-109:5, 156:8-

8    157:1.)  In exchange, the USDA and CTGC agreed that revenues from the patent licensing program

9    would be shared between the USDA and CTGC.  (Id. at 177:6-178:1.)  In accordance with that

10   agreement, the CTGC charges nurseries who distribute patented varieties a $5,000 participation fee

11   per patented variety (Id. at 112:6-10) and an additional $1 per production unit royalty.  (Id. at

12   112:22-113:8.)  These costs are then passed on by the nurseries to the California grape growers who

13   purchase the patented plant material from the nurseries.  (Id. at 112:22-113:8, 113:22-114:7.)  The

14   CTGC is fully aware that California grape growers bear the ultimate costs of the royalty fees, but

15   has imposed no restrictions on the nurseries' ability to pass on these costs.  (Id.)  Until recently

16   (about 2005 or 2006), CTGC did not even bother keeping track of the profits generated from its

17   patenting program.  (Id. at 130:23-131:5.)

18   **III.    LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT**

19   Summary judgment is appropriate in patent cases as in any other.  Barmag Barmer

20   Mischinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 835 (Fed. Cir. 1984).  The Court should

21   grant summary judgment when "the pleadings, depositions, answers to interrogatories, and

22   admissions on file, together with the affidavits, if any, show that there is no genuine issue of

23   material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

24   56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Ethicon Endo-Surgery, Inc. v. U.S.

25   Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998).  Summary judgment is a tool to promote

26   judicial economy and avoid unnecessary trials.  Scripps Clinic & Res. Found. V. Genentech, Inc.,

27   927 F.2d 1565, 1570 (Fed. Cir. 1991).

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## IV.    THE PATENT-IN-SUIT IS INVALID AS A MATTER OF LAW UNDER 35 U.S.C. §102(B)

Undisputed testimony, corroborated by both written and photographic evidence, demonstrates that more than a year prior to the application of the '284 patent, Lawrence Ludy (as well as Jim/Jack Ludy) had grafted and asexually reproduced Autumn King vines and harvested fruit from those vines.  Lawrence Ludy was under no obligation of secrecy or confidentiality.  To the contrary, Lawrence Ludy showed his vines and the fruit it bore to a number of people without asking any of them to maintain the secrecy of the Autumn King variety.  CTGC can present no evidence to rebut these events, and under well-established patent laws, this activity renders the '284 patent invalid under 35 U.S.C. §102(b).

### A.    Legal Standards Governing Invalidity Challenges to Plant Patents

Plant patents may be granted to "whoever invents or discovers and asexually reproduces any distinct and new variety of plant…"  35 U.S.C. § 161 (2000).  The grant accompanying a plant patent includes "the right to exclude others from asexually reproducing the plant, and from using, offering for sale, or selling the plant so reproduced, or any of its parts.…"  Id. §163.  Section 161 expressly makes plant patents subject to the novelty and statutory bar provision of the Patent Act, including the "on-sale" and "public use" provisions of 35 U.S.C. § 102(b).  Id. § 161; Bourne v. Jones, 114 F. Supp. 413, 419 (S.D. Fla. 1951), aff'd 207 F.2d 173 (5th Cir. 1953), cert. denied 346 U.S. 897 (1953); 1 CHISUM ON PATENTS, § 1.05[1][b][v] at 524(2006) ("The statutory bar provisions in Sections 102(b), 102(c) and 102(d) fully apply to plants.").

### 1.    The Statutory Bar of 35 U.S.C. §102(b) Precludes any Patent on Inventions in Public Use More than One Year Prior to the Application Date in the United States

35 U.S.C. § 102(b) provides: "A person shall be entitled to a patent unless…(b) the invention was…in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. §102(b) establishes a one year grace period based on public use, after which an inventor is barred from access to the patent system.  Id.

The Federal Circuit has defined "public use" as "any use of the claimed invention by a

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  person other than the inventor who is under no limitation, restriction or obligation of the secrecy to

2  the inventor." Baxter Int'l, Inc. v. Cobe Lab., Inc., 88 F.3d 1054, 1058-59 (Fed. Cir. 1996) (third

3  party prior use accessible to the public is a §102(b) bar). "The extent of public use is not important

4  for a single use is just as effectual as many to bar the right to a patent." Bourne, 114 F. Supp. at

5  419. "As a general principle, any non-secret use of the completed and operative invention or

6  discovery in its natural and intended way is a public use within the meaning of the statute." Id.

7      In the context of plant patents, possession of information that "enables a person of skill in the

8  art to practice asexual reproduction of the plant in a manner consistent with the statute can … act as

9  a §102(b) bar." In re Elsner, 381 F.3d 1125, 1129 (Fed. Cir. 2004). "In the case of plant patents, the

10  touchstone of the statutory subject matter is asexual reproduction of a unique biological organism.

11  When [§102(b) prior art] … puts one of ordinary skill in the art in possession of the plant itself,

12  which, based on the level of ordinary skill in the art, permits asexual reproduction without undue

13  experimentation, that combination of facts and events so directly convey the essential knowledge of

14  the invention … to erect a statutory bar." Id. "Since a plant variety that can be asexually

15  reproduced is incapable of being perfected or improved in the ordinary sense, any use must perforce

16  be of the complete[d] invention or discovery." Bourne, 114 F. Supp at 419; see also Ex Parte C, 27

17  U.S.P.Q.2d (BNA) 1492 (Bd. of Pat. App. 1992) ("use of seed, by growers, with no special

18  requirements for secrecy and confidentiality constituted commercial activity.…").

19              **2.     Third Party Public Use Qualifies as an Invalidating Use**

20      "[T]hird party [i.e., a person other than the inventor] prior use accessible to the public is a

21  section 102(b) bar." Eolas Technologies Inc. v. Microsoft Corp., 399 F.3d 1325, 1334 (Fed. Cir.

22  2005). "[A] third party may, and often does, initiate a public use." Id. Where a third party makes

23  "no attempt to maintain confidentiality or to deliberately evade disclosure…[such] activities may

24  erect a third party public use bar." Id. at 1335.

25      Although the Federal Circuit has held that "secret" prior use of an invention by a third party

26  is not an invalidating public use,[2] the minimum standard for what constitutes a "public" use (i.e., a

27  _____

28  [2] See W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 1549-50 (Fed. Cir. 1983);

1:06-cv-00842-OWW-TAG                                    Motion for Summary Judgment

non-secret use) by a third party encompasses nearly any unrestricted usage of the patented process

or apparatus.  2 CHISUM ON PATENTS, § 6.02[5][c] at 69 (2006)  For example, "[t]he statutory phrase

'public use' does not necessarily mean open and visible in the ordinary sense; it includes any use of

the claimed invention by a person other than the inventor who is under no limitation, restriction, or

obligation of secrecy to the inventor."  New Railhead Manufacturing, L.L.C. v. Vermeer

Manufacturing Co., 298 F.3d 1290, 1297 (Fed. Cir. 2002) (holding invalid a patent where the

patented method was performed at a commercial jobsite); See also Chemitron Corp. v. Procter &

Gamble Co., 287 F. Supp. 291, 306-14 (D. Md. 1968), aff'd, 427 F.2d 893 (4th Cir.), cert denied,

400 U.S. 925 (1970) (holding defendants' use of a chemical process "public" even though it

occurred inside machinery because defendants did not "physically isolate the areas in its several

plants where all these processes were utilized," did not place 'not authorized' signs on the doors, did

not screen employees entering the area, and "none of these employees, . . . were obliged to keep

[the] processes secret."); In re Smith, 714 F.2d 1127, 1134 (Fed. Cir. 1983) (defining public use as

"any use of [an] invention by a person other than the inventor who is under no limitation, restriction

or obligation of secrecy to the inventor").

### 3.    Consent Of The Inventor Is Not Required For A Public Use To Apply Under 35 U.S.C. §102(b).

Public use by a third party more than a year prior to the application for a patent renders a

patent invalid regardless of whether the patentee knew of, or consented to, that public use.  "[W]here

the purchase, sale or prior use…has been for more than [one] year[] prior to the application the

patent shall be held invalid, ***without regard to the consent or allowance of the inventor***."  Andrews

v. Hovey, 124 U.S. 694, 719 (1888) (emphasis added);  In re Blaisdell, 242 F.2d 779, 851 (CCPA

1957) ("[I]t is well established that to constitute public use or sale of an invention, it is not necessary

that…the article be used with the knowledge or consent of the inventor, or that the invention be

necessarily exposed to public view.").  See also Manning v. Cape Ann Insinglass & Glue Co., 108

U.S. 462, 465-66 (1883) (Patent statute "does not allow the issue [of a patent], when the invention

Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1371 (Fed. Cir. 1998).

-13-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   has been in public use for more than two years [now one year] prior to the application, either with or

2   without the consent or allowance of the inventor.").

3          Although some decisions under the pre-1870 Patent Act suggested that a public use without

4   the consent of the inventor would not render a patent invalid, in <u>Manning</u>, the Supreme Court

5   confirmed that the 1870 amendment to the Patent Act changed the law.  Specifically, the <u>Manning</u>

6   Court held that the 1870 amendment removed the requirement that public disclosure of an invention

7   prior to the submission of a patent application must be with the consent of the inventor to invalidate

8   a patent:

9              It is the policy of the patent laws to forbid the issue of a patent for an
               invention which has been in public use before the application thereof.
10             The statute of 1836 … did not allow the issue of a patent when the
               invention had been in public use…with the consent or allowance of
11             the inventor; and the statute of 1870…does not allow the issue, when
               the invention had been in public use…***either with or without the***
12             ***consent or allowance of the inventor***."

13  <u>Manning</u>, 108 U.S. at 465-66 (emphasis added).

14         The removal of the "consent or allowance of the inventor" requirement from the invalidating

15  public disclosure statute has continued to this day and is reflected in the express language of 35

16  U.S.C. §102(b).  Indeed, since the Supreme Court's decisions in <u>Manning</u>, federal courts have

17  consistently affirmed that a public use can take place without the consent of the inventor.  <u>See</u>

18  <u>Hobbs v. U.S. Atomic Energy Com.</u>, 451 F.2d 849, 860 (5th Cir. 1971) ("It has however long been

19  settled that placing on sale [under section 102(b)] may be by the inventor or another, with or without

20  the consent of the inventor."); <u>Watson v. Allen</u>, 254 F.2d 342, 345 (D.C. Cir. 1958) ("It is

21  immaterial that the use was without the inventor's consent, or that the use was due to factors not his

22  fault and beyond his control.").  Indeed, even outright theft of an invention, followed by a public use

23  of the stolen invention more than one year before the filing date of a patent application, bars

24  issuance of a valid patent:

25             The prior –public use proviso . . . was enacted by Congress in the
               public interest.  It contains no qualification or exception which limits
26             the nature of the public use.  We think that Congress intended that if
               an inventor does not protect his discovery by an application for a
27             patent within the period prescribed by the Act, and an intervening
               public use arises from any source whatsoever, the inventor must be
28             barred from a patent or from the fruits of his monopoly, if a patent has

-14-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1      issued to him.  There is not a single word in the statute which would
2      tend to put an inventor, whose disclosures have been pirated, in any
    different position from one who has permitted the use of his process.

3  Lorenz v. Colgate-Palmolive-Peet Co., 167 F.2d 423, 429 (3rd Cir. 1948) (holding a patent invalid

4  under the public use doctrine where a third person pirated the invention from the true inventor and

5  place it in public use more than one year before the critical date).

6      The Federal Circuit recently reaffirmed that the same rule applies to the "on-sale" bar

7  provision of 35 U.S.C. § 102(b) where an invention is stolen then offered for sale more than one

8  year before the filing of a patent application.  See Evans Cooling Systems, Inc., v. General Motors

9  Corp., 125 F.3d 1448 (Fed. Cir. 1997), cert. denied, 522 U.S. 1115 (1998) (refusing to "create an

10  exception to the on sale bar for those instances in which a third party misappropriates the invention

11  and later places the invention on sale or causes an innocent third party to place the invention on

12  sale…."); Special Devices, Inc. v. OEA Inc., 270 F.3d 1353, 1355 (Fed. Cir. 2001); In re Martin, 74

13  F.2d 951, 955-56 (CCPA 1935).

14          **4.**      **The Experimental Use Exception Does Not Apply to Unclaimed**

15                  **Features or Uses Beyond the Inventor's Control.**

16      The "experimental use doctrine" provides that a "public use" action will not trigger the

17  section 102(b) bar if the use was incidental to experimentation.  See Electromotive Division of

18  General Motors Corp. v. Transportation Systems Division of General Electric Co., 417 F.3d 1203,

19  1212 (Fed. Cir. 2005).  However, it is "settled law that the experimental use exception is not

20  applicable to experiments performed with respect to unclaimed features of an invention."  In re

21  Smith, 714 F.2d 1127, 1136 (Fed. Cir. 1983).  Additionally, market testing or attempts to develop

22  buyer demands does not fall within the experimental use exception.  See Alan Engineering Corp. v.

23  Bartell Indus., 299 F.3d 1336, 1355 (Fed. Cir. 2002).  Finally, for a "use" to fall within the

24  "experimental use" exception, the alleged experimentation must be under the inventor's direct

25  supervision and control.  Lough v. Brunswick Corp., 86 F.3d 1113, 1120 (Fed. Cir. 1996), cert.

26  denied, 522 U.S. 806 (1997) ("[I]f the inventor has no control over the alleged experiments, he is not

27  experimenting.  If he does not inquire about the testing or receive reports concerning the results,

28  similarly, he is not experimenting."); Baxter Int'l, Inc. v. COBE Labs, Inc., 88 F.3d 1054, 1060

1:06-cv-00842-OWW-TAG                      Motion for Summary Judgment

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   (Fed. Cir. 1996) ("The experimental use doctrine operates . . . to allow *the inventor* to refine his

2   invention or to assess its value relative to the time and expense of prosecuting a patent application.

3   If it is not the inventor or someone under his control or 'surveillance' who does these things, there

4   appears to us no reason why he should be entitled to rely upon them to avoid the statute.") (emphasis

5   in original).

**B.      The Invention Claimed in the '284 Patent Was In Public Use More Than One**
**Year Before the USDA Submitted the Patent Application**

8        Here, each of the elements of a public use under 35 U.S.C. §102(b) are present.  First, Larry

9   Ludy asexually reproduced the Autumn King variety of plants on his farm by July 2003.  These

10  plants bore fruit by September of that year, which Mr. Ludy harvested and distributed publicly.

11  These facts are undisputed and corroborated by written and photographic evidence, along with the

12  testimony of many witnesses.  (Hadley Dec., Ex. 10; L. Ludy Dep. [Hadley Dec., Ex. 7] at 39:13-

13  44:13, 128:12-21, 129:2-23, 134:2-7, 136:2-14, 137:15-21, 138:2-6, 138:20-25; Sandrini Dep.

14  [Hadley Dec., Ex. 11] at 61:20-63:13, 66:23-67:5, 72:1-74:11, 79:5-13, 80:19-81:4; Declaration of

15  Gerry Chua, ¶¶ 2-3; Declaration of Courtney Goldman, ¶2, Ex. A; Sandrini Dec., Exs. A and B.)

16  Recent DNA tests confirm that the grapevines grown and harvested by Larry Ludy in July 2003

17  (which he referred to as "Late White") is the Autumn King variety claimed in the '284 patent.

18  (Sandrini Dec., Ex. A.)  Because the USDA did not apply for the patent on Autumn King until

19  September 28, 2004, Larry Ludy undeniably possessed the invention of the '284 patent more than a

20  year prior.  In re Elsner, 381 F.3d at 1129 ("In the case of plant patents, the touchstone of the

21  statutory subject matter is asexual reproduction of a unique biological organism."); Bourne, 114

22  F.Supp at 419.

23       Mr. Ludy's use of the Autumn King grapevines more than one year before the USDA filed a

24  patent application easily qualifies as "public" under 35 U.S.C. § 102(b).  Mr. Ludy was under no

25  obligation of secrecy to the named inventors of the '284 patent or anyone else.  (J. Ludy Dep.

26  [Hadley Dec., Ex. 6] at 150:3-13, 154:7-23.)  Larry Ludy grew the Autumn King plants on his farm

27  in plain view.  Moreover, he took no measures to maintain the secrecy of these plants.  To the

28  contrary, Mr. Lawrence Ludy freely showed the grapevines and the fruits produced to others

-16-

1   including Mr. Chua, Mr. Sandrini, his niece, and other friends – all under no obligation of

2   confidentiality or understanding of secrecy.  (L. Ludy Dep. [Hadley Dec., Ex. 7] at 177:8-180:11,

3   190:4-192:25; Declaration of Courtney Goldman, ¶2, Ex. A; Declaration of Gerry Chua, ¶¶2-3;

4   Declaration of Rodrigo Cantorina, ¶2.)  Under these circumstances, the law is settled:  Mr. Ludy's

5   use was public.  Eolas Technologies Inc., 399 F.3d at 1335 (Where a third party makes "no attempt

6   to maintain confidentiality or to deliberately evade disclosure…[such] activities may erect a third

7   party public use bar."); New Railhead Manufacturing, L.L.C., 298 F.3d at 1297; Baxter Int'l, Inc.,

8   88 F.3d at 1058-59 (defining "public use" as "any use of the claimed invention by a person other

9   than the inventor who is under no limitation, restriction or obligation of the secrecy to the

10  inventor.").

11          The fact that Dr. Ramming did not "authorize" the release or use of the Autumn King plant

12  material at the time the Ludys reproduced it lacks legal relevance.  Under settled law, a public use

13  may occur even where the patentee had no knowledge or consent of that use.  Andrews v. Hovey,

14  124 U.S. at 719; In re Blaisdell, 242 F.2d 779, 851 (CCPA 1957).  Even if an invention is stolen and

15  placed in public use, the inventor has one year to file a patent application or the invention becomes

16  part of the public domain.  Evans Cooling Systems, 125 F.3d at 1448.  Finally, the fact that Dr.

17  Ramming did not authorize the reproduction of the Autumn King vines by the Ludys means that the

18  "experimental use" exception to section 102(b) cannot apply.  Lough, 86 F.3d at 1120.

19          Public policy supports this result.  In exchange for the exclusive rights granted in a patent,

20  the public has an interest in the prompt disclosure of inventions.  Section 102(b) reflects this balance

21  by requiring that inventors promptly disclose their contributions to the art in patent applications

22  within one year of an offer for sale or public use – or else forfeit the right to do so.  See, e.g. Evans

23  Cooling Sys., Inc. v. General Motors Corp., 939 F.Supp. 154, 156 (D. Conn. 1996) (citing J.A.

24  LaPorte, Inc. v. Norfolk Dredging Co., 787 F.2d 1577, 1583 (Fed. Cir. 1986).).  In this case, Dr.

25  Ramming easily could have sough patent protection in 2002 or 2003 – which would have protected

26  the patent against any reproduction by others.  (Ramming Dep. [Hadley Dec., Ex. 2] at 168:16-19;

27  177:24-178:3.)  Indeed, Dr. Ramming not only suggested that patent protection be sought in 2003,

28  but both the USDA and CTGC knew the potential consequences of delay.  (Nave Dep. [Hadley

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    Dec., Ex. 12] at 203:16-205:12.)  Nonetheless, Dr. Ramming deferred to the CTGC's

2    recommendation to defer patent protection.  (Ramming Dep. [Hadley Dec., Ex. 2] at 117:25-118:22,

3    137:13-15.)  By delaying filing, the Patent Act dictates the result – the patent is invalid under 35

4    U.S.C. § 102(b).

5         Finally, the facts here are nearly indistinguishable from the Bourne case.  In Bourne, the

6    plaintiff received a patent on a new sugar cane variety in conjunction with a program developed by

7    the State of Florida.  Bourne, 114 F. Supp at 415-16.  Approximately two years before the inventor

8    applied for patent protection, a co-worker of the inventor, without authorization, distributed sugar

9    cane plant material to commercial growers.  Id. at 417-18.  These commercial growers then

10   reproduced the sugar cane, which plaintiff ultimately patented, more than two years before the

11   plaintiff applied for patent protection.  Id.   Based on these facts, the court found the patent invalid

12   based on prior public use, and entered judgment in favor of an alleged infringer.  Id. at 420.  In

13   response to the invalidity defense, the Bourne court rejected an argument that his co-worker lacked

14   the authority to distribute the sugar cane plant material because, at the time of distribution, "there

15   were no restrictions placed on early users of untried varieties."  Id. at 419.  Also, the Bourne court

16   rejected an argument that the commercial growers did not engage in a "public" use because the

17   reproduction took place outside the control of the inventor.  Id. at 419-20.

18        Just as in Bourne, the reproduction by the Ludys took place outside the control of the

19   inventor.  Likewise, no restrictions existed on Autumn King at the time Larry Ludy reproduced the

20   variety since patent protection had not been sought yet.  Moreover, the evidence shows that Jim

21   Ludy received the Autumn King plant material from a USDA employee who was authorized to have

22   possession of that plant material and who placed no obligations on Jim Ludy's to limit the disclosure

23   of the material.  (J. Ludy Dep. [Hadley Dec., Ex. 6] at 80:25-81:7, 131:22-133:3; Tarailo Dep.

24   [Hadley Dec., Ex. 13] at 12:11-25, 13:23-14:2, 14:10-13, 14:19-22) and the USDA employee who

25   supplied the sticks placed no restrictions on their use.  Thus, the same result should be reached.

26   **V.    PLAINTIFF DOES NOT HAVE THE STATUTORY AUTHORITY TO LICENSE**

27   **AND ENFORCE PATENTS.**

28        Well-settled California law makes clear that commissions, such as the CTGC, cannot

-18-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   exercise powers beyond those expressly enumerated in the statute authorizing such commissions.

2   Under the Ketchum Act, which governs the CTGC, the CTGC lacks any statutory authority to

3   pursue a patent licensing program, bring suit against parties for patent infringement, or to generate

4   revenue through the collection of patent royalties.  Accordingly, the CTGC lacks the standing to sue

5   Mr. Sandrini, or any other party, for patent infringement.

6       **A.       The California Table Grape Commission's Statutory Powers.**

7       The CTGC was created in 1967 by the Ketchum Act (Food & Agr. Code, §§65500 *et seq.*).

8   Under the Ketchum Act, the CTGC's mission is "[t]o promote the sale of fresh grapes by advertising

9   and other similar means for the purpose of maintaining and expanding present markets and creating

10  new and larger intrastate, interstate and foreign markets for fresh grapes; to educate and instruct the

11  public with respect to fresh grapes; and the uses and time to use the several varieties, and the

12  healthful properties and dietetic value of fresh grapes."  Cal. Food & Agr. Code, § 65572(h).

13      To fund the objectives of the Ketchum Act, the law provides the CTGC with only a single

14  source of revenue – assessments levied on growers with very specific limitations:

15          There is hereby levied and imposed upon all fresh grapes shipped
            during each marketing season an assessment as fixed by the
16          commission at that amount determined by the commission as
            reasonably necessary to pay all obligations incurred or to be incurred
17          in accordance with this chapter and as reasonably necessary to carry
            out the objects and purposes of this chapter.  However, during any
18          marketing season the assessment shall not exceed $0.006522 per
            pound ($0.6522 per 100 pounds), computed on net weight when
19          shipped, whether in bulk or loose in boxes or in any other contained or
            packed in any style package.
20
            All shipments of 150 pounds or less of fresh grapes sold or shipped by
21          a producer direct to the consumer are exempt from the assessment.

22  Cal. Food and Agric. Code §65600.  Cal. Food and Agric. Code §§65601 – 65605 set forth various

23  requirements regarding the recordkeeping and payment scheme for these assessments.  The

24  Ketchum Act provides no other revenue-generating scheme for the CTGC.  California law has long

25  established that a commission's powers must be drawn from express statutory authority.  See United

26  Farm Workers of America, AFL-CIO v. Agricultural Labor Relations Bd., 41 Cal. App. 4th 303,

27  319-20 (1995) ("The Commission, as a state agency, has only those powers conferred on it by law.")

28  (citing Association for Retarded Citizens v. Department of Development Services, 38 Cal. 3d 384,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

1   391-93 (Cal. 1985); <u>Ferdig v. State Personnel Bd.</u>, 71 Cal. 2d 96, 103 (Cal. 1969)); <u>American</u>

2   <u>Federation of Labor v. Unemployment Ins. Appeals Bd.</u>, 13 Cal. 4th 1017, 920 P.2d 1314 (Cal.

3   1996) (holding that agency did not have statutory authority to reward interest); <u>Merced County v.</u>

4   <u>Helm</u>, 102 Cal. 159 (1894) (holding that an agency did not have the statutory authority to impose a

5   tax).

6          In <u>United Farm Workers of America</u> ("UFWA"), the California Court of Appeal specifically

7   addressed the scope of the CTGC's powers and held that the CTGC did not have the statutory

8   authority to initial labor relations suits, and therefore the CTGC lacked standing.  The court

9   reasoned that "there is nothing in the legislative history to show any contemplation of any

10  involvement by the industry-controlled Commission in the area of labor relations, or of any

11  enforcement role for the Commission outside the narrow area of the Ketchum Act."  <u>United Farm</u>

12  <u>Workers of America</u>, 41 Cal. App. 4th at 316.  In addition, the Court of Appeals reasoned that "[t]he

13  statutory construction doctrine of … the expression of certain things in a statute necessarily involves

14  the exclusion of other things not expressed" lead to the conclusion that "the express enumeration in

15  the Ketchum Act of the types of actions the Commission is authorized to bring impliedly excludes

16  the Commission from involving itself in other types of proceedings."  <u>Id.</u> at 316-317.  The <u>UFWA</u>

17  Court also rejected the argument that the CTGC's actions were allowed because they would benefit

18  growers generally: "[T]he mere fact that the agency's action might benefit growers generally is

19  insufficient to legitimize the agency's conduct.  Thus, although the Commission's filing of unfair

20  labor practice charges could lead to increased consumption of table grapes…that hoped-for result

21  did not permit the Commission to file unfair labor practice charges without legislative

22  authorization."  <u>Id.</u> at 320.

23         <u>B.C. Cotton, Inc. v. Voss</u>, 33 Cal. App. 4th 929 (1995), involving regulation of the cotton

24  industry, is also instructive.  There, the California Court of Appeal held a Department of Food and

25  Agriculture regulation regarding the breeding and development of cotton invalid.  It stated: "[W]hile

26  the Legislature can establish a licensing scheme and delegate the administration of the scheme to an

27  administrative agency, where the Legislature has not established a licensing requirement an

28  administrative agency may not confer such licensing authority upon itself…. Such an attempt by an

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-20-

1   administrative agency to enlarge the scope of the powers conferred upon it is unlawful and void."

2   *Id.* at 955-956 (citations omitted).  The Court of Appeals in <u>B.C. Cotton</u> also rejected the agency's

3   argument that the regulation would have protected and promoted the cotton industry.  <u>Id</u>. at 956.

4          Here, as in <u>UFWA</u> and <u>B.C. Cotton</u>, the Ketchum Act does not provide any authority to the

5   CTGC to establish a patent licensing program, does not allow the CTGC to initiate patent suits, and

6   does not authorize the CTGC to collect revenue through the imposition of a patent royalty.  The

7   CTGC's patent licensing scheme is nothing more than an end-around the limited powers and

8   revenue sources allowed under the Ketchum Act.  The history of the patent licensing program

9   confirms this.  More specifically, for more than 30 years of existence, the CTGC did not engage in a

10  patent licensing program.  If the CTGC wants to engage in a licensing program, it needs permission

11  from the California state legislature first.  Without that express permission, the CTGC self-

12  expansion of statutory authority is particularly troubling:  Assessments imposed on California's

13  grape growers are used to fund the development of new grape varieties that the CTGC is now

14  patenting and licensing.

15         In sum, there is no doubt that the CTGC lacks express statutory authority for its licensing

16  program.  Without that express authority, both <u>UFWA</u> and <u>B.C. Cotton</u> confirm that the CTGC lacks

17  standing to assert legal claims under the unauthorized program.  Thus, the CTGC's lawsuit against

18  Mr. Sandrini for patent infringement should be dismissed.

19  **VI.     THE CTGC OFFERED, AND MR. SANDRINI ACCEPTED, A LICENSE TO THE**

20  **          AUTUMN KING VARIETY.**

21         In 2001, the CTGC became aware the Mr. Sandrini may be in possession of Autumn King

22  vines.  Ms. Nave of the CTGC spoke to Mr. Sandrini regarding his alleged possession of Autumn

23  King.  (Nave Dep. [Hadley Dec., Ex. 12] at 350:19-23.)  On November 18, 2005, Ross Jones of the

24  CTGC sent Mr. Sandrini a letter asking Mr. Sandrini to sign an affidavit confirming his possession

25  of Autumn King.  (Hadley Dec., Ex. 14; Nave Dep. [Hadley Dec., Ex. 12] at 362:19-23.)  The

26  CTGC told Mr. Sandrini that once Mr. Sandrini signed an affidavit affirming his possession of

27  Autumn King, he would be sent an Autumn King Domestic Grower License Agreement for his

28  execution.  (Nave Dep. [Hadley Dec., Ex. 12] at 362:24-363:3.)  This letter was sent on behalf of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

and with the authorization of CTGC.  (Id. at 333:2-13.)  Mr. Sandrini subsequently sent the CTGC

an affidavit confirming that he possessed Autumn King.  (Hadley Dec., Ex. 17; Nave Dep. [Hadley

Dec., Ex. 12] at 363:4-7.)  CTGC then sent Mr. Sandrini a Domestic Grower License Agreement,

which Mr. Sandrini signed and returned to CTGC.  (Hadley Dec., Ex. 35; Nave Dep. [Hadley Dec.,

Ex. 12] at 363:8-364:5)  This Domestic Grower License Agreement pertained to Autumn King plant

material already in the possession of Mr. Sandrini.  (Nave Dep. [Hadley Dec., Ex. 2] at 366:13-18.)

The Domestic Grower License Agreement offered by CTGC and accepted and executed by

Mr. Sandrin unambiguously provided Mr. Sandrini with a license to the Autumn King '284 patent:

> 1.2    "Licensed Patents" shall mean (a) U.S. Patent Application No.
> 10/953,367 "Grapevine denominated as Autumn King," filed
> September 28, 2004, (b) all patents issuing therefrom including any
> reissue, reexaminations, extensions, divisions, renewals, substitutions,
> confirmations, registrations, revalidations, revisions, and additions of
> or to any of the foregoing…
>
> 1.3    "Licensed Variety" shall mean the variety denominated as
> Autumn King in U.S. Patent Application No. 10/953,387…
>
> 2.1    License Grant.  Subject to the terms and conditions of this
> Agreement, the Commission hereby grants to Grower a limited,
> nonexclusive, nontransferable right and license under the Licensed
> Patents during the term of this Agreement solely (a) to grown the
> Wood in the United States and (b) to sell or market the Fruit in the
> Territory in accordance with Article 4.

(Hadley Dec., Ex. 18.)  Accordingly, CTGC offered Mr. Sandrini a license to practice the '284

patent, which Mr. Sandrini accepted.  Under these circumstances, CTGC has no right to sue Mr.

Sandrini for patent infringement, as Mr. Sandrini already has an express and/or implied license to

the '284 patent.  Jacobs v. Nintendo of Am., 370 F.3d 1097, 1101-02 (Fed. Cir. 2004).

## VII.    CTGC'S STATE LAW CLAIMS ARE PREEMPTED BY FEDERAL PATENT LAW.

In Counts Three to Four of its Complaint, CTGC asserts causes of action against Defendants

for violation of the California Business and Professions Code, section 17200, intentional

interference with prospective economic relationships and unjust enrichment.  Each of these state law

claims is predicated on Mr. Sandrini's alleged possession of Autumn King plant material without a

license from CTGC.  In short, CTGC is seeking an award of damages for the making, using and

selling of information and ideas that CTGC claims are patented.  This is precisely the basis for

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  CTGC's patent infringement claim against Defendants.  As such, these state law claims are

2  preempted by federal patent law.

3         Under the Supremacy Clause, state law that conflicts with federal law is without effect.

4  <u>Bonito Boats</u>, 489 U.S. 141, 168 (1989). The United States Supreme Court has held that "state

5  regulation of intellectual property must yield to the balance struck by Congress in our patent laws."

6  <u>Id</u>. at 152.  Central to this balance are the requirements of novelty and non-obviousness (35 U.S.C.

7  sections 102 and 103), which exist principally to ensure that patents are granted for ideas not already

8  in the public domain.  <u>Id</u>. at 150.  Federal law preempts state law that offers "patent-like protection"

9  to discoveries unprotected under federal patent law.  <u>Id</u>. at 156.  <u>See</u> also <u>Ultra-Precision</u>

10  <u>Manufacturing, Ltd. v. Ford Motor Co.</u>, 411 F.3d 1369, 1377-82 (Fed. Cir. 2005) (holding the patent

11  law preempted state law claim of unjust enrichment); <u>Waner v. Ford Motor Co.</u>, 331 F.3d 851, 856-

12  57 (Fed. Cir. 2003) (holding that a district court properly granted summary judgment on unjust

13  enrichment claim due to federal preemption).

14         Here, CTGC does not claim that Mr. Sandrini received any benefit beyond that of obtaining

15  Autumn King material without a patent license.  Indeed, there is complete unity between the facts

16  underlying CTGC's patent law claim and CTGC's state law claims.  As such, the state law claims

17  are preempted by the federal patent laws.  <u>Ultra-Precision Manufacturing, Ltd.</u>, 411 F.3d 1379-80

18  ("Ultra-Precision makes no claim to an incremental benefit above and beyond the benefit the public

19  received when Ultra-Precision published the technical information it gave to Ford when Ultra-

20  Precision's patents issued.")  In other words, if CTGC cannot prevail on its patent claim (e.g.

21  because the '284 patent is held invalid), CTGC cannot prevail on its state claims either.  This is

22  because "federal patent law generally precludes recovering a royalty-like award premised on

23  defendants' making, using, offering to sell, or selling an unpatented discovery after plaintiff makes

24  the discovery available to the public." <u>Id</u>. at 1380.  Because CTGC's state law claims are predicated

25  entirely on the facts giving rise to its patent law claims, CTGC's state law claims should be

26  dismissed as preempted by federal law.

27         In addition, if the Court finds that (1) the '284 patent is invalid, (2) CTGC lacks the statutory

28  authority, and therefore standing, under the Kethcum Act to engage in its patent licensing program,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-23-

1  or (3) Mr. Sandrini has a license to the Autumn King grapevine, the Court should decline pendent

2  jurisdiction over CTGC's state law claims, because no federal claims would remain at issue.  35

3  U.S.C. section 1338(b) grants the Court jurisdiction over state unfair competition claims in

4  connection with related to patent claims.  But in the absence of a valid patent claim (*i.e.* if CTGC's

5  patent claims are dismissed for any of the reasons presented by this motion), the Court should

6  decline to continue exercising jurisdiction over exclusively state law claims.  See United Mine

7  Workers of Am. v. Gibbs, 383 U.S. 715, 725-26 (1966).

8  **VIII.   CONCLUSION**

9      CTGC's patent infringement claims should be rejected for the following reasons: (1) the

10  '284 patent is invalid under 35 U.S.C. §102(b) because the Autumn King was in public use for more

11  than a year prior to the filing of the application for the '284 patent; (2) the CTGC lacks the authority

12  under the Ketchum Act to create a patent licensing program, to sue for patent infringement or to

13  collect revenues from patent royalties and therefore lacks standing to bring this suit; and (3) the

14  CTGC offered Mr. Sandrini a license to the '284 patent, which Mr. Sandrini accepted and executed.

15  The facts concerning each of these issues are undisputed.  Accordingly, summary judgment against

16  CTGC is appropriate.

17

18  DATED:  March 30, 2007                    HENNIGAN BENNETT & DORMAN LLP

19

20

21                                          By _____/s/ Lawrence M. Hadley_____
                                               Lawrence M. Hadley
22

23                                          Attorney for Defendants
                                            RB SANDRINI, INC., RB SANDRINI FARMS,
24                                          L.P. d/b/a/ RB SANDRINI FARMS and
                                            RICHARD B. SANDRINI
25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

***The California Table Grape Commission v. RB Sandrini, et al.***
USDC Eastern District Case No. 1:06-cv-00842-OWW-TAG

     I certify that on March 30, 2007, I have caused the following document:

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

to be filed electronically with the Clerk of the Court through ECF will send an e-notice of the electronic filing to the following:

Robert D. Wilkinson
(RDW@bmj-law.com)
Baker, Manock & Jensen
A Professional Corporation
Fig Garden Financial Center
5260 North Palm Avenue, Fourth Floor
Fresno, CA  93704-2209
Telephone:  (559) 432-5400
Facsimile:  (559) 432-5620

Brian M. Boynton
(brian.boynton@wilmerhale.com)
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC  20006
Telephone:  (202) 663-6044
Facsimile:  (202) 663-6363

Michael J. Stump
(mstump@ralphwegis.com)
The Law Offices of Ralph B. Wegis
1930 Truxtun Avenue
Bakersfield, CA  93301
Telephone:  (661) 635-2100
Facsimile:  (661) 635-2107

| Dated:  March 30, 2007 | _____ |
|---|---|
| | /S/Lawrence M. Hadley |
| | Lawrence M. Hadley |