UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The California Table Grape Commission,<br><br>                 Plaintiff,<br>      v.<br><br>RB Sandrini, Inc., RB Sandrini Farms, L.P. d/b/a/ RB Sandrini Farms, and Richard B. Sandrini,<br><br>                 Defendants. | 1:06-cv-00842-OWW-TAG<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I.  Introduction

Before the court are cross-motions for summary judgment. Plaintiff, The California Table Grape Commission ("Commission"), moves for partial summary judgment on its first and second causes of action for patent infringement under 35 U.S.C. § 271 and for violation of California Business and Professions Code § 17200, respectively.  The Commission also moves for partial summary judgment on the defendants' affirmative defense and counterclaim that the patent in question is not invalid under the public use bar of 35 U.S.C. § 102(b).

Defendants, RB Sandrini, Inc. ("Sandrini Inc."), RB Sandrini Farms, L.P. d/b/a/ RB Sandrini Farms ("Sandrini Farms"), and Richard B. Sandrini ("Mr. Sandrini") (all defendants collectively, "Sandrini"), move for summary judgment on four

1  grounds: (1) the patent in question is invalid under the public
2  use bar of 35 U.S.C. § 102(b); (2) the Commission lacks statutory
3  authority under the Ketchum Act to engage in its patent licensing
4  program and therefore lacks standing; (3) the Commission granted
5  Sandrini a license to practice the patent in question; and (4)
6  federal law preempts the Commission's state law causes of action.

7

8                        **II.  Background**

9       The Commission and Sandrini each submitted a statement of
10 undisputed facts and a response to each other's statement of
11 undisputed facts.  It is relatively clear from the responses that
12 the parties do not agree on what facts are undisputed.

13

14      **A.   Facts in Support of the Commission's Motion**

15      Sandrini Inc. is a California corporation with its principal
16 place of business in Delano, California.  (PSUF 1).  Sandrini
17 Inc. is in the business of selling and shipping table grapes.
18 (PSUF 2).  Mr. Sandrini is the sole shareholder of Sandrini Inc.
19 (PSUF 3).  Sandrini Farms is a California limited partnership
20 with its principal place of business in Delano, California.
21 (PSUF 4).  Sandrini Farms is in the business of growing table
22 grapes.  (PSUF 5).  Mr. Sandrini is the sole owner of Sandrini
23 Farms either directly, or through Sandrini Inc.  (PSUF 6).  The
24 identity of the general and limited partners is not specified by
25 the moving papers.
26      In 1981, the Commission began funding the table grape
27 breeding program run by the United States Department of
28 Agriculture ("USDA").  (PSUF 7).  The Commission currently funds

                                2

1  approximately one-third of the USDA's program.  (PSUF 7).

2  Between 1990 and 2006, California table grape growers contributed

3  more than $1.1 million to the USDA program through their

4  assessments paid to the Commission.  (PSUF 7).

5       On August 6, 2001, the Commission and the USDA entered into

6  a memorandum of understanding establishing a framework for

7  cooperation between each other to develop and patent new table

8  grape varieties.  (PSUF 8).  The USDA and Commission agreed that

9  obtaining intellectual property protection for the USDA's new

10  table grape varieties would often be in the best interest of

11  table grape producers.  (PSUF 8).  The USDA and Commission also

12  agreed that as the USDA developed and decided to patent new table

13  grape varieties, the Commission would apply to become the

14  licensee.  (PSUF 8).  If the Commission became the licensee, it

15  would administer the rights to the new varieties and make them

16  available to the growers.  (PSUF 8).

17       USDA employees David W. Ramming ("Ramming") and Ronald E.

18  Tarailo ("Tarailo") invented Autumn King, the table grape at

19  issue in this case.  (PSUF 9).  Ramming and Tarailo filed Patent

20  Application No. 10/953,387 on September 28, 2004.  (PSUF 9).  In

21  connection with the patent application, the inventors of Autumn

22  King did not collect the measurements of the mature vines until

23  December 19, 2003; these measurements were the final piece of

24  data needed for the patent application.  (PSUF 10).  Sandrini,

25  however, asserts that the measurements of the mature vines were

26  taken in the summer of 2003 in less than thirty minutes and could

27  have been taken in earlier growing seasons.  (RPSUF 10).

28       The official public release of the Autumn King variety

1 occurred on July 13, 2005.  (PSUF 19).  Prior to the official
2 release, Ramming took numerous precautions to maintain control
3 over the Autumn King vines grown on USDA controlled property
4 (PSUF 19), although Sandrini states Ramming took no such
5 precautions.  (RPSUF 19).  No person at the USDA with authority
6 to do so authorized the release of the Autumn King variety to any
7 grower before the official release date.  (PSUF 19).  Sandrini,
8 however, disputes this and states that a USDA employee most
9 likely provided the Autumn King plant material to Jim Ludy prior
10 to the official release date.  (RPSUF 19).

11     On February 21, 2006, patent number US PP16,284 ("'284
12 Patent"), entitled Grape Vine Denominated Autumn King, was issued
13 to Ramming and Tarailo.  (PSUF 11).  The '284 Patent describes
14 and claims a variety of grapevine denominated Autumn King
15 ("Autumn King").  (PSUF 12).  The United States, as represented
16 by the Secretary of Agriculture, is the owner of the '284 Patent
17 by assignment from Ramming and Tarailo.  (PSUF 13).

18     The Commission and the United States entered into a license
19 agreement on June 27, 2005, which granted the Commission an
20 exclusive license to the '284 Patent.  (PSUF 14).  As the
21 exclusive licensee, the Commission makes the Autumn King variety
22 available to domestic growers through sublicensed nurseries.
23 (PSUF 15).  Currently, this is the only way growers are
24 authorized to obtain the Autumn King variety.  (PSUF 15).

25

26     1.  Sandrini's Infringement of the '284 Patent

27     Without authorization from the USDA or the Commission,
28 Sandrini grafted approximately 10,000 Autumn King buds onto vines

1  in early spring 2004 and grafted 16,000 vines in April 2005;
2  these vines remain on Sandrini's property.  (PSUF 17d).

3      In November 2004, Sandrini, on behalf of Larry Ludy, sold at
4  least 465 boxes of a variety of grape Mr. Sandrini and Larry Ludy
5  called "Late White" or "Big White."  (PSUF 17e).  In October and
6  November 2005, Sandrini sold at least 6,332 boxes of Autumn King
7  from the vines he grafted in 2004.  (PSUF 17e).

8      On November 22, 2005, Mr. Sandrini signed an affidavit
9  stating his company had 18,629 unauthorized and unreleased Autumn
10 King vines.  (PSUF 17b).  DNA testing conclusively established
11 Sandrini possesses the asexually propagated progeny of the first
12 Autumn King plant.  (PSUF 17c).

13     Sandrini tended to the Autumn King vines and caused grapes
14 to be harvested and sold from such vines after the '284 Patent
15 issued.  (PSUF 17f).  Specifically, Sandrini caused 7,309 boxes
16 of its Autumn King grapes to be harvested between October 3 and
17 October 9, 2006, and sold at a later date.  (PSUF 17g).
18 Sandrini's position is it has not harvested or sold Autumn King
19 grapes after the issuance of the '284 Patent, and any harvesting
20 and sale of its Autumn King grapes was through a third party and
21 by order of this Court.  (RPSUF 17g).  Neither the Commission nor
22 the USDA has ever authorized Sandrini to sell or use the Autumn
23 King variety.  (PSUF 17h).

24     Sandrini, with knowledge the '284 Patent had issued, used
25 and sold Autumn King material within the claim of the '284
26 Patent.  (PSUF 18).  Sandrini's position is it has not harvested
27 or sold Autumn King grapes after the issuance of the '284 Patent,
28 and any harvesting and sale of its Autumn King grapes was through

1  a third party and by order of this Court.  (RPSUF 18).  This is

2  somewhat disingenuous as it was Sandrini who sought and obtained

3  authority to market his 2006 disputed crop under a court imposed

4  protective order.  The Commission notified growers and shippers,

5  including Sandrini, that new varieties released by the USDA were

6  going to be patented.  (PSUF 18a).  Sandrini saw and read memos

7  from the Commission that a patent was pending for Autumn King;

8  Sandrini saved this memo.  (PSUF 18b and c).

9       One week after the '284 Patent issued, the Commission's

10 counsel sent Sandrini a letter, which attached a copy of the '284

11 Patent and also demanded Sandrini to remove the infringing Autumn

12 King material in his possession.  (PSUF 18d).  Sandrini looked at

13 the '284 Patent.  (PSUF 18e).  After being notified that he was

14 growing a patented plant variety, Sandrini continued to use and

15 tend his Autumn King vines.  (PSUF 18f).  Sandrini, on the other

16 hand, asserts that he has never grown Autumn King within the

17 scope of the USDA's exclusive rights.  (RPSUF 18f).  Rather, the

18 Autumn King in Sandrini's possession was asexually reproduced

19 prior to the issuance of the '284 Patent, and Sandrini has not

20 "used" Autumn King vines within the meaning of the Patent Act.

21 (RPSUF 18f).

22      The Autumn King grapevines Sandrini is currently growing

23 were propagated from vines that were obtained without

24 authorization from the USDA.  (PSUF 20).  Mr. Sandrini personally

25 took cuttings from Larry Ludy's vines in the winter of 2003-2004

26 and grafted approximately 10,000 buds in the early spring of

27 2004.  (PSUF 20).  Sandrini, however, contends that a USDA

28 employee provided Autumn King plant material to Jim Ludy prior to

1  the official release date, and Sandrini obtained Autumn King

2  plant material prior to the issuance of the '284 Patent.  (RPSUF

3  20).

4       Before Sandrini grafted the Autumn King variety, Mr.

5  Sandrini knew it was an unreleased USDA variety, that it was

6  going to be patented by the USDA, and that it was going to be

7  available only through licensed nurseries.  (PSUF 21).  Mr.

8  Sandrini asserts he could not have known that the Autumn King was

9  going to be patented because patent applications remain secret

10 until published or granted, and he could not have known the

11 United States Patent Office was going to issue a valid patent on

12 the Autumn King variety.  (RPSUF 21).

13      Mr. Sandrini believed from the first time he saw the grape

14 variety at issue, which he called "Late White," that it might be

15 C10/C67-120, a USDA developed variety.  (PSUF 21a).  Mr. Sandrini

16 also believed the plant material in Larry Ludy's possession came

17 from the USDA testing grounds.  (PSUF 21a).  Mr. Sandrini only

18 thought the "Late White" might have come from the USDA testing

19 grounds, not that he had any belief as to where it actually came

20 from.  (RPSUF 21a).

21      Before Mr. Sandrini acquired any plant material from Larry

22 Ludy, Jim Ludy specifically told Mr. Sandrini the variety which

23 he referred to as "Big White" was an unreleased USDA variety.

24 (PSUF 21b).  Jim Ludy also told Mr. Sandrini the "wood was going

25 to be released to nurseries, and you would have to go through a

26 nursery in order to get it," and he said he "was afraid it was

27 going to create a problem by not going through a nursery to get

28 that wood."  (PSUF 21b).  Mr. Sandrini asserts that Jim Ludy told

7

1 him that "Big White" was likely a USDA variety, but nothing else.
2 (RPSUF 21b; Decl. Mr. Sandrini, Doc. 122, ¶ 3).

3      Larry and Jim Ludy knew the "Big White" variety they
4 obtained was an unreleased USDA variety, they were not authorized
5 to have it, it might be patented, and they needed to keep their
6 possession of the variety secret.  (PSUF 22).  Sandrini asserts
7 the Ludys did not keep their possession of the variety secret.
8 (RPSUF 22).

9      Larry Ludy obtained the Autumn King material from his cousin
10 Jim Ludy, who obtained it from an unidentified contact whom Jim
11 Ludy believed had access to the USDA test plot.  (PSUF 22a).  The
12 unidentified contact, according to the Commission, warned Jim
13 Ludy the material had to be kept secret and could not be shared
14 with others.  (PSUF 22b).  Jim Ludy knew the USDA had not
15 released the Autumn King variety, and he did not believe the USDA
16 authorized his unidentified contact to give him the Autumn King
17 material.  (PSUF 22b).  Jim Ludy's explicit understanding,
18 according to the Commission, was he should "keep it quiet" and
19 "it was just to experiment with."  (PSUF 22b).  Sandrini asserts,
20 however, the unidentified contact who supplied Jim Ludy with
21 Autumn King sticks said nothing specific, and it was Jim Ludy's
22 general impression he should not advertise the use of the new
23 varieties.  (RPSUF 22b).

24      When Jim Ludy shared a small amount of the Autumn King plant
25 material with his cousin Larry, he repeated the warning the
26 material was unreleased, had to be kept secret, and "was just to
27 experiment with."  (PSUF 22c).  Jim Ludy also told Larry Ludy,
28 both before and after giving Larry plant material, not to share

**8**

1  the material with anyone else or tell anyone else he had the

2  material.  (PSUF 22c).  Sandrini asserts Jim Ludy imposed no

3  express confidentiality restrictions on Larry Ludy's use of the

4  Autumn King plant materials.  (RPSUF 22c).

5       The only use of the Autumn King variety prior to September

6  28, 2003, was by the USDA or its agents for their own

7  experimental purposes, apart from the Ludys' secret use of such

8  material.  (PSUF 23).  Sandrini disputes that the Ludys' use of

9  the Autumn King material was secret.  (RPSUF 23).  Despite such

10 alleged use, no Autumn King grapes were sold prior to September

11 28, 2003.  (PSUF 24).

12

13               2.   <u>Sandrini's Unfair Business Practices</u>

14      The Commission alleges Sandrini used unlawful means to

15 conceal its sale of Autumn King grapes.  To support this

16 allegation, the Commission asserts the following facts which

17 Sandrini disputes.  Sandrini falsified invoices and bills of

18 lading by identifying Autumn King grapes as Thompson Seedless

19 grapes, despite knowing they were not Thompson Seedless.  (PSUF

20 25a).  Sandrini falsely labeled the containers in which the

21 grapes were shipped by identifying Autumn King grapes as Thompson

22 Seedless grapes, despite knowing they were not Thompson Seedless.

23 (PSUF 25b).  Sandrini also falsely identified the Autumn King

24 variety as Thompson Seedless in reports filed with the

25 Commission.  (PSUF 23c).  Sandrini disputes falsifying invoices,

26 falsifying bills of lading, falsely labeling grape containers,

27 and falsely identifying Autumn King variety grapes as Thompson

28 Seedless with the Commission.  (RPSUF 25a, b, and c).  Sandrini

1   states he identified the Autumn King grapes as Thompson Seedless
2   not to conceal the true identity of the grapes, but rather
3   because he did not know the name of the variety.  (RPSUF 25a, b,
4   and c).

5        Sandrini's sale of Autumn King grapes has deprived the
6   Commission of royalties it would have collected from nurseries to
7   support its work on behalf of the Commission, and has deprived
8   the nurseries authorized to dispense Autumn King of revenue to
9   which they are entitled.  (PSUF 26).  Sandrini asserts the
10  Commission only collects royalties on the reproduction of Autumn
11  King, not on the sale of fruit.  (RPSUF 26).  Further, Sandrini
12  only reproduced Autumn King grapevines and sold Autumn King
13  grapes before the '284 Patent issued.  (RPSUF 26).

14       Sandrini has also benefitted from obtaining the Autumn King
15  variety before other growers.  (PSUF 28).  Sandrini's early use
16  of the Autumn King variety allowed him to experiment and acquire
17  know-how with the Autumn King variety, which was not available to
18  other growers.  (PSUF 28a).  Considerable trial and error is
19  required to learn how to cultivate, harvest, and store a
20  particular variety of grape.  (PSUF 28b).  Sandrini's use of
21  Autumn King has given it at least a two year head start over
22  other growers.  (PSUF 28c).  This head start has also given
23  Sandrini an opportunity to build relationships with wholesalers
24  at the expense of other growers and shippers.  (PSUF 28d).
25  Sandrini counters that any benefit it may have received does not
26  take into account the Commission's denial of the sale of Autumn
27  King to Sandrini while allowing sales to its competitors.  (RPSUF
28  28a, b, c, and d).

1       **B.    Facts in Support of Sandrini's Cross Motion**

2            **1.    Invalidity of the '284 Patent**

3       The application for the '284 Patent was filed on September

4   28, 2004.  (DSUF I.1).  The '284 Patent claims a new variety of

5   grapevine named the Autumn King.  (DSUF I.2).  Development of the

6   Autumn King began in 1993.  (DSUF I.3).  Around November 2000,

7   the Autumn King vines in the USDA breeding block began bearing

8   fruit.  (DSUF I.4 and RDSUF I.4).  In September 2001, Ramming

9   began collecting data for a patent on the Autumn King Variety.

10  (DSUF I.5).  In January 2002, Ramming stated in a report to the

11  Commission Autumn King will likely be released, and virus testing

12  would be completed by December 2002.  (DSUF I.6).  The

13  Commission, however, asserts the report only stated C67-120

14  "remains high on the list for future releases," not that Autumn

15  King will likely be released.  (RDSUF I.6).  The report did

16  indicate virus testing would be completed by December 2002, but

17  it was not completed by this date.  (RDSUF I.6).

18       In March 2002, the Commission's research committee decided

19  Ramming should continue collecting data needed to seek patent

20  protection, but the decision on releasing and patenting Autumn

21  King should be deferred another year.  (DSUF I.7).  According to

22  the Commission, however, its role was advisory to Ramming.

23  (RDSUF I.7).  Less than a year later, in January 2003, Ramming

24  recommended that the Autumn King be released that month; the

25  Commission, however, decided that any decision to release and

26  patent Autumn King should be deferred for another year.  (DSUF

27  I.8).  The Commission asserts the report recommended C67-120 be

28  released at an indeterminate time in the future and did not

1  recommend release in January 2003 because additional testing
2  needed to be done.   (RDSUF I.8).

3       Sandrini asserts all data needed for the Autumn King patent
4  application was available in February 2003 (DSUF I.9).   Sandrini
5  further asserts in the summer of 2003 all data needed for the
6  '284 Patent application was completed.   (DSUF I.10).   The
7  Commission's position is the collection of data needed for the
8  Autumn King patent application was not completed until December
9  19, 2003 (RDSUF I.10).

10      In early 2002, Jim Ludy obtained sticks of Autumn King plant
11 material and grafted approximately forty-six vines.   (DSUF I.11
12 and 12).   Jim Ludy was given the Autumn King without any
13 restrictions on its disclosure.   (DSUF I.15).   In March 2002, Jim
14 Ludy gave Larry Ludy Autumn King plant material, and Larry Ludy
15 grafted twenty-five vines of Autumn King on his land.   (DSUF I.13
16 and 14).   When Jim Ludy gave Larry Ludy Autumn King plant
17 material, Jim Ludy knew Larry Ludy would be using the plant
18 material to graft the Autumn King to grow Autumn King vines and
19 grapes.   (DSUF I.16).   Jim Ludy imposed no restrictions on Larry
20 Ludy's use or ability to publicly display the Autumn King vines.
21 (DSUF I.16).   Public access to Larry Ludy's Autumn King vines was
22 not limited in any way.   (DSUF I.17).   The Commission denies all
23 of these factual allegations.   (RDSUF I.11–17).

24      The Autumn King vines on Larry Ludy's land bore fruit by
25 August 2002 (DSUF I.18), although the Commission contends the
26 vines began producing fruit in 2003 (RDSUF I.18).   In the fall of
27 2002, Jim Ludy successfully grafted and grew Autumn King vines
28 and produced Autumn King grapes.   (DSUF 21).   The Autumn King

1 vines growing on Jim Ludy's Land were seen by several people
2 without any confidentiality agreement (DSUF 19); he did not take
3 any precautions to prevent the public from viewing the Autumn
4 King vines (DSUF 20), although it was his understanding to keep
5 it quiet.   (RDSUF 20).

6     Around November 2002, Mr. Sandrini observed Autumn King
7 vines with fruit growing on Jim Ludy's and Larry Ludy's
8 respective farms.   (DSUF 22).   The Commission disputes Mr.
9 Sandrini observed fruit on the Autumn King vines in November 2002
10 because such vines began producing fruit in 2003.   (RDSUF 22).
11 Larry Ludy's Autumn King vines produced fruit for a second year
12 in a row in July 2003, which was publicly viewed.   (DSUF 23).
13 The Commission denies Larry Ludy's Autumn King vines were
14 producing fruit for a second year in a row.   (RDSUF 23).   The
15 Autumn King growing on Larry Ludy's farm is genetically identical
16 to the plant variety claimed in the '284 Patent.   (DSUF 24).
17 Larry Ludy gave Mr. Sandrini Autumn King plant material.   (DSUF
18 25).   The Commission denies Larry Ludy gave Mr. Sandrini Autumn
19 King plant material, although it admits Mr. Sandrini has Autumn
20 King material that infringes the '284 Patent.   (RDSUF 25).

21

22          2.   The Commission's Lack of Statutory Authority Under
23               the Ketchum Act

24     Since the early 1980s, funding for research and development
25 of new plant varieties, including Autumn King, has been through
26 an assessment ultimately imposed on California's grape growers.
27 (DSUF II.3).   The shippers of grapes pay the Commission the
28 assessment, and the shippers are authorized under California law

13

1  to collect the assessment from the producer.   (RDSUF II.3).   The
2  Commission collects the assessment on a per pound basis.   (RDSUF
3  II.1).

4       In the late 1990s, the Commission contacted the USDA to
5  initiate a patent licensing program to encourage the USDA to
6  patent grape varieties developed with Commission funding.   (DSUF
7  II.4 and RDSUF II.4).   The Commission charges nurseries that
8  distribute USDA patented varieties a $5,000 annual license fee
9  and a royalty of $1 per vine sold.   (DSUF II.5 and RDSUF II.5).
10  The nurseries pass such charges on to growers that purchase the
11  patented plant material.   (DSUF II.6).   The Commission does not
12  prohibit the nurseries from passing on the cost of royalty
13  payments to growers that purchase patented plant material; the
14  nurseries may pass this cost on, but the Commission does not have
15  direct knowledge of this practice.   (RDSUF II.6).

16

17            3.   Sandrini's License to Use Autumn King

18       In 2005, the Commission's president, Kathleen Nave ("Nave"),
19  spoke with Mr. Sandrini regarding his possession of Autumn King
20  plant material.   (DSUF III.1 and RDSUF III.1)   On November 18,
21  2005, Ross Jones ("Jones"), the Commission's vice president of
22  research, sent Mr. Sandrini a letter on the Commission's behalf
23  asking Mr. Sandrini to sign an affidavit confirming his
24  possession of Autumn King.   (DSUF III.2).

25       The Commission informed Mr. Sandrini once he signed an
26  affidavit affirming his possession of Autumn King, he would be
27  sent an Autumn King Domestic Grower License Agreement for his
28  execution.   (DSUF III.3).   The Commission's letter dated November

                                14

1   18, 2005, informed Mr. Sandrini he would be "required to register

2   under a commission Domestic Grower License Agreement and pay

3   associated vine and box shipment fees and/or take other

4   mitigation measures as required[,]" including, "grafting or

5   destroying vines, or injunctions against shipping."  (RDSUF

6   III.3).  The letter further stated the Domestic Grower License

7   Agreement would be accompanied by "a letter summarizing relevant

8   fees and/or actions required."  (RDSUF III.3).  The Commission

9   sent Mr. Sandrini a Domestic Grower License Agreement pertaining

10  to Autumn King material already in his possession, which Mr.

11  Sandrini signed and returned to the Commission.  (DSUF III.4).

12  The Commission states it merely faxed Mr. Sandrini a blank copy

13  of its standard Domestic Grower License Agreement for Autumn

14  King; the Commission was not offering Mr. Sandrini a license for

15  his unauthorized Autumn King material that he could accept by

16  merely signing and returning the agreement.  (RDSUF III.4).  Mr.

17  Sandrini faxed the Commission a signed copy of the Domestic

18  Grower License Agreement,[1] but the Commission did not sign it.

19  _____

20      [1] The Agreement contained, among others, the following

21  terms:

22      1.2 "Licensed Patents" shall mean (a) U.S. Patent
        Application No. 10/953,367 "Grapevine Denominated as
23      Autumn King," filed September 28, 2004, (b) all patents
        issuing therefrom including any reissue,
24      reexaminations, extensions, divisions, renewals,
        substitutions, confirmations, registrations,
25      revalidations, revisions, and additions of or to any of
        the foregoing . . .
26

27      1.3 "Licensed Variety" shall mean the variety
28      denominated as Autumn King in U.S. Patent Application

15

1  (RDSUF III.4).

2

3           **4.    Preemption of the Commission's State Law Causes of**

4           **Action**

5       The Commission included several state law causes of action

6  in its complaint for patent infringement.  Count two of the

7  Commission's complaint is for violation of California Business

8  and Professions Code section 17200 ("§ 17200").  The Commission's

9  § 17200 cause of action is predicated on Sandrini's possession of

10 unlicensed Autumn King plant material.  (DSUF IV.1).  Count three

11 of the Commission's complaint is for intentional interference

12 with prospective economic relationships and is predicated on

13 Sandrini's possession of unlicensed Autumn King plant material.

14 (DSUF IV.2).  Count four of the Commission's complaint is for

15 unjust enrichment and is predicated on Sandrini's possession of

16 unlicensed Autumn King plant material.  (DSUF IV.3).  The

17 Commission asserts its state law causes of action are partly

18 based on Sandrini's unauthorized possession of Autumn King plant

19 material, but are not predicated solely on Sandrini's possession

20 of unlicensed Autumn King plant material or on the infringement

21 of the '284 Patent.  (RDSUF IV.1, 2, and 3).

22

23      No. 10/953,387 . . .

24

25      2.1 License Grant.  Subject to the terms and conditions
        of this Agreement, the Commission hereby grants to
26      Grower a limited, nonexclusive, nontransferable right
        and license under the Licensed Patents during the term
27      of this Agreement solely (a) to grow the Wood in the
        United States and (b) to sell or market the Fruit in
28      the Territory in accordance with Article 4.

                                  16

1

### III.   Legal Standard

2        Summary judgment is warranted only "if the pleadings,
3   depositions, answers to interrogatories, and admissions on file,
4   together with the affidavits, if any, show that there is no
5   genuine issue as to any material fact." Fed. R. Civ. P. 56(c);
6   *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).
7   Therefore, to defeat a motion for summary judgment, the non-
8   moving party must show (1) that a genuine factual issue exists
9   and (2) that this factual issue is material. *Id*.  A genuine
10  issue of fact exists when the non-moving party produces evidence
11  on which a reasonable trier of fact could find in its favor
12  viewing the record as a whole in light of the evidentiary burden
13  the law places on that party. *See Triton Energy Corp. v. Square
14  D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.
15  Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are
16  "material" if they "might affect the outcome of the suit under
17  the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*,
18  477 U.S. at 248).

19       The nonmoving party cannot simply rest on its allegations
20  without any significant probative evidence tending to support the
21  complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.
22  2001).

23                    [T]he plain language of Rule 56(c) mandates the
                    entry of summary judgment, after adequate time
24                    for discovery and upon motion, against a party
                    who fails to make a showing sufficient to
25                    establish the existence of an element essential
                    to the party's case, and on which that party
26                    will bear the burden of proof at trial.  In such
                    a situation, there can be "no genuine issue as
27                    to any material fact," since a complete failure
                    of proof concerning an essential element of the
28                    nonmoving party's case necessarily renders all

1          other facts immaterial.

2 *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more

3 implausible the claim or defense asserted by the nonmoving party,

4 the more persuasive its evidence must be to avoid summary

5 judgment.  *See United States ex rel. Anderson v. N. Telecom,*

6 *Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the

7 evidence must be viewed in a light most favorable to the

8 nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on

9 summary judgment is not to weigh evidence or resolve issues;

10 rather, it is to determine whether there is a genuine issue for

11 trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th

12 Cir. 1996).

13

14                      **IV.   Discussion**

15      **A.    The Commission's Statutory Authority Under the Ketchum**

16            **Act**

17      Sandrini contends the Commission lacks statutory authority

18 under the Ketchum Act to implement its patenting and licensing

19 program.  The Commission moves for summary judgment on the

20 grounds it does have statutory authority under the Ketchum Act to

21 operate its patent licensing program.  The Commission argues the

22 Ketchum Act is to be liberally construed and provides ample

23 authority for its patent licensing program.

24      Sandrini also moves for summary judgment on the grounds the

25 Commission does not have the statutory authority to engage in its

26 patent licensing program.  Sandrini argues California law does

27 not permit commissions to exercise powers beyond those expressly

28 enumerated in the statute authorizing the particular commission.

                            18

1  Under the Ketchum Act, Sandrini maintains the commission cannot
2  promulgate a patent licensing program or bring suit against
3  parties for patent infringement, nor can it generate revenues
4  through the collection of patent royalties.

5       The Ketchum Act of 1967 states that "[g]rapes produced in
6  California for fresh human consumption comprise one of the major
7  agricultural crops of California, and the production and
8  marketing of such grapes affects the economy, welfare, standard
9  of living and health of a large number of citizens residing in
10 this State."  Cal. Food & Agric. Code § 65500.  The Act
11 effectuates a state policy "to aid producers of California fresh
12 grapes in preventing economic waste in the marketing of their
13 commodity, to develop more efficient and equitable methods in
14 such marketing, and to aid such producers in restoring and
15 maintaining their purchasing power at a more adequate, equitable
16 and reasonable level."  *Id.* § 65500(g).  Although the statute
17 states the duties of the Commission, it does not enumerate every
18 duty or to define the exact extent of the Commission's authority.
19 Instead, the statute provides that the Ketchum Act shall be
20 "liberally construed" when defining the parameters of the
21 Commission's authority. Id. § 65674.

22      In *United Farm Workers v. Agricultural Labor Relations*
23 *Board*, 41 Cal. App. 4th 303 (Cal. Ct. App. 1995), the California
24 Court of Appeals faced the issue whether the Ketchum Act granted
25 the United Farm Workers standing to raise a claim.  The United
26 Farm Workers claimed that pesticides used on table grapes were
27 carcinogenic and led to various health problems in newborns.  *Id.*
28 at 308.  As a result, the United Farm Workers ran a campaign to

1  halt the use of pesticides on table grapes.  *Id.*  The Commission
2  suffered economically as a result of the boycott of the table
3  grapes and brought a claim against the United Farm Workers under
4  California Labor Code § 1154(d) and (h) for unfair labor
5  practices.  The court held that "nothing either in the language
6  of the Ketchum Act or in its legislative history supports the
7  claim the Legislature authorized the Commission to file unfair
8  labor practice charges."  *Id.* at 318. In its reasoning the court
9  stated, "the express enumeration in the Ketchum Act of the types
10 of actions the Commission is authorized to bring impliedly
11 excludes the Commission from involving itself in other types of
12 proceedings."  *Id.* at 319. Accordingly, the court held that the
13 Ketchum Act did not grant the Commission the authority to raise
14 charges of "unfair labor practice[s]."  *Id.* at 318.

15      Similarly, in *B.C. Cotton, Inc. v. Voss*, 33 Cal. App. 4th
16 929 (Cal. Ct. App. 1995), the California Court of Appeals held
17 the California Department of Food and Agriculture ("CDFA") abused
18 its authority to impose certain cotton regulations.  The CDFA
19 along with its Director, stated that breeders of cotton are
20 required to make their cotton available to all cotton growers and
21 not just themselves.  *Id.* at 948.  The court held that this is
22 such a specific requirement that the legislature would have
23 stated it as an administrative statute and is not something that
24 would have been implied.  *Id.* at 950.

25      These two cases are factually inapposite.  The Commission
26 asserts, "In B.C. Cotton, the CDFA regulations required growers
27 to license their own proprietary varieties to other growers,
28 penalizing conduct that the statutory scheme expressly

1  encouraged."   Here, by contrast, the Commission is exercising its
2  statutory authority to contract to improve marketing by
3  introducing new propriety, patented table grape varieties.
4  United Farm Workers is also inapplicable because the decision was
5  followed by the enactment of § 63903 of the Food and Agricultural
6  Code titled, "Administrative Civil Actions," which states "[i]n
7  addition to the authority granted to any commission by Part 2
8  (commencing with Section 64001), those commissions may commence
9  or participate in administrative and civil actions relative to
10 the activities of the commission."   This, in turn, nullified the
11 decision of the court in United Farm Workers and grants the
12 Commission authority to institute civil actions that concern the
13 marketing or development of table grapes.

14         The Commission does not dispute Sandrini's argument that an
15 administrative agency within California "derives its powers from
16 the statute under which it is created." Crawford v. Imperial
17 Irrigation Dist., 200 Cal. 318, 326 (1927).   However, the
18 Commission recognizes that California law grants administrative
19 agencies "additional powers as are necessary for the due and
20 efficient administration of powers expressly granted by statute,
21 or as are necessary for the due and efficient administration of
22 powers expressly granted by statute, or as may fairly be implied
23 from the statue granting the power." Dickey v. Raisin Proration
24 Zone No. 1, 24 Cal. 2d 796, 810 (1944).   Through this, the
25 Commission presents a strong argument supporting its statutory
26 authority to engage in the patent licensing program and in turn
27 to bring suit to enforce plant patents licensed by the
28 Commission.

1    The Commission also refers to specific sections in the
2  Ketchum Act, which grant the Commission discretion to define the
3  parameters of its own authority.  "It is hereby declared to be
4  the policy of this state to aid producers of California fresh
5  grapes in preventing economic waste in the marketing of their
6  commodity, to develop more efficient and equitable methods in
7  such marketing, and to aid such producers in restoring and
8  maintaining their purchasing power at a more adequate, equitable
9  and reasonable level." Cal. Food & Agric. Code § 65500(g).
10 Section 65572 states, "The powers and duties of the Commission
11 shall include the following, (c) To administer and enforce this
12 chapter, and to do and perform all acts and exercise all powers
13 incidental to or in connection with or deemed reasonably
14 necessary, proper or advisable to effectuate the purposes of this
15 chapter." *Id.* § 65572(c).  This comports with the "liberally
16 construed" requirement of the Ketchum Act. *Id.* § 65674

17    Further, the Ketchum Act specifically states that the
18 Commission has the power to "enter into any and all contracts and
19 agreements . . . to conduct, and contract with others to conduct,
20 scientific research, . . . to develop and discover the dietetic
21 value of fresh grapes and to develop and expand markets, and to
22 improve cultural practices and product handling so that the
23 various varieties may be placed in the hands of the ultimate
24 consumer in the best possible condition . . . and to undertake
25 any other similar activities which the [C]ommission may determine
26 appropriate for the maintenance and expansion of present markets
27 and the creation of new and larger markets for fresh grapes."
28 *Id.* § 65572(e),(i),(k).  The Commission's licensing program of

1  new patented grape varieties broadens product offerings by the

2  industry, which has the potential to develop and expand present

3  markets and to create new and larger markets for fresh grapes.

4  The Commission derives its authority for its patent licensing

5  program from the omnibus "other similar activities" provision and

6  the "develop and expand markets" objective. *Id.* § 65572(i).

7      Sandrini's argument against the Commission's ability to

8  bring suit is also foreclosed by the specific language of the

9  Ketchum Act because the current suit is the means of enforcement

10 of the patent licensing program which the Commission was

11 authorized by statute to adopt.  Section 65572 specifically

12 states that it is the Commission's duty "[t]o administer and

13 enforce this chapter, and . . . [t]o investigate and prosecute

14 civilly violations of this chapter." *Id.* 65572(c),(g).

15     The Ketchum Act grants the Commission authority to engage in

16 its patent licensing program, and the enactment of Cal. Food &

17 Agric. Code § 63903 provides sufficient authority for the

18 Commission to maintain its cause of action for patent

19 infringement.  Accordingly, the Commission's motion for summary

20 judgment that it has statutory authority to engage in its patent

21 licensing program is GRANTED.  Sandrini's motion for summary

22 judgment on the grounds the Commission does not have the

23 statutory authority under to the Ketchum Act to engage in its

24 patent licensing program is DENIED.

25

26     B.   **Validity of the '284 Patent**

27     Sandrini, by way of an affirmative defense and counterclaim,

28 asserts the '284 Patent is invalid because the Autumn King

23

1 variety was in public use more than one year prior to the patent
2 application date.

3      The Commission moves for summary judgment on Sandrini's
4 public use affirmative defense and counterclaim on the grounds
5 the '284 Patent is valid because the Autumn King variety was
6 neither ready for patenting nor in public use more than one year
7 prior to the patent application date.

8      Sandrini opposes the Commission's motion for summary
9 judgment and also moves for summary judgment on the grounds the
10 '284 Patent is invalid because the Autumn King variety was in
11 public use more than one year prior to the patent application
12 date.  Sandrini inferentially suggests that the Autumn King
13 variety was ready for patenting more than one year before the
14 application.

15      The application date for the Autumn King variety patent was
16 September 28, 2004.  Exactly one year prior to the application
17 date is the "critical date," which is September 28, 2003.  The
18 Commission argues the Autumn King variety was neither ready for
19 patenting nor in public use before September 28, 2003.  The
20 Commission contends the Autumn King variety was not ready for
21 patenting before the critical date because the last piece of data
22 necessary for the patent application was not collected until
23 December 19, 2003, nearly three months after September 28, 2003.
24 The Commission further maintains the secret use of improperly
25 obtained plant material by a grower who knew it was an unreleased
26 USDA variety is not an invalidating "public use" within the
27 meaning of 35 U.S.C. § 102(b).

28      Sandrini rejoins that the ready for patenting prong of the

24

1  public use bar has nothing to do with the time an inventor
2  completes the collection of all data needed to file a patent
3  application.   Sandrini suggests an invention can be ready for
4  patenting in one of two ways: First, by proof of reduction to
5  practice before the critical date, or Second, by proof that prior
6  to the critical date the inventor had prepared drawings or other
7  descriptions of the invention that were sufficiently specific to
8  enable a person skilled in the art to practice the invention.
9  Sandrini argues the Autumn King variety was necessarily ready for
10  patenting at the time Jim Ludy and Lawrence Ludy reproduced the
11  Autumn King variety in 2002-2003, otherwise the Ludys could not
12  have obtained sticks of the Autumn King plant to reproduce the
13  vines on their own properties.

14      Sandrini rejects the Commission's argument, as obsolete law,
15  that the public use bar cannot apply because Jim Ludy and
16  Lawrence Ludy improperly obtained the Autumn King plant material.
17  The Commission relies on pre-1870 cases to argue the public use
18  bar does not apply to a surreptitious or secret use.
19  Specifically, prior to 1870, the public use and on sale bars
20  applied only to uses and sales occurring "with the consent and
21  allowance of the inventor," but the 1870 amendments to the Patent
22  Act removed the requirement that public use or sale prior to the
23  critical date occur with the inventor's consent.

24

25           1.   <u>Presumption of Patent Validity</u>.

26      "A patent shall be presumed valid."   35 U.S.C. § 282.   "The
27  burden of establishing invalidity of a patent or any claim
28  thereof shall rest on the party asserting such invalidity."   *Id.*

1  The party challenging a patent's validity must prove its case by

2  clear and convincing evidence.  *Baxter Int'l, Inc. v. COBE*

3  *Laboratories, Inc.*, 88 F.3d 1054, 1057 (Fed. Cir. 1996).  One of

4  the enumerated defenses to a patent infringement claim is

5  "[i]nvalidity of the patent or any claim in suit on any ground

6  specified in part II of this title as a condition for

7  patentability[.]" 35 U.S.C. § 282.

8

9          2.   Public Use Bar.

10         Among the defenses specified in part II, is the public use

11  bar, which provides

12          [a] person shall be entitled to a patent unless−(b) the
            invention was patented or described in a printed
13          publication in this or a foreign country or in public use
            or on sale in this country, more than one year prior to
14          the date of the application for patent in the United
            States . . . .
15

16  35 U.S.C. § 102(b).  The date that is exactly one year prior to

17  the patent application date is known as the "critical date."  *See*

18  *Motionless Keyboard Co. v. Microsoft Corp.*, 2007 WL 1531401, at

19  *5 (Fed. Cir. May 29, 2007).  Thus, the inquiry is whether the

20  patented invention was in public use prior to the critical date.

21         "Public use includes any [public] use of [the claimed]

22  invention by a person other than the inventor who is under no

23  limitation, restriction, or obligation of secrecy to the

24  inventor."  *Motionless Keyboard Co.*, 2007 WL 1531401, at *5

25  (citing *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983) (citing

26  *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881))) (alteration in

27  original).

28         Recent decisions of the Federal Circuit clearly provide

26

1  "[w]hether a patent is invalid due to a § 102(b) public use is a

2  question of law based on underlying questions of fact."

3  *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294,

4  1301 (Fed. Cir. 2002); *Netscape Commc'n Corp. v. Konrad*, 295 F.3d

5  1315, 1320 (Fed. Cir. 2002); *Juicy Whip, Inc. v. Orange Bang,*

6  *Inc.*, 292 F.3d 728, 736-37 (Fed. Cir. 2002); *Dana Corp. v.*

7  *American Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002)

8  (citing *Intel Corp. v. International Trade Comm'n*, 946 F.2d 821,

9  829 (Fed. Cir. 1991)).

10      While it can be fairly said there is a significant amount of

11  case law interpreting the public use bar, the cases are very fact

12  specific, and it is difficult to delineate bright line rules to

13  unequivocally determine what constitutes public use.  The parties

14  have not cited and the court has not found a case on all fours

15  with the present case, i.e., whether the public use bar

16  invalidates a patent due to third party misappropriation and

17  surreptitious or secret use of an invention prior to the critical

18  date.

19      Two cases, however, provide useful guidance whether a secret

20  use exception to the public use bar exists.  In both *Lorenz v.*

21  *Colgate-Palmolive-Peet Co.* 167 F.2d 423 (3rd Cir. 1948) and *Evans*

22  *Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448 (Fed.

23  Cir. 1997), the Third Circuit and Federal Circuit declined to

24  create a secret use exception to the public use bar.

25      Nearly sixty years ago, the Third Circuit, in *Lorenz*,

26  invalidated a patent by reason of prior public use.  *Lorenz*, 167

27  F.2d at 430.  In *Lorenz*, the patent in suit covered the

28  manufacture of soap and the recovery of glycerine.  Lorenz filed

27

1  an application for his process in the Patent Office on January
2  24, 1920.   Shortly thereafter, Lorenz communicated the substance
3  of the disclosures of his application to Ittner, who was
4  Colgate's chief chemist, so Colgate could exploit the process if
5  it so desired.   Ittner claimed to be uninterested in the process.
6  Thereafter, the Patent Office rejected Lorenz's application, and
7  he abandoned its prosecution.   On July 18, 1933, patent number
8  1,918,603 was issued to Ittner on an application he filed on
9  February 19, 1931.   After learning about Ittner's '603 patent,
10 Lorenz filed a petition in the Patent Office to revive his
11 original application, which was later rejected.   On November 8,
12 1934, Lorenz filed a new application in which he adopted his own
13 nineteen claims of Ittner's '603 patent, asserting that he
14 disclosed the subject matter of the '603 patent to Ittner in
15 1920.   The Patent Office declared an interference, which was
16 decided in Lorenz's favor.   The trial court in *Lorenz* found that
17 the process of Lorenz's patent was in public use for more than
18 two years prior to the application date of November 8, 1934, and
19 declared Lorenz's patent invalid.

20      Lorenz contended no public use existed because Congress did
21 not intend to bar the grant of a valid monopoly to an inventor
22 whose disclosures have been pirated by the person to whom he
23 confided them.   Colgate, on the other hand, contended its use was
24 neither fraudulent nor piratical, and the disclosures made by
25 Lorenz to Ittner in 1920 carried no pledge, express or implied,
26 that Ittner or Colgate should not make use of Ittner's invention.

27      The *Lorenz* court painstakingly analyzed several Supreme
28 Court cases describing and explaining the history of the public

1  use bar beginning with the seminal case of *Pennock v. Dialogue*,

2  27 U.S. 1 (1829).  After reviewing these authorities, the *Lorenz*

3  court held "if an inventor does not protect his discovery by an

4  application for a patent within the period prescribed by the Act,

5  *and an intervening public use arises from any source whatsoever*,

6  the inventor must be barred from a patent or from the fruits of

7  his monopoly, if a patent has issued to him."  *Lorenz*, 167 F.2d

8  at 429 (emphasis added).  The court specifically noted "[t]here

9  is not a single word in the statute which would tend to put an

10  inventor, whose disclosures have been pirated, in any different

11  position from one who has permitted the use of his process."  *Id.*

12  In the words of the Third Circuit,

13          [t]he Supreme Court in its opinion in *Andrews v. Hovey*,
         124 U.S. 694 (1888) . . . put the matter succinctly when,
14          in referring to the second clause of Section 7 of the
         1839 Patent Act, it said that it was the Congressional
15          intent that the patent should be held invalid without
         regard to the consent or allowance of the inventor, if
16          there had been a prior public use within the terms of the
         statute.

17

18  *Lorenz*, 167 F.2d at 429.

19          More recently in 1997, the Federal Circuit, in *Evans*

20  *Cooling*, 125 F.3d 1448, invalidated a patent when the patented

21  invention, an aqueous reverse flow cooling system for internal

22  combustion engines, was offered for sale more than one year prior

23  to the critical date.

24          John Evans conceived the patented invention in 1984 and

25  reduced it to practice in 1986.  On July 1, 1992, Evans filed a

26  patent application.  On October 26, 1993, patent number 5,255,636

27  was issued to Evans for an aqueous reverse flow cooling system

28  for internal combustion engines.  In early 1994, Evans filed a

29

1  lawsuit against General Motors ("GM") alleging GM infringed the
2  '636 patent by the manufacture and sale of cars having GM's LT1
3  and LT99 engines.  GM asserted the '636 patent was invalid
4  because GM and its independent dealers had placed the patented
5  invention on sale prior to the critical date with the
6  introduction of the 1992 Corvette.  GM sent an order guide to its
7  dealers in late April or early May of 1991.  Several of the
8  dealers offered the 1992 Corvette for sale to customers.

9      Evans asserted GM should not be permitted to invalidate the
10  '636 patent because GM stole the invention from him.
11  Specifically, GM allegedly requested that Evans demonstrate its
12  aqueous reverse flow cooling system at GM's test facility in the
13  spring of 1989.  Evans alleged that GM stole the invention during
14  this demonstration.  The district court granted summary judgment
15  in favor of GM because the record established GM and its dealers
16  placed the 1992 Corvette with the LT1 engine on sale prior to the
17  critical date.

18      In affirming the district court, the Federal Circuit held
19  the '636 patent invalid because the patented invention was on
20  sale one month prior to the critical date when a customer ordered
21  a 1992 Corvette from a Chevrolet dealership.[2]

22  _____

23      [2] GM also argued the '636 patent was invalid because GM
24  placed the reverse flow cooling system in its engines on sale
    when it sent the order guide and supplemental information
25  brochure to its dealers across the country in late April or early
    May 1991.  With respect to GM's argument, the court specifically
26  stated "we do not reach or decide that issue here."  *Evans*
    *Cooling*, 125 F.3d at 1452.  Although GM's argument is addressed
27  to the on sale clause of § 102(b), had the *Evans Cooling* court
    decided the issue, additional guidance might have been available

1   Evans also urged the Federal Circuit to create a new
2  exception to the on sale bar.  Specifically, Evans sought an
3  exception that an otherwise invalidating offer for sale does not
4  invalidate a patent "where a third party surreptitiously steals
5  an invention while it is a trade secret and then, unbeknownst to
6  the inventor, allegedly puts the invention on sale [more than one
7  year] before the inventor files a patent application covering the
8  stolen invention."  *Evans Cooling*, 125 F.3d 1452 (brackets in
9  original).

10   In support of its argument, Evans cited an relied on three
11  Supreme Court cases from the 1800s—*Pennock v. Dialogue*, 27 U.S. 1
12  (1829), *Shaw v. Cooper*, 32 U.S. 292 (1833), and *Kendall v.*
13  *Winsor*, 62 U.S. 322 (1859).  The Federal Circuit, however, found
14  none of these cases dispositive of the issue raised by Evans
15  noting *Pennock* was a public use case where the use at issue was
16  undertaken with the patentee's knowledge, the statements Evans
17  relied on in *Shaw* were dicta, and *Kendall* addressed the issue of
18  whether the defendant had the right to continue to use an
19  invention after a patent had issued.  The court did, however,
20  rely on *Lorenz v. Colgate-Palmolive-Peet Co.*, 167 F.2d 423 (3rd
21  Cir. 1948), noting the Third Circuit rejected arguments similar
22  to Evans's arguments.  The *Evans Cooling* court specifically cited
23  the following analysis in *Lorenz* by which the Third Circuit
24  declined to create an exception to the statutory bar:

25       The prior-public-use proviso . . . contains no
        qualification or exception which limits the nature of the
26       public use.  We think that Congress intended that if an

27  _____

28  to analyze the public use issue presently before this court.

31

inventor does not protect his discovery by an application for a patent within the period prescribed by the Act, and an intervening public use arises from any source whatsoever, the inventor must be barred from a patent or from the fruits of his monopoly, if a patent has issued to him. There is not a single word in the statute which would tend to put an inventor, whose disclosures have been pirated, in any different position from one who has permitted the use of his process . . . . [I]solated instances of injustice may result if the law be strictly applied, but the inventor's remedy is sure. He is master of the situation and by prompt action [in filing a patent application] can protect himself fully and render the defense of prior public use impossible.

*Evans Cooling*, 125 F.3d 1453 (alterations in original).[3]  While the *Evans Cooling* court did empathize with the harshness of the result to Evans, it noted he would not be without recourse if GM in fact misappropriated his invention—"Evans would have an appropriate remedy in state court for misappropriation of a trade secret." *Evans Cooling*, 125 F.3d 1454.

Here, the '284 Patent is presumed valid under 35 U.S.C. § 282.  Ramming and Tarailo filed the patent application for the Autumn King variety on September 28, 2004, making the critical date September 28, 2003.  The '284 patent can be invalidated if the Autumn King variety was in public use prior to September 28, 2003.

Public use before the critical date is determined by whether the Autumn King variety was publicly used by the Ludys or

_____

[3] In dicta, the court went on to state "[e]ven if we were to create an exception to the on sale bar such that third parties accused of misappropriating an invention could not invalidate a patent based upon sales by the guilty third party, GM correctly asserts that [*In re Martin*, 74 F.2d 951 (C.C.P.A. 1935)] squarely holds that activities of third parties uninvolved in the alleged misappropriation raise the statutory bar, even if those activities are instigated by the one who allegedly misappropriated the invention." *Evans Cooling*, 125 F.3d 1453.

1  Sandrini under no limitation, restriction, or obligation of
2  secrecy to Ramming, Tarailo, and the USDA.  *See Motionless*
3  *Keyboard*, 2007 W.L. 1531401, at *5.

4      There is a factual dispute whether the Ludys publicly used
5  the Autumn King variety by allegedly misappropriating and then
6  using the Autumn King variety in a hidden or secret manner, and
7  whether the Ludys attempted to misdesignate the true origin or
8  identity of their grapes.  Based on which version of the facts
9  the trier of facts finds true, the legal decision will be made
10 whether such actions rise to the level of public use.

11     The Commission asserts Larry Ludy and Jim Ludy knew the "Big
12 White" variety was an unreleased USDA variety, they were not
13 authorized to have it, it might be patented, and they needed to
14 keep their possession of the grape variety secret.  Sandrini, on
15 the other hand, asserts the Ludys did not keep their possession
16 of the variety secret.

17     The Commission offers to prove that Larry Ludy obtained
18 Autumn King plant material from his cousin Jim Ludy, who in turn
19 obtained it from an "unidentified contact," ostensibly associated
20 with the USDA, whom Jim Ludy believed had access to the USDA test
21 plot.  The Commission claims that Jim Ludy's intent in possessing
22 the Autumn King plant material was to "keep it quiet" and "it was
23 just to experiment with."  Sandrini asserts the unidentified
24 contact who supplied Jim Ludy with Autumn King sticks said
25 nothing specific, and it was Jim Ludy's "general impression" he
26 should not advertise the use of the new variety.

27     The Commission asserts that when Jim Ludy shared a small
28 amount of the Autumn King plant material with his cousin Larry,

33

1 Jim repeated the warning to Larry that the material was
2 unreleased, had to be kept secret, and "was just to experiment
3 with."   Jim Ludy also told Larry Ludy, both before and after
4 giving Larry plant material, not to share the material with
5 anyone else or tell anyone else he had the material.   Sandrini,
6 on the other hand, asserts Jim Ludy imposed no express
7 confidentiality restrictions on Larry Ludy's use of the Autumn
8 King plant materials.

9      Sandrini rejoins that Jim Ludy did not impose any
10 restrictions on Larry Ludy's use or ability to display the Autumn
11 King vines.   Sandrini further asserts public access to Larry
12 Ludy's Autumn King vines was not limited in any way.   The
13 Commission denies these factual allegations.   Sandrini also
14 testified that the Autumn King vines growing on Jim Ludy's land
15 were seen by several people without any confidentiality
16 agreement, and Jim Ludy did not prevent the public from viewing
17 Jim's Autumn King vines.   Mr. Sandrini saw Autumn King vines
18 bearing fruit, growing on Jim Ludy's and Larry Ludy's farms.

19      The parties vigorously dispute whether Jim Ludy and Larry
20 Ludy secretly used or tried to hide the use of the Autumn King
21 variety or did so openly and notoriously.   The Commission
22 contends the Ludys' use was surreptitious and secret, while
23 Sandrini contends the Ludys' use was open and available for all
24 the public to see.   Further dispute exists whether Jim Ludy was
25 under any obligation to Ramming, Tarailo, and the USDA to keep
26 his possession of the Autumn King plant material secret and
27 hidden from others.   These factual disputes cannot be resolved on
28 summary judgment.

1    Sandrini has not demonstrated by undisputed, clear and
2  convincing evidence, as a matter of law, that the '284 Patent was
3  in public use prior to the critical date and is therefore not
4  entitled to summary judgment.  Nor has the Commission
5  demonstrated as a matter of law that the validity of the '284
6  Patent cannot withstand a § 102(b) public use challenge.

7    The Commission's motion for summary judgment on the validity
8  of the '284 Patent is DENIED.  Sandrini's motion for summary
9  judgment on the invalidity of the '284 Patent is DENIED.  The
10 '284 Patent is presumed valid under 35 U.S.C. § 282; it remains
11 for Sandrini to overcome this presumption at trial by
12 demonstrating by clear and convincing evidence that the '284
13 Patent was in public use prior to the critical date.

14

15    **C.   Infringement of the '284 Patent**

16        **1.   Infringement**

17    Assuming, *arguendo*, its validity, the Commission contends
18 Sandrini intentionally infringed the '284 Patent.  Sandrini
19 denies it has infringed the '284 Patent because it asexually
20 reproduced the Autumn King plant material prior to the issuance
21 of the '284 Patent, and it never sold or offered for sale Autumn
22 King plant material after the '284 Patent issued.  Sandrini
23 contends it cannot be liable for infringement because any of its
24 alleged use of the Autumn King plant material occurred before the
25 USDA held any exclusive rights to it; i.e., before the issuance
26 of the '284 Patent.

27    Whoever, without authority to do so, "makes, uses, offers to
28 sell, or sells any patented invention, within the United States

35

1  or imports into the United States any patented invention during
2  the term of the patent therefor, infringes the patent."  35
3  U.S.C. § 271.  "Until the patent is issued, there is no property
4  right in it; that is, no such right as the inventor can enforce."
5  *Marsh v. Nichols, Shepherd & Co.*, 128 U.S. 605, 612 (1888).
6  Patent infringement requires a determination whether someone "(1)
7  without authority (2) makes, uses, offers to sell, sells, or
8  imports (3) the patented invention (4) within the United States,
9  its territories, or its possessions (5) during the term of the
10  patent."  *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 421 F.
11  Supp. 2d 1321, 1334 (E.D. Wash. 2006).  For purposes of proving
12  the third element in a plant patent infringement action, the
13  patentee must prove under 35 U.S.C. § 163 that the infringing
14  plant is an asexual reproduction of the patented plant.  *Id.*

15      Inventions of new and distinct varieties of plants are
16  entitled to patent protection like any other invention.  *See* 35
17  U.S.C. § 161 (stating "[t]he provisions of this title relating to
18  patents for inventions shall apply to patents for plants, except
19  as otherwise provided.").  Patent law specifically provides
20  "[w]hoever invents or discovers and asexually reproduces any
21  distinct and new variety of plant, including cultivated sports,
22  mutants, hybrids, and newly found seedlings, other than a tuber
23  propagated plant or a plant found in an uncultivated state, may
24  obtain a patent therefor, subject to the conditions and
25  requirements of this title."  *Id.*  Thus, § 161 "engrafts the
26  Plant Patent Act onto the basic patent law, which requires [the
27  application of] all the rules, regulations, and provisions of the
28  basic patent law[.]"  *Imazio Nursery, Inc. v. Dania Greenhouses*,

1  69 F.3d 1560, 1564 (Fed. Cir. 1995).

2  "In the case of a plant patent, the grant shall include the
3  right to exclude others from asexually reproducing the plant, and
4  from using, offering for sale, or selling the plant so
5  reproduced, or any of its parts, throughout the United States, or
6  from importing the plant so reproduced, or any parts thereof,
7  into the United States."  35 U.S.C. § 163.

8  Determining patent infringement is a two-step process.  "The
9  first step is to determine the meaning and scope of the patent
10 claim asserted to be infringed."  *Imazio*, 69 F.3d at 1569 *citing*
11 *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.
12 Cir. 1995).  "The second step is to compare the properly
13 construed claim to that which is asserted to infringe."  *Imazio*,
14 69 F.3d at 1569 *citing Markman v. Westview Instruments, Inc.*, 52
15 F.3d 967, 976 (Fed. Cir. 1995).  The first step applicable to
16 delineate the scope of a plant patent claim is the asexual
17 progeny of the plant shown and described in the particular
18 patent.  *Imazio*, 69 F.3d at 1568-69.  As to the second step, "the
19 patentee must prove that the alleged infringing plant is an
20 asexual reproduction, that is, the progeny of the patented
21 plant."  *Id.* at 1569.

22 The Patent Act grants the patentee the right to exclude
23 others from using the claimed invention.  35 U.S.C. § 271(a).
24 Congress, however, has not defined the word "use" under § 271(a),
25 and few cases discuss the question of whether a particular use is
26 an infringing use under § 271(a).  *See* 5 Donald S. Chisum, *Chisum*
27 *on Patents* § 16.02[4][b] (2004) [hereinafter *Chisum*] (noting
28 "[t]he question of what constitutes 'use' of the invention has

37

1   rarely arisen.").*; see also, Black & Decker (U.S.), Inc. v. Home
2   Prod. Mktg., Inc.*, 929 F. Supp. 1114, 1121 (N.D. Ill. 1996).

3        "[A]s a matter of law mere possession of a product or
4   machine covered by a patent does not constitute infringement,
5   absent a threatened or contemplated use or sale." *L.A. Gear,
6   Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1298 (C.D. Cal.
7   1994); *see also Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d
8   1342, 1366 (Fed. Cir. 1998); *Chisum* § 16.02[4][b].

9        To prove infringement, it must be determined whether
10  Sandrini (1) without authority (2) made, used, offered to sell,
11  sold, or imported, (3) an asexual reproduction of Autumn King
12  plant material (4) within the United States (5) during the term
13  of the patent.

14       There is an active dispute whether the Ludys publicly used
15  the Autumn King variety before the critical date, making
16  premature determination whether Sandrini infringed the '284
17  Patent.

18       Sandrini argues that because its initial reproduction of
19  Autumn King took place prior to the issuance of the '284 Patent,
20  any subsequent use or sale of that reproduced plant material
21  falls beyond the reach of the USDA's exclusive patent rights.
22  This argument is foreclosed by *Columbia & N.R.R. Co. v. Chandler*,
23  241 F. 261, 263 (9th Cir. 1917), where the Ninth Circuit held
24  that while there can be no invasion of a patentee's rights before
25  a patent issues, "it does not follow, from the fact that there
26  can be no claim of damages for manufacturing [the patented
27  product] before the issuance of the patent, that [such
28  manufactured products] were set free from the monopoly of the

1  patent, and could thereafter be used, without liability to the
2  inventor," and *Coakwell v. United States*, 372 F.2d 508, 511 (Ct.
3  Cl. 1967), which cited *Columbia & N.R.R. Co. v. Chandler*, for the
4  proposition: "[t]he fact that certain articles embodying an
5  invention were manufactured before and obtained by the defendant
6  before the patent was issued does not authorize their use
7  thereafter."   The Federal Circuit has held that "[m]ere
8  possession of a product which becomes covered by a subsequently
9  issued patent does not constitute an infringement of that patent
10 until the product is used, sold, or offered for sale in the
11 United States during the term of the patent."  *Johns Hopkins*
12 *Univ. v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998) (citing
13 *Cohen v. United States*, 487 F.2d 525, 527 (Ct. Cl. 1973) and
14 *Columbia & N.R.R. Co. v. Chandler*, 241 F. 261 (9th Cir. 1917)).

15      The Commission's motion for summary judgment on infringement
16 of the '284 Patent is DENIED.

17      Amenable to summary adjudication, if the infringement issue
18 is reached, is the issue of asexual reproduction.  DNA testing
19 conclusively establishes—and Sandrini does not dispute the
20 results that show the Autumn King vines on Sandrini's property
21 are the asexually propagated progeny of the first Autumn King
22 plant.  There is no dispute Sandrini's conduct occurred in
23 California.  It is also undisputed that the term of the '284
24 Patent commenced upon its issuance, on February 21, 2006, and has
25 not expired.

26      The issuance of license is analyzed below.

27      On the issue of "use," the Commission refers to Mr.
28 Sandrini's deposition testimony.  (Sandrini Dep. Tr. p. 156, lns.

1  10-12).  Mr. Sandrini testified:

2  Q:  "[w]hat are the production processes you go through as a

3  grower?"  (Sandrini Dep. Tr. p. 156, lns. 12-13).

4  A:  "[P]runing, suckering, various sprays, hand tipping."

5  (Sandrini Dep. Tr. p. 156, lns. 14-15).

6  Mr. Sandrini further responded: "[l]eaf pulling, and eventually

7  harvesting."  (Sandrini Dep. Tr. p. 156, ln. 17).

8       Sandrini last pruned its Autumn King[4] grapes in January

9  2006.  (Sandrini Dep. Tr. p. 157, ln. 19).  As the pruning last

10 occurred prior to the issuance of the '284 Patent, Sandrini

11 cannot have "used" its Autumn King vines through pruning during

12 the term of the '284 Patent.

13      Sandrini did, however, undisputedly "use" its Autumn King

14 vines after the '284 Patent issued on February 21, 2006, by

15 implementing cultural practices to bring the grapes to harvest.

16      Mr. Sandrini testified suckering, which includes shoot

17 trimming, last occurred in April 2006.  (Sandrini Dep. Tr. p.

18 157, ln. 21).

19      Mr. Sandrini testified that chemical sprays were applied to

20 the vines and grapes for mildew control every fourteen days

21 during 2006 up to the point the vines or grapes start to mature.

22 (Sandrini Dep. Tr. p. 157, ln. 22-25 through p. 158, lns. 1-5).

23 Mr. Sandrini further testified the last time he sprayed his late

24 whites for mildew control was three to four weeks before his

25 deposition date of September 13, 2006.  (Sandrini Dep. Tr. p.

26 _____

27      [4] Mr. Sandrini refers to his Autumn King vines and grapes as
   "late white" rather than Autumn King; the vines and grapes are
28 one and the same.

**40**

1  158, lns. 6-8).   The purpose of spraying for mildew control is
2  twofold; first, mildew is not eye-appealing, and second, it can
3  lead to bacteria formation and funguses and destruction of the
4  grape.  (Sandrini Dep. Tr. p. 158, lns. 12-16).   Mr. Sandrini
5  further testified he had to spray for  "leaf hoppers," a small
6  fly-like insect that hops from leaf to leaf.  (Sandrini Dep. Tr.
7  p. 159, lns. 12-16).   The leaf hoppers "suck[] nutrients from the
8  leaves and excretes on the grape berries."  (Sandrini Dep. Tr. p.
9  159, lns. 17-19).   Leaf hoppers do not cause long-term damage to
10  the vines, but do cause damage to the grape production for a
11  given year.  (Sandrini Dep. Tr. p. 159, lns. 20-24).   Sandrini
12  testified he applied Giberal in May of 2006, (Sandrini Dep. Tr.
13  p. 160, lns. 2-10) and spot treated the "late white" grapes with
14  an herbicide in June or July 2006.  (Sandrini Dep. Tr. p. 160,
15  lns. 15-18).

16      The last time he hand tipped the late whites was in early
17  June.  (Sandrini Dep. Tr. p. 162, lns. 1-3).   Hand tipping is the
18  process of cutting a few berries out of a bunch when the berries
19  in a bunch are too tight.  (Sandrini Dep. Tr. p. 161, lns. 18-
20  21).   If the bunch is too long, it is tipped "to make it the
21  right formation."  (Sandrini Dep. Tr. p. 161, lns. 21-22).   Hand
22  tipping is done to produce the best bunch of berries.  (Sandrini
23  Dep. Tr. p. 161, lns. 23-25).

24      Mr. Sandrini testified the last time he engaged in leaf
25  pulling for the late whites was sometime in June.  (Sandrini Dep.
26  Tr. p. 162, lns. 8-14).   "Leaf pulling is pulling the bunches
27  that are touching the grapes so that they can get the proper air
28  circulation through there."  (Sandrini Dep. Tr. p. 162, lns. 5-

1  7).   Sandrini's grapes were in a position to be harvested and
2  sold in 2006.  (Sandrini Dep. Tr. p. 163, lns. 11-13).

3      It is argued that these substantial acts, of tending to the
4  Autumn King vines, to bring the grapes to maturity, constitute
5  "use" of Autumn King vines protected by the '284 Patent.  The
6  result of all Sandrini's efforts in 2006 was to produce "late
7  white" grapes for harvest and market.  Sandrini offers no
8  explanation why he would undertake the processes of suckering,
9  spraying, hand tipping, and leaf pulling his vines other than to
10 produce the grapes for sale.  These facts, if proved by
11 admission, constitute a "use" within the meaning of the Patent
12 Act.

13

14         2.   Wilful Infringement

15     The Commission contends Sandrini's infringement was wilful.
16 Sandrini argues he did not wilfully infringe the '284 Patent if,
17 arguendo, the court were to find he did infringe the '284 Patent.
18 Sandrini argues wilful infringement does not exist because he
19 reproduced the Autumn King grapevines and sold Autumn King grapes
20 before the '284 Patent issued.

21     Whether the infringement of a patent was wilful is a
22 question of fact.  Vulcan Eng'g Co., Inc. v. FATA Aluminum, Inc.,
23 278 F.3d 1366, 1378 (Fed. Cir. 2002).  "The rules of patent
24 infringement are rules of business ethics, and require prudent
25 commercial actions in accordance with the law."  Id.  "The tort
26 of wilful infringement arises upon deliberate disregard for the
27 property rights of the patentee."  Id.  The focus is generally on
28 whether the infringer exercised due care to avoid infringement,

1  usually by seeking the advice of competent counsel.  *Id.*  Willful

2  infringement must be proved by clear and convincing evidence in

3  view of the totality of the circumstances that the alleged patent

4  infringer acted in disregard of the patent and lacked a

5  reasonable basis for believing it had a right to do what it did.

6  *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1354

7  (Fed. Cir. 1999).

8  Wilful infringement necessarily requires an underlying

9  finding of infringement, and focuses on intent which is a pure

10 question of fact.  Since infringement cannot be determined until

11 the factual disputes surrounding the public use issue are

12 resolved, necessarily, its character as wilful, cannot now be

13 decided as a matter of law.

14 The Commission's motion for summary judgment on the grounds

15 of wilful infringement is DENIED.

16

17       **D.   Sandrini's License to Practice the '284 Patent**

18 Mr. Sandrini contends he has an express license from the

19 Commission to practice the '284 Patent.  Sandrini argues the

20 Commission offered him a license to practice the '284 Patent,

21 which he accepted.  The Commission rejoins that Sandrini cannot

22 raise a license defense at this late juncture and, even if it

23 could, no license exists because the Commission never offered

24 Sandrini a license he could accept by merely signing and

25 returning a license agreement.

26       **1.   Express or Implied License**

27 "A patent license agreement is in essence nothing more than

28 a promise by the licensor not to sue the licensee."

**43**

1 *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Salzer*

2 *Maschinen-fabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed.

3 Cir. 1987). "Whether express or implied, a license is a contract

4 governed by ordinary principles of state contract law." *State*

5 *Contracting & Eng'g Corp. v. State of Florida*, 258 F.3d 1329,

6 1339 (Fed. Cir. 2001).

7     Here, California law applies to determine whether a valid

8 license agreement exists between the Commission and Sandrini.

9 *See* Cal. Civ. Code § 1646 (stating "[a] contract is to be

10 interpreted according to the law and usage of the place where it

11 is to be performed; or if it does not indicate a place of

12 performance, according to the law and usage of the place where it

13 is made."). The parties do not contest that any law other than

14 California law should apply. Additionally, the Domestic Grower

15 License Agreement ("DGLA") under which Sandrini claims an express

16 license, provides a choice of law provision at Article 10.4:

17 "the provisions of this Agreement, including the provisions of

18 the exhibits hereof, will be interpreted in accordance with the

19 provisions of California law . . . ."

20     "The language of a contract is to govern its interpretation,

21 if the language is clear and explicit, and does not involve an

22 absurdity." Cal. Civ. Code § 1638. "When a contract is reduced

23 to writing, the intention of the parties is to be ascertained

24 from the writing alone, if possible; subject, however, to other

25 provisions of this title." Cal. Civ. Code § 1639.

26     State law principles determine the nature of the agreement

27 between the Commission and Sandrini. *Banner Entm't, Inc. v.*

28 *Superior Court of Los Angeles County*, 62 Cal. App. 4th 348, 357

1   (Cal. Ct. App. 1998).   It is well settled under California law

2   "that there is no contract until there has been a meeting of the

3   minds on *all* material points."   *Id.* at 357-58 (emphasis in

4   original).

5           When it is clear, both from a provision that
            the proposed written contract would become
6           operative only when signed by the parties as
            well as from any other evidence presented by
7           the parties that both parties contemplated
            that acceptance of the contract's terms would
8           be signified by signing it, the failure to
            sign the agreement means no binding contract
9           was created.

10  *Id.* at 358 *citing Beck v. American Health Group Int'l, Inc.*, 211

11  Cal. App. 3d 1555, 1562 (Cal. Ct. App. 1989).   This rule holds

12  true even though the party sought to be bound by the agreement

13  indicated a willingness to sign the agreement.   *Banner*, 62 Cal.

14  App. 4th at 358.[5]

15      "Mutual intent is determinative of contract formation

16  because there is no contract unless the parties thereto assent,

17  and they must assent to the same thing, in the same sense."   *Id.*

18  at 358-59.   "It is essential to the existence of every contract

19  that there should be a reciprocal assent to a definite

20  proposition, *and when the parties to a proposed contract have*

21  *themselves fixed the manner in which their assent is to be*

22  *manifested, an assent thereto, in any other or different mode,*

23  ───────────────

24      [5] If, however, the parties "orally agreed upon all of the
    terms and conditions of a proposed written agreement with the
25  mutual intention that the oral agreement should thereupon become
    binding, the mere fact that a formal written agreement to the
26  same effect has not yet been signed does not alter the binding
    validity of the oral agreement."   *Banner*, 62 Cal. App. 4th at
27  358.   Here, there is no evidence an oral license agreement
    between the Commission and Sandrini exists.
28

1  *will not be presumed*."  *Id.* at 359 (emphasis in original).

2      In 2005, Ms. Nave spoke with Mr. Sandrini regarding his
3  possession of Autumn King plant material.  On November 18, 2005,
4  Mr. Jones sent Mr. Sandrini a letter asking him to sign an
5  affidavit acknowledging Sandrini's possession of Autumn King
6  plant material.  The Commission informed Mr. Sandrini once he
7  signed an affidavit he would be sent an Autumn King Domestic
8  Grower License Agreement to execute.  After Mr. Sandrini signed
9  an affidavit attesting to his possession of Autumn King plant
10 material, the Commission sent him a blank DGLA, which he signed
11 and faxed to the Commission.  The Commission, however, did not
12 sign the faxed DGLA that Mr. Sandrini signed.

13     The DGLA that Mr. Sandrini signed provided:

14          **DOMESTIC GROWER LICENSE AGREEMENT — AUTUMN KING**

15     This Domestic Grower License Agreement (together with the
   exhibits which are attached hereto and hereby incorporated by
16 reference, the "Agreement") entered as of the Effective Date
   designated below by and between the California Table Grape
17 Commission, with a principal place of business at 392 W.
   Fallbrook, Suite 101, Fresno, CA 93711-6150 (hereinafter referred
18 to as the "Commission") and the Grower designated below
   (hereinafter referred to as "Grower").  This Agreement consists
19 of this Signature Page and the attached Basic Terms and
   Conditions, which is hereby incorporated by reference.

20
       *The Commission reserves the right at its own discretion to*
21 *enter into or refuse to enter into this Agreement* and no Wood
   will be provided to the Grower unless and until both the
22 Commission and the Grower execute this Agreement.  By signing
   this Agreement, the Grower agrees to be bound by the terms and
23 conditions set forth on the attached Basic Terms and Conditions
   form, including, without limitation, the restrictions prohibiting
24 Grower from asexually reproducing the Wood provided in Connection
   with this Agreement and from selling, transferring or otherwise
25 providing the Wood to any third party.  (Emphasis added).

26 GROWER: Richard B. Sandrini

27 Address of Principal Place of Business: 10889 Casey Ave.
                                          Delano, Ca 93215
28

Effective Date: this  3rd  day of  January , 2006

Licensed Variety: Autumn King

Planting Details:   Assessor's Parcel Number(s) 521-110-08-00-4
_____  Planting Density 7X12  Total Acreage  49

Total Vines   18,629

    IN WITNESS WHEREOF, the parties hereto have executed this
Agreement effective on the date specified below.

California Table Grape          [GROWER]
Commission

By:_____    By: /s/ Richard B. Sandrini

Name:_____    Name: R.B. Sandrini Farms

Title:_____    Title: Owner

Date:_____


The information in the license agreement was hand written and

only signed by Mr. Sandrini.

    The DGLA Mr. Sandrini signed and returned to the Commission

is not ambiguous, and the parties do not contend that it is.

Therefore, the express language of the license agreement governs

its interpretation,  Cal. Civ. Code § 1638, and the parties'

intentions will be ascertained by looking no further than the

four corners of the license agreement.  Mr. Sandrini does not

claim any oral representations were made to him whether the

Commission would sign the agreement or whether a license would be

granted to him.

    The DGLA explicitly requires signatures from both the

Commission and Sandrini to become effective.  The first paragraph

of the DGLA specifies it is "entered as of the Effective Date

47

1  designated below by and between the . . . Commission and the
2  Grower designated below . . . ."  This provision contemplates
3  that for the DGLA to become effective, both the Commission and
4  Sandrini need to "enter" into the DGLA.  The Commission did not
5  enter into the DGLA with Sandrini because it never signed the
6  agreement.  The second paragraph of the DGLA specifies "[t]he
7  Commission reserves the right at its own discretion to enter into
8  or refuse to enter into this Agreement and no Wood will be
9  provided to the Grower unless and until both the Commission and
10 the Grower execute this Agreement."  This provision expressly
11 states that the Commission reserves its right to enter into or
12 refuse to enter into the license agreement.  The absence of a
13 signature on behalf of the Commission evidences that it refused
14 to enter into the DGLA with Sandrini, and Sandrini does not point
15 to any facts indicating otherwise.  Finally, the last sentence
16 before the space for the parties' signatures provides "IN WITNESS
17 WHEREOF, the parties hereto have executed this Agreement
18 effective on the date specified below."  The absence of a
19 signature on behalf of the Commission, accompanied by the
20 provision in paragraph two reserving the Commission's right to
21 enter into the DGLA, establishes the Commission never executed
22 the DGLA that Mr. Sandrini signed.
23     Sandrini's argument that the Commission's reserved right to
24 enter into the DGLA is merely a condition precedent to the
25 receipt of new plant material and not plant material already in
26 Mr. Sandrini's possession is without merit.  The proper
27 interpretation, an issue of law, when read in conjunction with
28 other provisions in the DGLA, is the Commission, in its

1  discretion, may either enter into a license agreement with a

2  grower, or choose not to.  Here, the condition precedent to

3  receiving Wood is the signature of the Commission and the grower.

4  The condition precedent to receiving Wood is separate and

5  independent from the Commission's discretion to enter into or to

6  not enter into a license agreement with a grower.

7      Giving full effect to all provisions in the DGLA, the

8  agreement specifically requires signatures from both the

9  Commission and Sandrini as conditions precedent to the existence

10 of a valid and operative license agreement.  As the Commission

11 never signed the DGLA, a valid and operative, express written

12 license agreement between the Commission and Sandrini does not

13 exist.  *Banner*, 62 Cal. App. 4th at 358.

14      Sandrini provides no facts to suggest the Commission granted

15 it an implied or an oral license to practice the '284 Patent.

16 Indeed, the only evidence Sandrini submitted regarding a license

17 is that the Commission sent Mr. Sandrini a blank DGLA that he

18 signed and returned to the Commission.  The written license

19 agreement Mr. Sandrini signed reflects the basis for an express

20 license, not an implied license.  With no other facts to support

21 an implied license, Sandrini cannot prove a valid implied license

22 to practice the '284 Patent.[6]

23          2.   Sandrini's Untimely Raising of a License Defense

24      The Commission argues Sandrini failed to raise the existence

25 of a license as an affirmative defense as required by Federal

26 _____

27      [6] At the hearing on the cross motions for summary judgment
   on June 20, 2007, Sandrini acknowledged he was not pursuing an
28 implied or oral license defense.

1  Rule of Civil Procedure 8(c) ("FRCP") and is now barred from
2  doing so.  Sandrini, on the other hand, argues its Fifth and
3  Tenth Affirmative Defenses of estoppel and misuse, respectively,
4  are predicated on the fact the Commission granted Sandrini a
5  license in the '284 Patent.

6      "The doctrines of legal estoppel and equitable estoppel have
7  been applied by courts to imply a license." *Spindelfabrik*, 829
8  F.2d at 1080.  Legal estoppel "is merely a shorthand for saying
9  the grantor of a property right or interest cannot derogate from
10  the right granted by his own subsequent acts." *Id.*  The rationale
11  "is to estop the grantor from taking back that for which he
12  received consideration."  *Id.*

13      Sandrini's Fifth Affirmative Defense provides "[t]he
14  Commission's claim for infringement of the '284 patent is limited
15  and/or barred by the equitable doctrines of laches, estoppel, and
16  unclean hands.  While Sandrini could have pleaded its license
17  defense in a clearer manner, its Fifth Affirmative Defense of
18  estoppel encompasses a license defense and is  sufficient to
19  satisfy the pleading standard of FRCP 8(c).  *Spindelfabrik*, 829
20  F.2d at 1080.  The Commission could have, but did not raise a
21  Rule 12 motion to Sandrini's defenses and has had ample time to
22  propound discovery to ascertain the facts supporting the estoppel
23  defense.

24      Sandrini's motion for summary judgment on a theory of an
25  express or implied license is DENIED.

26      E.   The Commission's § 17200 Cause of Action

27      The Commission contends Sandrini is liable for "unfair
28  competition" under California Business and Professions Code §

**50**

1   17200.  Specifically, the Commission contends Sandrini unlawfully

2   infringed the '284 Patent, Sandrini unlawfully and unfairly used

3   misappropriated USDA property for his own gain at the expense of

4   other growers, and Sandrini unlawfully and unfairly concealed his

5   actions.  Sandrini, on the other hand, contends he is not liable

6   under § 17200 for several reasons.  First, Sandrini did not

7   infringe any proprietary rights held by the USDA before or after

8   the '284 Patent issued.  Second, the Commission is not a "person"

9   with standing to sue under § 17200.  Third, the Commission lacks

10  standing to assert a § 17200 cause of action because it is not an

11  "aggrieved person" as defined by statute.    Fourth, the

12  Commission does not assert any facts indicating Sandrini stole

13  Autumn King plant materials.

14      Business and Professions Code sections 17200-17210 is known

15  as California's unfair competition law, which provides remedies

16  for a wide range of unfair business practices.  Under § 17200,

17  unfair competition "mean[s] and includes any unlawful, unfair or

18  fraudulent business act or practice . . . ."  Cal. Bus. & Prof.

19  Code § 17200.

20      "An unfair business practice occurs when the practice

21  offends an established public policy or when the practice is

22  immoral, unethical, oppressive, unscrupulous or substantially

23  injurious to consumers."  *People v. Duz-Mor Diagnostic Lab.,*

24  *Inc.*, 68 Cal. App. 4th 654, 662 (Cal. Ct. App. 1998).  The test

25  of whether a business practice is unfair under § 17200 involves

26  an examination of [that practice's] impact on its alleged victim,

27  balanced against the reasons, justifications and motives of the

28  alleged wrongdoer[,] . . . [and] the court must weigh the utility

51

1  of the defendant's conduct against the gravity of the harm to the

2  alleged victim." *Id.*

3       An unlawful business practice under § 17200 occurs when a

4  person violates a law. *Cel-Tech Communications, Inc. v. Los*

5  *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999).

6  Section 17200 borrows violations of other laws and treats them as

7  unlawful actions that are independently actionable under § 17200.

8  *Id.*

9       Here, the Commission contends Sandrini used misappropriated

10 Autumn King plant material to infringe the '284 Patent.  The

11 Commission also contends Sandrini took possession of

12 misappropriated USDA property without authorization from the

13 USDA, and with knowledge it was an unreleased variety.  Sandrini

14 contends there is no evidence indicating Sandrini was the one who

15 stole the Autumn King plant materials.

16      The Commission also contends Sandrini attempted to conceal

17 his wrongful actions by violating regulatory and criminal laws.

18 Specifically, Sandrini falsified invoices and bills of lading by

19 identifying Autumn King grapes as Thompson Seedless grapes, when

20 Sandrini knew they were not Thompson Seedless grapes.  Sandrini

21 shipped Autumn King grapes in containers bearing false labels in

22 direct contravention of California shipping regulations.

23 Sandrini committed a misdemeanor by falsifying shipping reports

24 with the Commission.  Sandrini, on the other hand, contends he

25 was not trying to conceal the identity of the Autumn King grapes.

26 Sandrini labeled the Autumn King grapes as Thompson Seedless

27 grapes because he did not know the name of the Autumn King

28 variety.

1    Sandrini argues the Commission lacks standing to bring a §
2  17200 cause of action because it is not an "aggrieved person" as
3  defined by statute as the Commission has not suffered an injury
4  or lost money as a result of unfair competition.  The Commission
5  contends it has been injured because it did not receive any vine
6  royalties that would have been collected by an authorized nursery
7  had Sandrini purchased its Autumn King vines through the proper
8  channels.  The Commission's lost royalties are a legally
9  cognizable injury that give the Commission standing to assert a §
10 17200 cause of action.

11   Sandrini contends the Commission is not a "person" with
12 standing to sue under § 17200.  The Commission, on the other
13 hand, agrees that it is a governmental entity, but that fact is
14 not determinative of whether it may bring suit under § 17200.  In
15 support of its argument, the Commission contends § 17204
16 authorizes corporations to bring suit under § 17200, and the
17 Ketchum Act, in turn, provides the Commission shall "have and
18 possess all of the powers of a corporation."

19   The Ketchum Act specifically provides "[t]he California
20 Table Grape Commission *shall be and is hereby declared a*
21 *corporate body*."  Cal. Food & Agric. Code § 65551 (emphasis
22 added).  The Ketchum Act further provides the Commission "shall
23 have the power to sue and be sued, to contract and be contracted
24 with, *and to have and possess all of the powers of a*
25 *corporation*."  *Id.* (emphasis added).

26   The Ketchum Act specifically declares the Commission a
27 "corporate body," which "possesses all of the powers of a
28 corporation."  As § 17204 specifically provides a "person" may

                                53

1  sue under § 17200, and § 17201 defines "person" as including

2  corporations, the Commission has standing to sue under § 17200 as

3  a corporation.

4      As genuine issues of material fact exist regarding the

5  Commission's § 17200 cause of action, the Commission's motion for

6  summary judgment is DENIED.

7

8      E.   Preemption of the Commission's State Law Causes of

9           Action

10     Sandrini contends the Commission's state law causes of

11 action for unfair competition under § 17200, intentional

12 interference with prospective economic advantage, and unjust

13 enrichment are all predicated on Sandrini's alleged possession of

14 Autumn King plant material without a license from the Commission.

15 Because the Commission seeks damages for its state law claims,

16 which are predicated on Sandrini's infringement of the '284

17 Patent, they are preempted.  The Commission, on the other hand,

18 contends its state law causes of action are not preempted by

19 federal patent law because the state law claims are not entirely

20 predicated on the facts giving rise to its patent law claim.

21     Federal patent law may preempt state law if it "stands as an

22 obstacle to the accomplishment and execution of the full purposes

23 and objectives of Congress."  *Kewanee Oil Co. v. Bicron Corp.*,

24 416 U.S. 470, 479 (1974).  "When state law touches upon the area

25 of federal statutes enacted pursuant to constitutional authority,

26 it is familiar doctrine that the federal policy may not be set at

27 naught, or its benefits denied by the state law."  *Id.* at 479–80.

28     Patent law will not preempt state law claims if such claims

**54**

1  "include additional elements not found in the federal patent law

2  cause of action and if they are not an impermissible attempt to

3  offer patent-like protection to subject matter addressed by

4  federal law." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294,

5  1306 (Fed. Cir. 1999).

6      Tortious interference with prospective economic relations

7  "requires proof that the defendant intentionally engaged in acts

8  wrongful by some measure other that the fact of the interference

9  itself which are designed to disrupt an economic relationship

10 between the plaintiff and another." *Id.* (citing *Della Penna v.*

11 *Toyota Motor Sales U.S.A., Inc.*, 11 Cal. 4th 376 (Cal. 1995).)

12 "Tortious interference protects business relationships." *Rodime*,

13 174 F.3d at 1306.

14      Unfair competition requires a plaintiff to prove the

15 defendant "engaged in an unfair business practice, that is, a

16 business practice that is immoral, unethical, oppressive,

17 unscrupulous, or substantially injurious." *Id.* (citing *People v.*

18 *Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 206

19 (Cal. Ct. App. 1984)).  "Unfair competition prevents unethical

20 and oppressive business practices." *Rodime*, 174 F.3d at 1306.

21      In *Rodime*, the Federal Circuit addressed whether, under

22 California law, tortious interference with prospective economic

23 relations and unfair competition were preempted by federal patent

24 law.  The court held that "these state law causes of action do

25 not constitute an impermissible attempt to offer patent-like

26 protection to subject matter addressed by federal law." *Id.*  The

27 court held "because these state law causes of action protect

28 interests different from federal patent law, federal law does not

55

1  preempt [the plaintiff's] state law claims."  *Id.*

2      The Commission's state law claims are not foreclosed as a

3  matter of law because they have different elements and do not

4  constitute an impermissible attempt to offer patent-like

5  protection.  Sandrini's motion for summary judgment as to the

6  Commission's state law claims is DENIED.

7

8                  **V.  <u>Conclusion</u>**

9      The Commission's motion for summary judgment on the grounds

10  it has statutory authority to engage in its patent licensing

11  program is GRANTED, and Sandrini's motion for summary judgment on

12  the grounds the Commission lacks statutory authority to engage in

13  its patent licensing program is DENIED.

14      The Commission's motion for summary judgment seeking to

15  establish that the '284 Patent is not invalid under the public

16  use bar of 35 U.S.C. § 102(b) is DENIED.  Sandrini's motion for

17  summary judgment seeking to establish that the '284 Patent is

18  invalid under the public use bar of 35 U.S.C. § 102(b) is DENIED.

19      The Commission's motion for summary judgment on the grounds

20  Sandrini infringed the '284 Patent is DENIED.  The Commission's

21  motion for summary judgment on the grounds Sandrini's

22  infringement of the '284 Patent was willful is DENIED.

23      Sandrini's motion for summary judgment on the grounds the

24  Commission granted it an express license to practice the '284

25  Patent is DENIED.

26      The Commission's motion for summary judgment on the grounds

27  Sandrini's conduct was unlawful, unfair, or fraudulent under

28  California Business and Professions Code § 17200 is DENIED.

**56**

1    Sandrini's motion for summary judgment on the grounds the
2  Commission's state law causes of action are preempted by the
3  Patent Act is DENIED.

4

5  DATED:  6/27/2007            /s/ Oliver W. Wanger
6                              United States District Judge
7                              Oliver W. Wanger